**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

WINGS TO GO, INC.,
        Plaintiff,    :
                    :
    v.               :    CIVIL ACTION
                    :
YUSUF KARACAOGLU,    :    NO._____
ERGUN OLUS,
WING SHOP LLC, f/k/a RS KITCHEN LLC,
                    :
    and            :
                    :
JOHN DOES 1-100,        :
         Defendants.  :

**CASE MANAGEMENT TRACK DESIGNATION FORM**

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants.  (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a)    Habeas Corpus – Cases brought under 28 U.S.C. §2241 through §2255.    ☐

(b)    Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits.    ☐

(c)    Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.    ☐

(d)    Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos.    ☐

(e)    Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and    ☐

that need special or intense management by the court.  (See reverse side of this form for a detailed explanation of special management cases.)

(f)     Standard Management – Cases that do not fall into any one         **X**
        of the other tracks.


DUANE MORRIS LLP


_____/s/ Ryan E. Borneman_____
J. Manly Parks (74647)
E-mail:jmparks@duanemorris.com
Ryan E. Borneman (203540)
E-mail:reborneman@duanemorris.com
Adrienne Gittens (314367)
E-mail:agittens@duanemorris.com

30 South 17th Street
Philadelphia, PA  19103-4196
Telephone: +1 215 979 1000
Fax: +1 215 979 1020

*Attorneys for Wings To Go, Inc.*

Dated: August 6, 2014

JS 44   (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Wings To Go, Inc.

**DEFENDANTS**
Yusuf Karacaoglu,
Ergun Olus,
Wingshop LLC f/k/a RS Kitchen LLC, and
John Does 1-100

**(b)** County of Residence of First Listed Plaintiff   Anne Arundel Cnty., MD
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Philadelphia Cnty., PA
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Duane Morris LLP
30 S. 17ᵗʰ Street 19103-4196
(215) 979-1000

Attorneys *(If Known)*
Unknown

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1   U.S. Government
Plaintiff

☒ 3   Federal Question
*(U.S. Government Not a Party)*

☐ 2   U.S. Government
Defendant

☐ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| | | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | | ☐ 790 Other Labor Litigation | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☒ 196 Franchise | | | ☐ 791 Employee Retirement Income Security Act | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from Another District *(specify)*   ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. §§ 1114, 1116, 1117 and 1125; 28 U.S.C. § 1332

Brief description of cause:
Lanham Act and state law trademark infringement and unfair competition, tortious interference, and breach of contract

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $   damages, attorneys' fees, and injunctive relief

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

**VIII.  RELATED CASE(S)**
**IF ANY**        *(See instructions):*        JUDGE _____ DOCKET NUMBER _____

DATE *Aug 6, 2014*            SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

JS 44 Reverse  (Rev. 12/12)

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

Authority For Civil Cover Sheet

**DUANE MORRIS** LLP
By:    J. Manly Parks
        Ryan E. Borneman
        Adrienne Gittens
30 South 17th Street
Philadelphia, PA 19103-4196
Telephone: +1 215 979 1342/1105/1818
Fax: +1 215 979 1020
JMParks@duanemorris.com
REBorneman@duanemorris.com
AGittens@duanemorris.com

*Attorneys for Wings To Go, Inc.*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WINGS TO GO, INC., | : |
| Plaintiff, | : |
| | : |
| v. | :    CIVIL ACTION NO. |
| | : |
| YUSUF KARACAOGLU, | : |
| ERGUN OLUS, WING SHOP LLC, f/k/a | : |
| RS KITCHEN LLC and | : |
| JOHN DOES 1-100 | : |
| Defendants. | : |

## DISCLOSURE STATEMENT OF WINGS TO GO, INC. PURSUANT TO FED. R. CIV. P. 7.1

Plaintiff Wings-To-Go, Inc. ("***WTG***"), by and through its undersigned counsel, and

pursuant to Fed. R. Civ. P. 7.1, hereby states as follows:

    1.  WTG does not have any parent corporation.

2.  No publicly held corporation owns 10% or more of WTG's stock.

DUANE MORRIS LLP


____/s/ Ryan E. Borneman_____
J. Manly Parks (74647)
E-mail:jmparks@duanemorris.com
Ryan E. Borneman (203540)
E-mail:reborneman@duanemorris.com
Adrienne Gittens (314367)
E-mail:agittens@duanemorris.com

30 South 17th Street
Philadelphia, PA  19103-4196
Telephone: +1 215 979 1000
Fax: +1 215 979 1020

*Attorneys for Wings To Go, Inc.*

Dated: August 6, 2014

DM1\4944686.1

# UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM** to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: 403 Headquarters Dr., Suite 5 Millersville, MD 21108

Address of Defendant: Yusuf Karacaoglu - 4144 Orchard Street, Philadelphia, PA 19124; Ergun Olus - 2301 Tremont St., Apt. H208, Philadelphia, PA 19115; Wing Shop LLC - 2927 Kensington Ave., Philadelphia  PA 19134

Place of Accident, Incident or Transaction: 7109 Frankford Ave, Philadelphia, PA 19136 , 408 Doylestown Rd, Montgomeryville, PA 18936, and 1817 Cottman Avenue, Philadelphia, PA 19111

*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))    Yes ☐  No ☒

Does this case involve multidistrict litigation possibilities?    Yes ☐  No ☒

*RELATED CASE, IF ANY:*

Case Number: _____  Judge _____  Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?

    Yes ☐  No ☒

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?

    Yes ☒  No ☐

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?

    Yes ☐  No ☒

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?

    Yes ☐  No ☒

CIVIL: (Place ✓ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☒ All other Federal Question Cases
    (Please specify) Lanham Act, 15 USC s 1125

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
    (Please specify) _____

## ARBITRATION CERTIFICATION

*(Check Appropriate Category)*

I, Ryan E. Borneman _____, counsel of record do hereby certify:

☒ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☒ Relief other than monetary damages is sought.

DATE: August 6, 2014        Ryan E. Borneman                203540

Attorney-at-Law                Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: August 6, 2014        Ryan E. Borneman                203540

CIV. 609 (5/2012)

American LegalNet, Inc.
www.FormsWorkFlow.com

**DUANE MORRIS LLP**
By:    J. Manly Parks
        Ryan E. Borneman
        Adrienne Gittens
30 South 17th Street
Philadelphia, PA  19103-4196
Telephone: +1 215 979 1342/1105/1818
Fax: +1 215 979 1020
JMParks@duanemorris.com
REBorneman@duanemorris.com
AGittens@duanemorris.com

*Attorneys for Wings To Go, Inc.*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| WINGS TO GO, INC., | : |
| | : |
| Plaintiff, | : |
| | : |
| | : |
| v. | :    CIVIL ACTION NO. |
| | :    _____ |
| YUSUF KARACAOGLU, | : |
| ERGUN OLUS, WING SHOP LLC, f/k/a | : |
| RS KITCHEN LLC and | : |
| JOHN DOES 1-100 | : |
| | : |
| Defendants. | : |

## COMPLAINT

Plaintiff Wings-To-Go, Inc. ("*WTG*"), by and through its undersigned counsel, hereby

files this Complaint against Defendants Yusuf Karacaoglu ("*Karacaoglu*"), Ergun Olus

("*Olus*"), Wing Shop LLC f/k/a RS Kitchen LLC ("*RSK*") and John Does 1-100 (collectively

referred herein as "*Defendants*"), and alleges as follows:

## NATURE OF ACTION

1.      WTG franchises and licenses the nationwide chain of Wings To Go® restaurants. Karacaoglu is the former franchisee of two Wings To Go® restaurants in the Philadelphia, Pennsylvania area, pursuant to franchise agreements with WTG.  Olus is the current and/or former partner of Karacaoglu and was a co-franchisee of a Wings To Go® restaurant in Philadelphia, Pennsylvania.  Karacaogul and Olus operated a Wings To Go® restaurant franchisee individually or in the name of RSK.

2.      Karacaoglu currently owns and operates three "Wing Shop" restaurants in violation of his franchise agreements with WTG.  These restaurants are located at 7109 Frankford Ave, Philadelphia, PA 19136 (the "***Frankford Avenue Location***"), 408 Doylestown Rd, Montgomeryville, PA 18936 (the "***Montgomeryville Location***"), and 1817 Cottman Avenue, Philadelphia, PA 19111 (the "***Cottman Avenue Location***") (collectively referred herein as the "***Karacaoglu Locations***").

3.      Karacaoglu became the lawful franchisee of a Wings to Go® restaurant located at the Frankford Avenue Location in 2010, at which point he entered into a Wings To Go® Franchise Agreement (the "***Frankford Franchise Agreement***").  The Frankford Franchise Agreement granted Karacaoglu a limited license to use Wings To Go® trademarks and trade secrets in connection with operating the Frankford Avenue Location.  Frankford Franchise Agreement, ¶ 1.1 attached hereto as Exhibit A.  The Frankford Franchise Agreement included a non-compete provision prohibiting Karacaoglu from owning, maintaining, operating, *et cetera*, a similar restaurant within ten miles of the Frankford Avenue Location or any other Wings To Go® restaurant.  The non-competition provision was effective both during the term of the Frankford Franchise Agreement and for a period of two years after the Agreement's termination

- 2 -

or expiration.  Frankford Franchise Agreement, at ¶ 17.3 and Ex. D "Confidentiality and Non-Competition Agreement" at ¶ 6.

4.      Later that year, the franchise rights were transferred to Karacaoglu and Olus as fifty-percent interest owners in the business.

5.      In or around January 2013, WTG learned that Karacaoglu and Taras Jurczak ("*Jurczak*"), who was at that time the Wings To Go® franchisee of the Montgomeryville Location had contracted to assign the Wings To Go® franchise agreement for the Montgomeryville Location ("*Montgomeryville Franchise Agreement*") to Karacaoglu.

6.      Karacaoglu and Jurczak subsequently contracted to assign the Montgomeryville Franchise Agreement to Karacaoglu, and Karacaoglu thereafter commenced operating the Montgomeryville Location as a Wings To Go® restaurant.

7.      In or around June 2012, Karacaoglu contacted WTG seeking to obtain franchise rights to operate a WTG restaurant at the Cottman Avenue Location.  WTG denied this request due to operational deficiencies at the Frankford Avenue Location.

8.      Unhappy with WTG's refusal of his request for a franchise for the Cottman Avenue Location, Karacaoglu then unlawfully converted the Frankford Avenue and Montgomeryville Locations from Wings To Go® franchise restaurants to competing "Wing Shop" restaurants.  Karacaoglu also proceeded to open a "Wing Shop" restaurant at the Cottman Avenue Location, which is within 10 miles of the Frankford Avenue Location.

9.      After converting the Karacaoglu Locations to "Wing Shop" restaurants, Karacaoglu used WTG's Marks in connection with all of the Karacaoglu Locations and intentionally caused confusion to consumers regarding whether the Karacaoglu Locations were affiliated with WTG and the Wings To Go® brand.

10.     Karacaoglu then attempted to convince other WTG franchisees to convert their Wings To Go® restaurants to "Wing Shop" restaurants in violation of their respective Wings to Go® franchise agreements.

11.     WTG seeks damages for the Defendants' breaches of the Frankford and Montgomeryville Franchise Agreements, for Karacaoglu's tortious interference with WTG's contractual relations with its franchisees, and for trademark infringement and unfair competition. WTG further seeks injunctive relief, treble damages, punitive damages, and attorneys' fees for the Defendants' unlawful trademark infringement and unfair competition. WTG also seeks a declaratory judgment that the Franchise Agreements have been terminated and are no longer in effect, with the exception of the provisions of the Franchise Agreements that survive termination.

## JURISDICTION AND VENUE

12.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1338 because WTG has set forth claims under the Lanham Act, 15 U.S.C. §§ 1114, 1116, 1117 and 1125. This Court has supplemental jurisdiction over WTG's common law trademark infringement and unfair competition claims pursuant to 28 U.S.C. § 1367.

13.     The Court has subject matter jurisdiction over WTG's state law claims pursuant to 28 U.S.C. § 1332 because of the diversity of citizenship of the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 (b)(2), because a substantial part of the events or omissions giving rise to the claims herein occurred in this judicial district.

## PARTIES

15.     WTG is a corporation organized and existing under the laws of Delaware with its principal place of business located at 403 Headquarters Dr., Suite 5 Millersville, MD 21108.

- 4 -

16.     Karacaoglu, an adult individual, is a citizen of Pennsylvania and resides at 4144 Orchard Street, Philadelphia, PA 19124.

17.     Olus, an adult individual, is a citizen of Pennsylvania and resides at 2301 Tremont St., Apt. H208, Philadelphia, PA 19115.

18.     RSK is a Pennsylvania Limited Liability Company created in January 2010 located at 2927 Kensington Ave., Philadelphia PA  19134.  RSK subsequently changed its name from RS Kitchen LLC to Wing Shop LLC.

19.     John Does 1-100 are individuals to whom Karacaoglu may have transferred any ownership interest in Karacaoglu's former Wings To Go® restaurants and/or who have otherwise acted with or on behalf of Karacaoglu in carrying out the conduct on which WTG's claims as set forth herein are based.

## FACTUAL ALLEGATIONS

I.     **The WTG System and Marks**

20.     The WTG System is a comprehensive business format for the establishment, operation and development of high-standard wing-themed restaurants with distinctive features in products, services, and training.  The WTG System is designed to ensure that WTG and the services and products offered therein meet uniform, high quality standards.  The WTG System is also designed to protect WTG's name and reputation.  As such, all WTG franchise agreements require franchisees to comply with the WTG System in the operation of their Wings To Go® restaurants.

21.     The WTG System is widely known and favorably recognized by consumers. Consumers choose WTG because of WTG's reputation for, *inter alia*, quality and service.  The WTG System is founded upon adherence to WTG's standards and specifications.

22.     WTG owns the federally-registered Wings To Go® trademark, service marks, logo and derivations thereof (the "*Marks*") as well as the distinctive and well-known Wings To Go® system.  Among the trademark registrations owned by WTG are: WINGS TO GO & Design 1,681, 537 March 31, 1992; W WINGS TO GO & Design 3, 391,935 March 4, 2008; WINGS TO GO 3,391,934 March 4, 2008; HOMICIDE 3,401,900 March 25, 2008; and W WINGS TO GO & Design 3,462,346 July 8, 2008.

23.     The WTG Marks are registered on the Principal Register of the United States Patent and Trademark Office.  These registrations continue in full force and effect and all those eligible are incontestable under Section 15 of the Lanham Act, 15 U.S.C. § 1065.

24.     WTG has given notice to the public of the registration of the WTG Marks as provided in 15 U.S.C. § 1111 and complies with all legal requirements to ensure that WTG and its authorized licensees remain the exclusive users of the WTG Marks.

25.     WTG has continuously used the WTG Marks in interstate commerce in connection with the promotion and licensing of Wings To Go® businesses and the services they offer throughout the United States, including in the Commonwealth of Pennsylvania, since the date of their registration.

26.     WTG and its authorized franchisees use the WTG Marks as the marks and trade identity by which the products and services offered by WTG and its franchisees are distinguished from other restaurant businesses and the products and services offered by them.

27.     In addition to its registered Marks, WTG has developed numerous trademarks, including, but not limited to, Simply Great Wings!™ (also referred herein as the "*Marks*").

28.     WTG and its authorized franchisees have extensively advertised and promoted Wings To Go® businesses and the services they offer under the WTG Marks throughout the

- 6 -

United States and through various media.  The substantial efforts of WTG and its predecessors include: (1) the development of methods for maintaining the quality and uniformity of products sold by franchisees; (2) the development of uniform designs and markings for equipment and packaging; (3) the development of unique and proprietary menu items; (4) the development of promotional materials; and (5) the training and education of franchisees and store operators for the proper operation of a Wings To Go® restaurant.

29.     As a result of such efforts and the considerable money spent in connection therewith, the services offered by WTG and its licensees under the WTG Marks have met with widespread public approval and have established demand and goodwill among consumers throughout the United States, including in the Commonwealth of Pennsylvania.  The Marks have become associated in the minds of consumers with products of consistently high quality, including award-winning buffalo wings and sauces, which are sold in clean, attractive, and distinctively furnished restaurants.

30.     WTG licenses the use of the Marks, trade secrets, and intellectual property to franchisees upon the execution of a franchise agreement, thereby allowing franchisees to benefit from the goodwill generated by the WTG Marks.

## II.     The Frankford Avenue Location Franchise Agreement

31.     In December 2010, the Frankford Franchise Agreement with WTG was transferred to Karacaoglu and Olus as co-franchisees.

32.     The Frankford Franchise Agreement authorized Karacaoglu, Olus and RSK to operate a Wings To Go® restaurant at the Frankford Avenue Location and utilize the Marks to prepare and market WTG-approved products *at that location only*.  *See* Frankford Franchise Agreement, ¶ 1.1-.2.

- 7 -

33.     In the Frankford Franchise Agreement, Karacaoglu, Olus and RSK further agreed to "operate the Restaurant in strict conformity with such methods, standards, and specifications, as Franchisor may from time to time prescribe" and to ensure that all "materials, signs, decorations and other items specified by Franchisor bear the Proprietary Marks in the form, color, location, and manner prescribed by Franchisor." Frankford Franchise Agreement, ¶¶ 7.2, 7.9, 8.2.

34.     Pursuant to Paragraph 2.1, the Frankford Franchise Agreement had an initial term of ten years, with an option for renewal.

35.     In accordance with Paragraph 4.2 of the Frankford Franchise Agreement, Karazaoglu, Olus and RSK agreed to pay a continuing monthly royalty fee to WTG at the rate of four percent of the gross revenue from the Frankford Avenue Location.

36.     The Frankford Franchise Agreement further required Karacaoglu, Olus and RSK to submit monthly to WTG current financial statements.  Frankford Franchise Agreement, ¶ 11.1.

37.     In addition to the provisions limiting the use of the WTG Marks, Karacaoglu, Olus and RSK agreed to "promptly notify Franchisor of any suspected unauthorized use of the Proprietary Marks."  Frankford Franchise Agreement, ¶ 8.2.8.

38.     Pursuant to Paragraph 8.3 of the Frankford Franchise Agreement, Karacaoglu, Olus and RSK acknowledged that the WTG system and any benefits derived therefrom are the sole property of WTG.

39.     The Frankford Franchise Agreement also contained detailed post-termination provisions.

40.     Pursuant to Paragraph 16 of the Frankford Franchise Agreement, Karacaoglu, Olus and RSK agreed that upon the termination of the franchise rights they would not

appropriate, use, or duplicate the WTG System, or any portion of it, or any computer software used in connection with it, for use at any other retail business or to divert any business to another restaurant, own a competing restaurant or use any WTG trade secrets.

41.     In Paragraph 16 of the Frankford Franchise Agreement, Karacaoglu, Olus and RSK agreed not to use any such information in any other business or in any manner not specifically authorized or approved in writing by WTG.

42.     Pursuant to Paragraph 16.9 of the Frankford Franchise Agreement, Karacaoglu, Olus and RSK further agreed to return to WTG all copies of the manuals and all other material containing WTG trade secrets, operating instructions, or business practices.

43.     In Paragraph 16.4 of the Frankford Franchise Agreement, Karacaoglu, Olus and RSK agreed, upon the termination or expiration of the franchise rights and at WTG's option, to assign to WTG any interest which Karacaoglu, Olus and RSK had in any lease or sublease for the Frankford Avenue Location.  In the event that WTG elected not to exercise its option to acquire the lease, Karacaoglu, Olus and RSK agreed to make any modifications or alterations to the premises in order to "distinguish the appearance of the premises from that of" a Wings To Go® restaurant.

44.     Significantly, Karacaoglu, Olus and RSK also agreed to a covenant not to compete, both during the term of the Agreement and post-termination, as part of the Frankford Franchise Agreement.  Frankford Franchise Agreement, ¶ 10, 17.3.  Pursuant to Exhibit E "Confidentiality and Non-Competition Agreement" attached to the Frankford Franchise Agreement, Karacaoglu, Olus and RSK also agreed as follows:

> 2.     As a stockholder, director, officer, member and/or employee of Franchisee, I will receive valuable confidential information, disclosure of which would be detrimental to Franchisor and Franchisee, including, without limitation, the Manual, recipes, cooking methods, preparation of menu items, drawings,

suppliers, equipment, product costs, accounting methods, management tools, or advertising, which may be communicated to me or of which I may be apprised by virtue of my position with Franchisee, which are beyond the present skills and experience possessed by me.  This list of confidential matters is illustrative only and does not include all matters considered confidential by Franchisor and Franchisee.

3.     I will hold in strict confidence all information designed by Franchisor or Franchisee as confidential…

4.     While in my position with Franchisee, I will not do anything which may injure Franchisee or Franchisor, such as (a) divert or attempt to divert any present or prospective business or customer of any Wings to Go restaurant to any competitor, by direct or indirect inducement or otherwise; (b) do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with Franchisor's marks and the System; or (c) employ or seek to employ any person who is at that time been employed by Franchisor or any franchisee of Franchisor (including Franchisee), or otherwise directly or indirectly induce such person to leave his or her employment.

5.     While in my position with Franchisee, I will not own, maintain, operate, engage in, be employed by, provide assistance to, or have any interest in (as owner or otherwise) any business that offers, sells or manufactures products or services which are the same as or similar to the products and services offered by the Restaurant under the System including, but not limited to, chicken wings. Provided, however, that this Paragraph 5 shall not apply to my current position with Franchisee.

6.     For two (2) years after I cease to be in my position with Franchisee, I will not own, maintain, operate, engage in, be employed by, provide assistance to, or have any interest in (as owner or otherwise) any business that:  (a)(i) is the same as, or substantially similar to, a Wings To Go restaurant; or (ii) offers, sells or manufactures products or services which are the same as or similar to the products and services offered by the Restaurant under the System, including, but not limited to, chicken wings; and (b) is, or is intended to be, located at or within:  (i) Franchisee's Territory, which I acknowledge has been described to me; (ii) ten (10) miles of the Restaurant; or ten (10) miles of any Wings to Go restaurant.

45.     In Paragraphs 16.8 of the Frankford Franchise Agreement, Karacaoglu, Olus and RSK agreed that damages alone could not compensate WTG if there were a violation of the non-competition covenant in the Franchise Agreement.  Karacaoglu, Olus and RSK also agreed that any alleged violation of the non-competition covenant would give WTG the right to seek

injunctive relief, in addition to any other remedies that may be available to WTG at law or in equity.

46.     Pursuant to Paragraph 17.6 of the Frankford Franchise Agreement, Karacaoglu, Olus and RSK agreed to compensate WTG for any costs and expenses, including reasonable attorneys' fees, that WTG incurred if it prevails in a judicial proceeding to enforce the Agreement.

**III.     Karacaoglu's Assignment of the Montgomeryville Franchise Agreement**

47.     After executing the Frankford Franchise Agreement, Karacaoglu subsequently sought WTG's consent to the assignment of the Montgomeryville Franchise Agreement from Jurczak, who was as that time the WTG franchisee for the Montgomeryville Location.

48.     The Montgomeryville Franchise Agreement contained virtually identical terms to the Frankford Franchise Agreement. *See* Montgomeryville Franchise Agreement attached as Ex. B.  Specifically, the Montgomeryville Franchise Agreement contained the following terms:

- a limited license to use Wings To Go® trademarks and trade secrets, ¶ 1.5;

- non-competition provision that was effective both during the term of the Montgomeryville Franchise Agreement and for a period of two years after the Agreement's termination or expiration, ¶ 12.2;

- to "strictly comply with all standards, specifications, processes, procedures, requirements, and instructions of WTG regarding the Operation of the Restaurant" and to "display the Marks and other commercial symbols only in a manner approved by WTG," ¶¶ 4.2, 4.9;

- initial term of ten years, ¶ 3.1;

- to pay a continuing weekly royalty fee to WTG at the rate of four percent of the gross revenue, ¶ 7.1;

- to "submit to WTG current financial statements and other such reports as WTG may reasonably request to evaluate or compile research data on any aspects of the Restaurant or the Franchisee's business," ¶ 9.1;

- to "immediately notify WTG of all infringements or imitations of the Marks or know-how which come to its attention," ¶ 4.5;

- upon the termination of the franchise rights, to not appropriate, use, or duplicate the WTG System, or any portion of it, or any computer software used in connection with it, for use at any other retail business or to divert any business to another restaurant, own a competing restaurant or use any WTG trade secrets, ¶ 12.2;

- upon termination, to return to WTG all copies of the manuals, the point-of-sale computer software, and all other material containing WTG trade secrets, operating instructions, or business practices, ¶ 14.5.5;

- upon the termination or expiration of the franchise rights and at WTG's option, to assign to WTG any interest which Karacaoglu had in any lease or sublease for the Montgomeryville Avenue Location.  In the event that WTG elected not to exercise its option to acquire the lease, Karacaoglu agreed to make any modifications or alterations to the premises, including, but not limited to changing and assigning the telephone number to WTG, in order to "distinguish the appearance of the premises from that of" a Wings To Go® restaurant, ¶ 14.5.2;

- damages alone could not compensate WTG if there were a violation of the non-competition covenant in the Franchise Agreement, ¶ 12.5, 14; and

- to compensate WTG for any costs and expenses, including reasonable attorneys' fees, that WTG incurred if it prevails in a judicial proceeding to enforce the Agreement, ¶ 15.9.

49.     In or around January 2013, WTG learned that Jurczak had assigned the Montgomeryville Franchise Agreement to Karacaoglu, without prior authorization from WTG.

50.     Karacaoglu thereafter began operating the Wings To Go® restaurant at that location using the WTG marks and selling WTG-approved products.

## IV.     The Cottman Avenue Location and Karacaoglu's Retaliatory Opening of the "Wing Shop" Restaurants

51.     Karacaoglu also sought to franchise an additional Wings To Go® restaurant at the Cottman Avenue Location.

52.     WTG expressly denied this request, citing operational and performance deficiencies with the Frankford Avenue Location.

53.     Despite WTG's express denial of Karacaoglu's request for a WTG franchise for the Cottman Avenue Location, Karacaoglu leased the site and commenced building out a restaurant there.  Karacaoglu initially hung a large "Wings To Go®" sign above the front entrance for the Cottman Avenue Location.

54.     Karacaoglu also began withholding royalty payments from WTG for the Frankford Avenue and Montgomeryville Locations that were required under the Frankford Avenue Franchise Agreement and Montgomeryville Franchise Agreement.

55.     Around this same time, during a meeting with WTG representatives, Karacaoglu admitted to underreporting sales at the Montgomeryville and Frankford Avenue Locations. According to Karacaoglu, the sales at those locations were 3 to 4 times higher than reported, thus depriving WTG of the correct amount of royalties owed under the Montgomeryville and Frankford Franchise Agreements.

56.     On May 29, 2013, legal counsel for WTG sent a demand letter (the "*May 29 letter*") to Karacaoglu, advising Karacaoglu of his obligations to pay royalties under the Montgomeryville Franchise Agreement.  The May 29 letter requested that Karacaoglu provide WTG with sales figures for the Montgomeryville Location from the date of assignment to the present in order to determine Karacaoglu's liability to WTG for unpaid royalties.  The May 29 letter further advised Karacaoglu that he was not authorized to operate the Cottman Avenue Location, which was within 10 miles of the Frankford Avenue Location, and that any use of WTG's Marks or products in connection with the Cottman Avenue Location was unauthorized and unlawful.

57.     Shortly after receiving the May 29 letter, Karacaoglu purported to change the Montgomeryville Location to a "Wing Shop," selling a virtually identical menu to that offered

- 13 -

when the location was a Wings To Go® restaurant.  Karacaoglu also converted the Cottman

Avenue Location to a "Wing Shop" restaurant.  Moreover, despite the warnings and demands set

forth in the May 29 letter, Karacaoglu continued to use WTG's Marks, products, proprietary

menu items, and procedures in connection with the Montgomeryville and Cottman Avenue

Locations.

58.     During this same time period, Karacaoglu, Olus and RSK also unlawfully

converted the Frankford Avenue Location to a "Wing Shop," but continued to use WTG's Marks

and confidential proprietary information in connection with that restaurant.

59.     In total, Karacaoglu continues to operate three "Wing Shop" restaurants, two of

which were originally Wings To Go® restaurants, in violation of the Franchise Agreements.

Upon information and belief and as detailed herein, Karacaoglu uses WTG's marks, confidential

manuals, trade secrets, and other proprietary information at each of these locations without

authorization from WTG and in violation of the terms of his WTG Franchise Agreements.

Likewise, upon information and belief and as detailed herein, Olus and RSK uses WTG's marks,

confidential manuals, trade secrets, and other proprietary information at the Frankford Avenue

Location without authorization from WTG.  At a minimum, Olus and RSK has violated the

Frankford Franchise Agreement by failing to immediately notify WTG of the unauthorized use

of its Marks, thus facilitating the unlawful use.

60.     John Does 1-100 have assisted Karacaoglu, Olus and RSK in the use of WTG's

Marks and confidential proprietary information, received apparent ownership interest in the

Karacaoglu Locations, and/or otherwise participated in the unlawful use of the WTG Marks as

detailed herein.

- 14 -

61.     Karacaoglu, Olus, RSK and/or John Does 1-100 are using WTG Marks in the "Wing Shop" website's meta tags and other embedded text.

62.     Moreover, Defendants have intentionally used WTG Marks in the "Wing Shop" web page headline.  As a result, when internet users visit the "Wing Shop" website, the headline for the web page reads: "Wing Shop & Wings to Go Simply Great Wings!"

63.     By using the WTG Marks in connection with the advertisement and sale of their food products, both in meta tags and in the website's headline, Defendants have misrepresented that "Wing Shop" is somehow affiliated, connected, or otherwise associated with WTG.

**V.     Karacaoglu's Attempts to Lure Other WTG Franchisees to Abandon Their WTG Franchise Agreements and Convert to "Wing Shop" Restaurants**

64.     In addition to converting two once-legitimate Wings To Go® locations to "Wing Shop" restaurants and opening a third "Wing Shop" restaurant in violation of the non-compete provision in the Frankford Franchise Agreement, Karacaoglu has attempted to convince several WTG franchisees to breach their franchise agreements with WTG by converting their Wings To Go® restaurants to "Wing Shop" restaurants.

65.     Upon information and belief, Karacaoglu is actively continuing in his efforts to induce other WTG franchisees to continue to use WTG's Marks and confidential proprietary information to operate as "Wing Shop" restaurants without paying WTG the royalties to which it is contractually entitled.

**COUNT ONE – BREACH OF CONTRACT: IN-TERM VIOLATIONS (Against Karacaoglu, Olus and RSK)**

66.     WTG repeats and reiterates the foregoing allegations as if fully set forth herein.

67.     Pursuant to the terms of the Frankford and Montgomeryville Franchise Agreements, WTG granted Karacaoglu, Olus and RSK a limited license to use the Marks and any WTG confidential proprietary information strictly in conformance with the Franchise

- 15 -

Agreements and at those locations *only*.  The Agreements further required Karacaoglu, Olus and RSK to accurately report sales figures and gross revenues to WTG, and to pay a percentage of gross revenues to WTG as a royalty for the use of the Marks and WTG's confidential proprietary information.

68.     Under the Franchise Agreements, Karacaoglu, Olus and RSK were also obligated to provide WTG with current financial statements or any other financial reports reasonably requested by WTG.

69.     As set forth herein, Karacaoglu, Olus and RSK have violated these and other terms of the Frankford and Montgomeryville Franchise Agreements with their conduct, including, but not limited to: (i) failing to pay royalties to WTG for use of the Marks, (ii) underreporting sales for the Frankford Avenue and Montgomeryville Locations and thus paying a lower royalty than was contractually required, (iii) using the WTG Marks and selling WTG-approved products at the Cottman Avenue Store, and (iv) failing to provide WTG with financial statements and reports as demanded in the May 29 letter.

70.     As a result of Karacaoglu's, Olus' and RSK's actions, WTG has suffered and is continuing to suffer irreparable injury, and is entitled to both damages and permanent injunctive relief enforcing the provisions of the Frankford and Montgomeryville Franchise Agreements prohibiting the unauthorized use of the WTG Marks and proprietary confidential information.

71.     WTG is further entitled to reasonable attorneys' fees and costs under the Frankford and Montgomeryville Franchise Agreement.

## COUNT TWO – BREACH OF CONTRACT: POST-TERM VIOLATIONS
### (Against Karacaoglu, Olus and RSK)

72.     WTG repeats and reiterates the foregoing allegations as if fully set forth herein.

73.     The Frankford and Montgomeryville Franchise Agreements also contained unambiguous post-termination provisions.  These provisions obligated Karacaoglu (under both Franchise Agreements) and Olus and RSK (under the Frankford Franchise Agreement) to assign the telephone number for the Frankford Avenue and Montgomeryville Locations to WTG upon the termination or expiration of the Franchise Agreements.  The non-compete provisions also prohibited Karacaoglu (under both Franchise Agreements) and Olus and RSK (under the Frankford Franchise Agreement) from, *inter alia*, owning or operating any competing business within 10 miles of the location of those restaurants or of any other WTG location both during the term of the Agreements and for two years after the termination or expiration of the Franchise Agreements.

74.     The Frankford and Montgomeryville Franchise Agreements further obligated Karacaoglu (under both Franchise Agreements) and Olus and RSK (under the Frankford Franchise Agreement) to immediately cease to use any WTG Marks, confidential methods, procedures, or techniques associated with the WTG system upon the termination or expiration of the Agreement.

75.     As set forth herein, Karacaoglu (in connection with both Franchise Agreements) and Olus and RSK (in connection with the Frankford Franchise Agreement) have violated these and other terms of the Frankford and Montgomeryville Franchise Agreements with their conduct, including, but not limited to: (i) Karacaoglu's attempts to open an unauthorized WTG franchise at the Cottman Avenue location, (ii) Karacaoglu's, Olus' and RSK's conversion of the Frankford Avenue Location to a "Wing Shop" restaurant, (iii) Karacaoglu's conversion of the Montgomeryville Location to a "Wing Shop" restaurant, (iv) Karacaoglu's opening and operating a "Wing Shop" restaurant at the Cottman Avenue Location, and (v) the continuing use

- 17 -

of WTG Marks and confidential proprietary information in the operation of the three "Wing Shop" restaurants, including the website(s) for those restaurants.

76.     WTG has a legitimate business interest in its valuable confidential business information, substantial business relationships with existing and prospective customers, and the goodwill and reputation associated with WTG's Marks and business system in and around the territories governed by the Franchise Agreements.

77.     The non-competition provisions in the Franchise Agreements are reasonably necessary to protect WTG's legitimate business interests.

78.     As a result of the actions of Karacaoglu, Olus and RSK, WTG has suffered and is continuing to suffer irreparable injury, and is entitled to both damages and permanent injunctive relief enforcing the post-termination provisions of the Frankford and Montgomeryville Franchise Agreements.

79.     WTG is further entitled to reasonable attorneys' fees and costs under the Frankford and Montgomeryville Franchise Agreements.

### COUNT THREE – TRADEMARK INFRINGEMENT (LANHAM ACT)
### (Against All Defendants)

80.     WTG repeats and reiterates the foregoing allegations as if fully set forth herein.

81.     As previously set forth, WTG owns several United States Trademark Registrations for its Marks and also owns numerous unregistered marks, such as Simply Great Wings!™.

82.     Under the Franchise Agreements, the franchisees are licensed to use the WTG Marks, system, trade secrets, copyrights, *et cetera*, in conjunction with operating the Wings To Go® restaurants.

83.     The trade secrets that the franchisees are licensed to use include, but are not limited to, WTG operational manuals, other printed manuals, forms and materials included in the WTG system, all of which contain confidential proprietary information belonging to WTG.

84.     WTG's Marks have become well and favorably known to the general public as an indication of quality merchandise and services, distinguishing Wings To Go® restaurants from similar businesses and representing valuable assets of WTG's business.

85.     Even after converting the Karacaoglu Locations from Wings To Go® restaurants to "Wing Shop" restaurants, Karacaoglu (with respect to all of the Karacaoglu Locations) and Olus and RSK (with respect to the Frankford Avenue Location) have continued to hold themselves out to the public as WTG franchisees, and Defendants have continued to intentionally trade on the WTG system, use WTG's Marks, and deliberately misappropriate WTG's goodwill in connection with all of the Karacaoglu Locations, all to the detriment of WTG.

86.     Defendants have continued to use WTG Marks in the operation of the Karacaoglu Locations and Defendants continue to use WTG Marks to advertise and sell substantially similar food products as those sold in legitimate Wings To Go® restaurants, including in the meta tags and headline for the website(s) for those restaurants.

87.     Defendants have also continued to use WTG's trade secrets, including manuals for the proper operation of a Wings To Go® restaurant and manuals for the preparation of proprietary WTG menu items in the operation of the Karacaoglu Locations.

88.     Defendants' unauthorized use of the Marks in the operation of the Karacaoglu Locations is identical or substantially identical to the lawful use thereof by other legitimate WTG franchisees.  Accordingly, Defendants' conduct is intended to, and does, cause a likelihood of confusion or mistake on the part of members of the consuming public who patronize the

DM1\4911248.2

Karacaoglu Locations and/or who seek to patronize Wings To Go® restaurants in the same geographic area as the Karacaoglu Locations.

89.     Defendants have received actual notice of these violations and infringements of the WTG Marks and have constructive notice of WTG's rights in the WTG Marks and the registrations thereof pursuant to 15 U.S.C. § 1072.  Defendants' continued infringement is willful, malicious, fraudulent and deliberate.

90.     Indeed, Defendants' conduct has been and continues to be undertaken with deliberate intention and design to trade on WTG's goodwill and constitutes willful, wanton and otherwise outrageous conduct.

91.     Defendants are guilty of trademark infringement pursuant to 15 U.S.C. §§ 1114, 1116 and 1117 and Defendants' false representations of association with WTG, including, but not limited to the false representations on Defendants' website, constitutes a false designation of products and services in violation of 15 U.S.C. § 1125.

92.     As a direct and proximate result of Defendants' infringement, WTG has been and is likely to be substantially injured in its business, including in its reputation, resulting in lost revenues and profits and the dilution of WTG's goodwill.

93.     WTG has been irreparably injured by its inability to control the use of its Marks and the representations of authority that Defendants have made to the public.

94.     WTG has no adequate remedy at law for Defendants' misconduct because the WTG Marks are unique and represent to the public WTG's identity, reputation and goodwill, such that damages alone cannot fully compensate WTG for Defendants' misconduct.

95.     Unless enjoined by the Court, Defendants will continue to use and infringe the WTG Marks.  This threat of future injury to WTG's business identity, goodwill and reputation

requires both preliminary and permanent injunctive relief to prevent Defendants' continued use

of the WTG Marks and to ameliorate and mitigate WTG's injuries.

## COUNT FOUR- UNFAIR COMPETITION (LANHAM ACT)
### (Against All Defendants)

96.    WTG repeats and reiterates the foregoing allegations as if fully set forth herein.

97.    Defendants' acts, practices and conduct, including, but not limited to, unlawfully

converting the Frankford Avenue and Montgomeryville Locations (as applicable) from Wings

To Go® restaurants to "Wing Shop" restaurants, operating the Cottman Avenue Location as a

"Wing Shop" restaurant using WTG Marks, and using WTG Marks on the "Wing Shop" website,

constitute unfair competition and false designation of origin and false or misleading descriptions

or representations of fact.  Defendants' representations are likely to cause confusion or to cause

mistake, to deceive others as to the affiliation, connection or association of the parties, and,

further, misrepresent the nature, characteristics, qualities or geographic origin of the parties'

goods, services and commercial activities, all in violation of 15 U.S.C. § 1125(a).

98.    As a direct and proximate result of Defendants' unfair competition, WTG has

been and is likely to be substantially injured in its business, including its goodwill and

reputation, resulting in lost revenues and profits.

99.    WTG has no adequate remedy at law for Defendants' misconduct because the

WTG Marks are unique and represent to the public WTG's identity, reputation and goodwill,

such that damages alone cannot fully compensate WTG for Defendants' misconduct.

100.    Unless enjoined by the Court, Defendants will continue to use and infringe the

WTG Marks to WTG's irreparable injury.  This threat of future injury to WTG's business

identity, goodwill and reputation requires preliminary and permanent injunctive relief to prevent

- 21 -

Defendants' continued use of the WTG Marks and engaging in other forms of unfair competition, and to ameliorate and mitigate WTG's injuries.

## COUNT FIVE- COMMON LAW TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION (Against All Defendants)

101.   WTG repeats and reiterates the foregoing allegations as if fully set forth herein.

102.   Defendants have, *inter alia,* (i) improperly traded upon, and thereby misappropriated, the reputation and valuable goodwill of WTG, (ii) unlawfully used the WTG Marks and WTG's trade secrets and other confidential information, and (iii) created a likelihood of confusion and mistake on the part of the purchasing public as to the source or origin of the goods and services distributed and sold by Defendants in the Karacaoglu Locations' "Wing Shop" restaurants and on the Defendants' website.

103.   By reason of the above, Defendants are liable for common law dilution of WTG's proprietary trade dress and Marks.

104.   By reason of the above, Defendants are also liable to WTG for common law trademark infringement and unfair competition.

105.   WTG has been damaged and irreparably injured as a result of these actions.

## COUNT SIX – TORTIOUS INTERFERENCE WITH EXISTING BUSINESS RELATIONS (Against Karacaoglu)

106.   WTG repeats and reiterates the foregoing allegations as if fully set forth herein.

107.   WTG is a party to valid and binding agreements with WTG franchisees for the operation of their respective Wings To Go® franchise restaurants.

108.   Karacaoglu had knowledge of the franchise agreements between WTG and those WTG franchisees.

- 22 -

109.    Karacaoglu improperly, intentionally, and willfully interfered with those Franchise Agreements by attempting to lure other WTG franchisees to breach their contracts with WTG and convert their Wings To Go® restaurants to "Wing Shop" restaurants.

110.    Karacaoglu purposefully undertook these actions with the specific intent to harm the existing business relationship between WTG and its franchisees.

111.    As a direct and proximate result of Karacaoglu's intentional and unlawful conduct, WTG has suffered damages.

**COUNT SEVEN – DECLARATORY JUDGMENT**
**(Against Karacaoglu, Olus and RSK)**

112.    WTG repeats and reiterates the foregoing allegations as if fully set forth herein.

113.    WTG contends that the Frankford and Montgomeryville Franchise Agreements, and Karacaoglu's, Olus' and RSK's rights thereunder, have terminated.

114.    Karacaoglu (in connection with the Frankford Avenue and Montgomeryville Locations) and Olus and RSK (in connection with the Frankford Avenue Location) continue to use WTG Marks and proprietary confidential information in connection with advertising and operating "Wing Shop" restaurants, but have breached various material provisions of the Frankford and Montgomeryville Franchise Agreements.

115.    Actual, existing and justiciable controversies have arisen and exist between WTG, on the one hand, and Karacaoglu, Olus and RSK, on the other hand, as to whether the Franchise Agreements have been terminated and are no longer in effect, other than with respect to the provisions that survive termination, such as the non-competition provision. WTG has no adequate remedy at law.

DM1\4911248.2

## PRAYER FOR RELIEF

WHEREFORE, WTG demands that judgment be entered in its favor, as follows:

1) On Counts One and Two,

   a) That WTG be awarded compensatory damages in a precise amount to be determined at trial and reasonable attorneys' fees and costs.

   b) That Karacaoglu, Olus and RSK, their agents, immediate family members, and all other persons acting in concert or participation with them, or acting under the authority of or in privity with them, and each and all of them, be enjoined permanently from:

      • Owning or operating any competing business at the Cottman Avenue Location (or any other location) in violation of the ten mile post-termination non-competition covenant in the Frankford and Montgomeryville Franchise Agreements; and

      • Owning or operating any restaurants or other prohibited businesses at the locations of the former Frankford Avenue and Montgomeryville Wings To Go® restaurants in violation of the post-termination non-competition covenants in the Franchise Agreements for those respective restaurants.

2) On Counts Three, Four, and Five:

   a) That Defendants and their agents, servants, employees and all persons acting in concert or participation with them, or holding by, through or under them, or acting under the authority of or in privity with them, and each and all of them, be enjoined and restrained permanently, from:

      • using WTG's Trademarks, or any colorable imitation thereof, and from engaging in conduct suggesting any affiliation or connection with WTG;

      • advertising, distributing, offering for sale or selling goods and services bearing the Marks;

      • otherwise infringing WTG's Marks, or diluting the distinctive quality of the Marks; and

      • committing any other act or acts which are calculated to induce the belief that goods and services not of WTG's sponsorship are of WTG's

sponsorship and from otherwise competing unfairly with WTG in any manner.

b)  That Defendants be required to deliver up to WTG all indicia of WTG's Marks and Trade Secrets in their possession or under their control.

c)  That Defendants be ordered to file with the Court and to serve upon WTG's attorneys, within ten (10) days after service upon such individual of the Decree of Injunction issued by the Court in this action, a report in writing setting forth in detail the manner and form in which such individual has complied with such injunction.

d)  That Defendants be required to account to WTG for all profits made by virtue of said individual's infringement of WTG's Marks and trade dress and by virtue of such individual's unfair competition.

e)  That Defendants be preliminarily and permanently enjoined from using the WTG Marks on or in connection with the "Wing Shop" website and be required to immediately remove all references to WTG's Marks, including, but not limited to, the use in the headline or in the form of meta tags and/or embedded text.

3)  Further, on Counts Three and Four, that WTG be awarded treble damages pursuant to 15 U.S.C. § 1117, punitive damages in an amount to be determined, and reasonable attorneys' fees.

4)  On Count Six, that WTG be awarded compensatory damages in a precise amount to be determined at trial.

5)  On Count Seven, that the Court determine and declare that (i) WTG's termination of the Frankford and Montgomeryville Franchise Agreements was valid, proper and effective, (ii) WTG is legally entitled to assignment of the telephone numbers associated with those businesses and the return of all confidential proprietary materials and order Karacaoglu, Olus and RSK immediately to assign, or cause to be assigned, such numbers and return such materials to WTG, (iii) Karacaoglu, Olus and RSK have no further rights under the Franchise Agreements or otherwise to use WTG's Marks, and (iv) that Karacaoglu, Olus and RSK remain bound and obligated

- 25 -

to honor all obligations in the Franchise Agreements that survive the termination of those Agreements.

DUANE MORRIS LLP

/s/ Ryan E. Borneman
J. Manly Parks (74647)
E-mail:jmparks@duanemorris.com
Ryan E. Borneman (203540)
E-mail:reborneman@duanemorris.com
Adrienne Gittens (314367)
E-mail:agittens@duanemorris.com

30 South 17th Street
Philadelphia, PA  19103-4196
Telephone: +1 215 979 1000
Fax: +1 215 979 1020

*Attorneys for Wings To Go, Inc.*

Dated: August 6, 2014

- 26 -

# EXHIBIT "A"

## ASSIGNMENT

THIS ASSIGNMENT ("Assignment") dated as of _12 06 2010_ is entered into by and between _RETEP SAYIN_ (hereinafter individually and collectively referred to as "Assignor") and _YUSUF KARACAOGLU_ ("Assignee").

WHEREAS, that certain franchise agreement dated _April 1_, 20_10_ (the "Franchise Agreement") was entered into between Wings to Go, Inc., a Delaware corporation ("WTG"), as franchisor, and Assignor, as franchisee.

WHEREAS, the Assignor has previously assigned the Franchise Agreement to the Assignee.

WHEREAS, WTG has previously consented to such assignment.

WHEREAS, Assignor and Assignee desire to evidence the assignment of the Franchise Agreement by Assignor to Assignee.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.       Assignee has assigned and, to the extent Assignor has any remaining rights under the Franchise Agreement, does hereby assign the Franchise Agreement to Assignee.

2.       Assignee has assumed and does hereby assume all of the rights, benefits and obligations of Assignor, as Franchisee, under the Franchise Agreement and Assignee agrees to be bound by and comply with the terms of the Franchise Agreement.

3.       This Assignment shall be legally binding upon Assignor and its heirs, personal representatives, successors and assigns and shall inure to the benefit of Assignee and all its successors and assigns.

4.       This Assignment may be executed in counterparts, each of which shall be deemed to be an original copy of this Assignment and all of which, when taken together, shall be deemed to be one and the same assignment.

Witness: _Jose Michetti_

Assignor: _RETEP SAYIN_

Witness: _Jose Michetti_

Assignee: _Yusuf Karacaoglu_

Witness: _Ocie M Melanson_
OCIE M MELANSON

Franchisor Approval: _John Brinton_
JOHN BRINTON

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
SHARON McGINLEY, Notary Public
City of Philadelphia, Phila. County
My Commission Expires April 23, 2012

*42*
*mayfair*

## ASSIGNMENT

THIS ASSIGNMENT ("Assignment") dated as of ___11 - 11 th___, ___2008___ is entered into by and between ___HASHNIN KAHN___ (hereinafter individually and collectively referred to as "Assignor") and ___REJEP SAYIN Jr.___ ("Assignee").

WHEREAS, that certain franchise agreement dated _____, 20___ (the "Franchise Agreement") was entered into between Wings to Go, Inc., a Delaware corporation ("WTG"), as franchisor, and Assignor, as franchisee.

WHEREAS, the Assignor has previously assigned the Franchise Agreement to the Assignee.

WHEREAS, WTG has previously consented to such assignment.

WHEREAS, Assignor and Assignee desire to evidence the assignment of the Franchise Agreement by Assignor to Assignee.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     Assignee has assigned and, to the extent Assignor has any remaining rights under the Franchise Agreement, does hereby assign the Franchise Agreement to Assignee.

2.     Assignee has assumed and does hereby assume all of the rights, benefits and obligations of Assignor, as Franchisee, under the Franchise Agreement and Assignee agrees to be bound by and comply with the terms of the Franchise Agreement.

3.     This Assignment shall be legally binding upon Assignor and its heirs, personal representatives, successors and assigns and shall inure to the benefit of Assignee and all its successors and assigns.

4.     This Assignment may be executed in counterparts, each of which shall be deemed to be an original copy of this Assignment and all of which, when taken together, shall be deemed to be one and the same assignment.

Witness:                              Assignor:

_____             _____
                                      HASHNIN KAHN

Witness:                              Assignee:

_____             _____
                                      REJEP SAYIN Jr.

DEC-01-2010(WED) 13:38  WINGS TO GO INC.

**EXHIBIT F TO**
**WINGS TO GO**
**FRANCHISE AGREEMENT**

**DISCLOSURE OF PRINCIPALS**
**(To be completed if Franchisee is a Corporation,**
**Partnership, or Limited Liability Company Only)**

1.  Date:  12-6-2010

2.  Franchisee Contact.  The following individual is a shareholder, member, or partner of Franchisee and is the principal person to be contacted on all matters relating to the Franchised Business:

    Name: YUSUF KARACAOGLU

    Address: 4144 ORCHARD St.

    Philadelphia PA 19135

    Daytime Telephone No.: 610 888 5495

    Evening Telephone No.: 484 904 7276

    Facsimile No.:

    E-mail Address: KARACAOGLU18@Hotmail.com

3.  Franchisee Owners.  The undersigned agree and acknowledge that the following is a complete list of all of the shareholders, partners, or members ("Owners") of Franchisee and the position and percentage interest of each individual:

| Name | Position | Interest (%) |
|---|---|---|
| YUSUF KARACAOGLU | OWNER | 50 |
| ERGUN OCLSS | OWNER | 50 |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

4.  Change in Owners.  Franchisee acknowledges and agrees that any proposed change in the Owners listed in Paragraph 3, above, shall require Franchisor's prior written consent in accordance with the terms of Section 14 of the Franchise Agreement.

**[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]**

IN WITNESS WHEREOF, the undersigned has duly executed this Disclosure of Principals on the date first above written.

**FRANCHISEE**

ADIL BILGIC
_____
Witness/Attest

By _____

Name: YUSUF KARACAOGLU

Title: OWNER

**OWNERS**

ADIL BILGIC
_____
Witness/Attest

By _____

Name: Ergun Olus

Title: Owner

ADIL BILGIC
_____
Witness/Attest

By _____

Name: YUSUF KARACAOGLU

Title: OWNER

_____
Witness/Attest

By _____

Name: _____

Title: _____

DEC-02-2010(THU) 14:37      WINGS TO GO, INC.

# EXHIBIT E TO
# WINGS TO GO
# FRANCHISE AGREEMENT

## GUARANTEE, INDEMNIFICATION, AND ACKNOWLEDGMENT

As an inducement to Wings To Go, Inc. ("Franchisor") to execute the Franchise Agreement between Franchisor and ___R S Kichen LLC___ ("Franchisee") dated __4 - 1__, 20 _10_ (the "Agreement"), the undersigned, jointly and severally, hereby unconditionally guarantee to Franchisor and its successors and assigns that all of Franchisee's obligations under the Agreement will be punctually paid and performed.

Upon demand by Franchisor, the undersigned will immediately make each payment to Franchisor required of Franchisee under the Agreement. The undersigned hereby waive any right to require Franchisor to: (a) proceed against Franchisee for any payment required under the Agreement; (b) proceed against or exhaust any security from Franchisee; or (c) pursue or exhaust any remedy, including any legal or equitable relief, against Franchisee. Without affecting the obligations of the undersigned under this Guarantee, Franchisor may, without notice to the undersigned, extend, modify, or release any indebtedness or obligation of Franchisee, or settle, adjust, or compromise any claims against Franchisee. The undersigned waive notice of amendment of the Agreement and notice of demand for payment by Franchisee, and agree to be bound by any and all such amendments and changes to the Agreement.

The undersigned hereby agree to defend, indemnify, and hold Franchisor harmless against any and all losses, damages, liabilities, costs, and expenses (including, but not limited to, reasonable attorneys' fees, reasonable costs of investigation and court costs) resulting from, consisting of, or arising out of or in connection with any failure by Franchisee to perform any obligation of Franchisee under the Agreement, any amendment thereto, or any other agreement executed by Franchisee referred to therein.

The undersigned hereby acknowledge and agree to be individually bound by all of the confidentiality provisions and non-competition covenants contained in Sections 10 and 17 of the Agreement.

This Guarantee shall terminate upon the termination or expiration of the Agreement, except that all obligations and liabilities of the undersigned which arose from events which occurred on or before the effective date of such termination shall remain in full force and effect until satisfied or discharged by the undersigned, and all covenants which by their terms continue in force after the expiration or termination of the Agreement shall remain in force according to their terms. Upon the death of an individual guarantor, the estate of such guarantor shall be bound by this Guarantee, but only for defaults and obligations hereunder existing at the time of death; and the obligations of the other guarantors will continue in full force and effect.

The undersigned guarantors agree that the dispute resolution and attorney fee provisions in Section 26 of the Agreement are hereby incorporated into this Guarantee by reference, and references to "Franchisee" and the "Agreement" therein shall be deemed to apply to the undersigned "Guarantors" and this "Guarantee," respectively, herein. Unless specifically stated otherwise, the terms used in this Guarantee shall have the same meaning as in the Agreement.

This Guarantee shall be interpreted and construed under the laws of the State of Maryland. In the event of any conflict of law, the laws of Maryland shall prevail, without regard to, and without giving effect to, the application of the State of Maryland conflict of law rules. Franchisor shall have the right to commence an action against the undersigned Guarantors in any court of competent jurisdiction, and the undersigned hereby agrees to submit to the personal jurisdiction of such court, and waives all objections to personal jurisdiction or venue for purposes hereof. GUARANTORS KNOWINGLY, VOLUNTARILY, AND INTELLIGENTLY WAIVE THEIR RIGHT TO A TRIAL BY JURY IN ANY JUDICIAL PROCEEDING CONCERNING THIS GUARANTEE OR THE FRANCHISE AGREEMENT.

Any and all notices required or permitted under this Guarantee shall be in writing and shall be personally delivered, sent by registered mail, or sent by other means which afford the sender evidence of delivery or rejected delivery (but shall not be sent by e-mail), to the respective parties at the following addresses unless and until a different address has been designated by written notice to the other party:

Notices to Franchisor:      Wings To Go, Inc.
                            846 Ritchie Highway, Suite 1B
                            Severna Park, MD 21146
                            Attn: President

Notices to Guarantors:      7321 ROOSEVELT BLVD
                            PHILADELPHIA, PA 19149

                            Attn: YUSEF KARACAGLIS

Any notice by a method which affords the sender evidence of delivery or rejected delivery shall be deemed to have been given at the date and time of receipt or rejected delivery.

**[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]**

Rx Date/Time      JAN-27-2011(THU) 19:08          2153388009                    P.007
01/27/2011  19:23    2153388                 OFFICEMAX 359                  PAGE  07/08

IN WITNESS WHEREOF, each of the undersigned has signed this Guarantee as of the date of the Agreement.

Rebecca Fosbenner

_____
Witness

**GUARANTORS**

_____
Name: _Yusof Koracaoglis_

_____
Name: _Ergun Olus_

_____
Witness

_____
Witness

_____
Name:_____

## EXHIBIT D TO
## WINGS TO GO
## FRANCHISE AGREEMENT

## CONFIDENTIALITY AND NON-COMPETITION AGREEMENT

In consideration of my position as stockholder, director, officer, member and/or employee of RS KitchEN LLS (the "Franchisee"), and other good and valuable consideration, the receipt and sufficiency of which is acknowledged, I hereby acknowledge and agree that:

1.      Wings To Go, Inc. (the "Franchisor"), as the result of the expenditure of time, skill, effort, and money, has developed, and continues to develop, a distinctive system relating to the establishment and operation of Wings To Go restaurants, which feature "Buffalo-style" chicken wings, boneless tenders, "Buffalo-style" shrimp, and other food items and beverages on a take-out or dine-in basis, all under the trade name "Wings To Go" (the "System").

2.      As a stockholder, director, officer, member and/or employee of Franchisee, I will receive valuable confidential information, disclosure of which would be detrimental to Franchisor and Franchisee, including, without limitation, the Manual, recipes, cooking methods, preparation of menu items, drawings, suppliers, equipment, product costs, accounting methods, management tools, or advertising, which may be communicated to me or of which I may be apprised by virtue of my position with Franchisee, which are beyond the present skills and experience possessed by me. This list of confidential matters is illustrative only and does not include all matters considered confidential by Franchisor and Franchisee.

3.      I will hold in strict confidence all information designated by Franchisor or Franchisee as confidential. Unless Franchisor otherwise agrees in writing, I will disclose and/or use the confidential information only in connection with my duties as an employee of Franchisee. My undertaking not to disclose confidential information is a condition of my position with Franchisee, and continues even after I cease to be in that position.

4.      While in my position with Franchisee, I will not do anything which may injure Franchisee or Franchisor, such as (a) divert or attempt to divert any present or prospective business or customer of any Wings To Go restaurant to any competitor, by direct or indirect inducement or otherwise; (b) do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with Franchisor's marks and the System; or (c) employ or seek to employ any person who is at that time been employed by Franchisor or any franchisee of Franchisor (including Franchisee), or otherwise directly or indirectly induce such person to leave his or her employment.

5.      While in my position with Franchisee, I will not own, maintain, operate, engage in, be employed by, provide assistance to, or have any interest in (as owner or otherwise) any business that offers, sells or manufactures products or services which are

the same as or similar to the products and services offered by the Restaurant under the System, including, but not limited to, chicken wings.  Provided, however, that this Paragraph 5 shall not apply to my current position with Franchisee.

6.    For two (2) years after I cease to be in my position with Franchisee, I will not own, maintain, operate, engage in, be employed by, provide assistance to, or have any interest in (as owner or otherwise) any business that:    (a)(i) is the same as, or substantially similar to, a Wings To Go restaurant; or (ii) offers, sells or manufactures products or services which are the same as or similar to the products and services offered by the Restaurant under the System, including, but not limited to, chicken wings; and (b) is, or is intended to be, located at or within:  (i) Franchisee's Territory, which I acknowledge has been described to me; (ii) ten (10) miles of the Restaurant; or ten (10) miles of any Wings To Go restaurant.

7.    Franchisor is a third-party beneficiary of this Agreement and may enforce it, solely and/or jointly with Franchisee.  I am aware that my violation of this Agreement will cause Franchisor and Franchisee irreparable harm; therefore, I acknowledge and agree that Franchisor and/or Franchisee may apply for the issuance of an injunction preventing me from violating this Agreement in addition to any other remedies it may have hereunder, at law or in equity; and I agree to pay Franchisor and Franchisee all the costs it/they incur/s, including without limitation attorneys' fees, if this Agreement is enforced against me.  Due to the importance of this Agreement to Franchisor and Franchisee, any claim I have against Franchisor or Franchisee is a separate matter and does not entitle me to violate, or justify any violation of, this Agreement.  If any part of this Agreement is held invalid by a court or agency having valid jurisdiction, the rest of the Agreement is still enforceable and the part held invalid is enforceable to the extent found reasonable by the court or agency.  I agree that all the words and phrases used in this Agreement will have the same meaning as used in the Franchise Agreement, and that such meaning has been explained to me.

8.    Franchisor may, in its sole discretion, reduce the scope of any covenant set forth in this Agreement, without my consent, effective immediately upon my receipt of written notice thereof; and I agree to comply with any covenant as so modified.

**[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]**

9.      This Agreement shall be construed under the laws of the State of
Maryland.  Except as provided in Paragraph 8 above, the only way this Agreement can be
changed is in a writing signed by both Franchisee and me.

Signature: _Yuf Konklu Egun Olu_

Name: _Yusuf Karacaoglu Ergun Olus_

Address: _7109 Frontford av Mayfair Philadel,_
_19135_

Title: _Wings to Go_
_RS. Kitchen LLC_

**ACKNOWLEDGED BY FRANCHISEE**

By: _Yuf Kolu Ergun Olus_

Name: _Yusuf Karoolu Ergun Olus_

**EXHIBIT D TO**
**WINGS TO GO**
**FRANCHISE AGREEMENT**

<u>CONFIDENTIALITY AND NON-COMPETITION AGREEMENT</u>

In consideration of my position as stockholder, director, officer, member and/or employee of _RS Kitchen LLS_ (the "Franchisee"), and other good and valuable consideration, the receipt and sufficiency of which is acknowledged, I hereby acknowledge and agree that:

1.      Wings To Go, Inc. (the "Franchisor"), as the result of the expenditure of time, skill, effort, and money, has developed, and continues to develop, a distinctive system relating to the establishment and operation of Wings To Go restaurants, which feature "Buffalo-style" chicken wings, boneless tenders, "Buffalo-style" shrimp, and other food items and beverages on a take-out or dine-in basis, all under the trade name "Wings To Go" (the "System").

2.      As a stockholder, director, officer, member and/or employee of Franchisee, I will receive valuable confidential information, disclosure of which would be detrimental to Franchisor and Franchisee, including, without limitation, the Manual, recipes, cooking methods, preparation of menu items, drawings, suppliers, equipment, product costs, accounting methods, management tools, or advertising, which may be communicated to me or of which I may be apprised by virtue of my position with Franchisee, which are beyond the present skills and experience possessed by me. This list of confidential matters is illustrative only and does not include all matters considered confidential by Franchisor and Franchisee.

3.      I will hold in strict confidence all information designated by Franchisor or Franchisee as confidential. Unless Franchisor otherwise agrees in writing, I will disclose and/or use the confidential information only in connection with my duties as an employee of Franchisee. My undertaking not to disclose confidential information is a condition of my position with Franchisee, and continues even after I cease to be in that position.

4.      While in my position with Franchisee, I will not do anything which may injure Franchisee or Franchisor, such as (a) divert or attempt to divert any present or prospective business or customer of any Wings To Go restaurant to any competitor, by direct or indirect inducement or otherwise; (b) do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with Franchisor's marks and the System; or (c) employ or seek to employ any person who is at that time been employed by Franchisor or any franchisee of Franchisor (including Franchisee), or otherwise directly or indirectly induce such person to leave his or her employment.

5.      While in my position with Franchisee, I will not own, maintain, operate, engage in, be employed by, provide assistance to, or have any interest in (as owner or otherwise) any business that offers, sells or manufactures products or services which are

the same as or similar to the products and services offered by the Restaurant under the System, including, but not limited to, chicken wings.  Provided, however, that this Paragraph 5 shall not apply to my current position with Franchisee.

6.  For two (2) years after I cease to be in my position with Franchisee, I will not own, maintain, operate, engage in, be employed by, provide assistance to, or have any interest in (as owner or otherwise) any business that:  (a)(i) is the same as, or substantially similar to, a Wings To Go restaurant; or (ii) offers, sells or manufactures products or services which are the same as or similar to the products and services offered by the Restaurant under the System, including, but not limited to, chicken wings; and (b) is, or is intended to be, located at or within:  (i) Franchisee's Territory, which I acknowledge has been described to me; (ii) ten (10) miles of the Restaurant; or ten (10) miles of any Wings To Go restaurant.

7.  Franchisor is a third-party beneficiary of this Agreement and may enforce it, solely and/or jointly with Franchisee.  I am aware that my violation of this Agreement will cause Franchisor and Franchisee irreparable harm; therefore, I acknowledge and agree that Franchisor and/or Franchisee may apply for the issuance of an injunction preventing me from violating this Agreement in addition to any other remedies it may have hereunder, at law or in equity; and I agree to pay Franchisor and Franchisee all the costs it/they incur/s, including without limitation attorneys' fees, if this Agreement is enforced against me.  Due to the importance of this Agreement to Franchisor and Franchisee, any claim I have against Franchisor or Franchisee is a separate matter and does not entitle me to violate, or justify any violation of, this Agreement.  If any part of this Agreement is held invalid by a court or agency having valid jurisdiction, the rest of the Agreement is still enforceable and the part held invalid is enforceable to the extent found reasonable by the court or agency.  I agree that all the words and phrases used in this Agreement will have the same meaning as used in the Franchise Agreement, and that such meaning has been explained to me.

8.  Franchisor may, in its sole discretion, reduce the scope of any covenant set forth in this Agreement, without my consent, effective immediately upon my receipt of written notice thereof; and I agree to comply with any covenant as so modified.

**[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]**

9.    This Agreement shall be construed under the laws of the State of
Maryland.  Except as provided in Paragraph 8 above, the only way this Agreement can be
changed is in a writing signed by both Franchisee and me.

Signature: _____

Name: _Yusuf Karacaoglu  Ergun Oks_

Address: _7109 Frankford av Mayfair Philadel_
                          _19135_

Title: _Wings to Go_
           _RJ Kitchen LLC_

**ACKNOWLEDGED BY FRANCHISEE**

By: _____

Name: _____

**WINGS TO GO RESTAURANT**


**FRANCHISE AGREEMENT   042 Mayfair PA**

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| 1. | GRANT | 1 |
| 2. | TERM AND RENEWAL | 3 |
| 3. | DUTIES OF FRANCHISOR | 4 |
| 4. | FEES | 5 |
| 5. | OPENING OF FRANCHISED BUSINESS | 7 |
| 6. | TRAINING | 8 |
| 7. | DUTIES OF FRANCHISEE | 9 |
| 8. | PROPRIETARY MARKS | 13 |
| 9. | OPERATING MANUAL | 18 |
| 10. | CONFIDENTIAL INFORMATION | 19 |
| 11. | ACCOUNTING AND RECORDS | 20 |
| 12. | ADVERTISING AND PROMOTION | 20 |
| 13. | INSURANCE | 24 |
| 14. | TRANSFER OF INTEREST | 26 |
| 15. | DEFAULT AND TERMINATION | 28 |
| 16. | OBLIGATIONS UPON TERMINATION OR EXPIRATION | 31 |
| 17. | COVENANTS | 34 |
| 18. | CORPORATE, PARTNERSHIP OR LIMITED LIABILITY COMPANY FRANCHISEE | 35 |
| 19. | TAXES, PERMITS, AND INDEBTEDNESS | 37 |
| 20. | INDEPENDENT CONTRACTOR AND INDEMNIFICATION | 37 |
| 21. | APPROVALS AND WAIVERS | 38 |
| 22. | GRANT OF SECURITY INTEREST | 39 |
| 23. | NOTICES | 39 |
| 24. | ENTIRE AGREEMENT | 40 |
| 25. | SEVERABILITY AND CONSTRUCTION | 40 |
| 26. | APPLICABLE LAW AND CHOICE OF VENUE | 41 |
| 27. | FRANCHISEE'S ACKNOWLEDGMENTS AND REPRESENTATIONS | 42 |

## EXHIBITS

EXHIBIT A – SITE SELECTION ADDENDUM
EXHIBIT B – TERRITORY
EXHIBIT C – ADA CERTIFICATION
EXHIBIT D – CONFIDENTIALITY AND NON-COMPETITION AGREEMENT
EXHIBIT E – GUARANTEE, INDEMNIFICATION AND ACKNOWLEDGMENT
EXHIBIT F – DISCLOSURE OF PRINCIPALS
EXHIBIT G – CONDITIONAL ASSIGNMENT OF LEASE; CONSENT AND AGREEMENT
    OF LESSOR

*RS Kitchen LLC*

## WINGS TO GO
## FRANCHISE AGREEMENT

THIS AGREEMENT, made and entered into on  April 1, 2010, by and between Wings To Go, Inc., a Delaware corporation with its principal place of business at 846 Ritchie Highway, Suite 1B, Severna Park, Maryland 21146 ("Franchisor"), and Rejep Sayin, Jr. ("Franchisee"), with its principal place of business at **7109 Frankford Avenue Mayfair, PA 19135**

### WITNESSETH:

WHEREAS, Franchisor, as the result of the expenditure of time, skill, effort, and money, has developed, and continues to develop, a distinctive system relating to the establishment and operation of Wings To Go restaurants, which feature "Buffalo-style" chicken wings, boneless tenders, "Buffalo-style" shrimp, and other food items and beverages on a take-out or dine-in basis, with optional delivery and catering services, all under the trade name "Wings To Go" (the "System");

WHEREAS, the distinguishing characteristics of the System include, without limitation, distinctive exterior and interior building design, décor, color scheme, and furnishings; uniform standards and specifications for fixtures, furnishings, products, supplies and equipment; uniform standards, specifications, and procedures for operations; employee training and assistance; inventory control; quality and uniformity of products and services; and advertising and promotional programs; all of which may be changed, improved and further developed by Franchisor from time to time;

WHEREAS, the System is identified by means of certain trade names, service marks, trademarks, logos, emblems, trade dress, and indicia of origin, including, but not limited to, the mark "Wings To Go," as are now designated and may hereafter be designated by Franchisor in writing for use in connection with the System (the "Proprietary Marks");

WHEREAS, Franchisee desires to enter into the business of operating a Wings To Go restaurant under Franchisor's System and Proprietary Marks, and wishes to enter into an agreement with Franchisor for that purpose, and to receive the training and other assistance provided by Franchisor in connection therewith; and

WHEREAS, Franchisee understands and acknowledges the importance of Franchisor's high standards of quality, cleanliness, appearances, and service and the necessity of operating the business franchised hereunder in conformity with Franchisor's standards and specifications.

NOW, THEREFORE, the parties agree as follows:

1.   **GRANT**

1.1   <u>Grant of Franchise</u>.  Franchisor grants to Franchisee the right and Franchisee undertakes the obligation, upon the express terms and conditions set forth in this Agreement, to establish and operate a Wings To Go restaurant (the "Restaurant" or "Franchised Business"), and to use the Proprietary Marks and the System, as they may be changed and improved from time to

10792739.1

*Initials* RS / VS
*Franchisee*    *Franchisor*

time at Franchisor's sole discretion, solely in connection therewith and only at the location set forth in Section 1.2 hereof.

1.2 <u>Approved Location</u>. Franchisee shall operate the Restaurant only at a location approved by Franchisor (the "Approved Location"). If known at the time of execution of this Agreement, the exact street address of the Approved Location is **7109 Frankford Avenue Mayfair, PA 19135** If, at the time of execution of this Agreement, a location for the Restaurant has not been obtained by Franchisee and approved by Franchisor, Franchisee shall lease or acquire a location within one hundred eighty (180) days after the date of this Agreement, subject to the Franchisor's approval, as provided for in the Site Selection Addendum attached hereto as Exhibit A. Franchisee shall not relocate the Restaurant without the prior written approval of Franchisor. Franchisor shall have the right, in its sole discretion, to withhold approval of relocation.

1.3 <u>Franchisee's Territory</u>. Except as otherwise provided in this Agreement, during the term of this Agreement Franchisor shall not establish or operate, nor license any other person to establish or operate, a Wings To Go restaurant under the System and the Proprietary Marks at any location within the territory described in Exhibit B attached hereto (the "Franchisee's Territory"). Franchisor retains the rights, among others, on any terms and conditions Franchisor deems advisable, and without granting Franchisee any rights therein:

1.3.1 To establish and operate, and license others to establish and operate, a Wings To Go restaurant under the System and the Proprietary Marks at any location outside the Franchisee's Territory;

1.3.2 To sell to, solicit, or direct advertising or promotional materials to customers located in Franchisee's Territory;

1.3.3 To offer, sell or distribute, directly or indirectly, or license others to offer, sell or distribute any products or services from any location other than a Wings To Go restaurant, notwithstanding its proximity to the Approved Location whether within or outside the Franchisee's Territory, under the same or different Proprietary Marks, including, without limitation, sales made at or through special events (pursuant to Section 1.4 below), retail locations, supermarkets, convenience stores, grocery stores, temporary locations, carts, or kiosks, catalogs, mail order, or electronic means (for example, the Internet);

1.3.4 To establish or acquire and operate any business or store of any kind under different proprietary marks, at any location (notwithstanding its proximity to the Approved Location) whether located within or outside the Franchisee's Territory; and

1.3.5 Within and outside Franchisee's Territory, and notwithstanding any other provision hereof, to acquire, merge with, or otherwise affiliate with, and thereafter own and operate, and franchise or license others to own and operate, any business of any kind, including, without limitation, any business that offers products or services the same as or similar to those offered under the System or that uses the Proprietary Marks or any other system or marks.

Initials _____ / _____
      Franchisee   Franchisor

1.4    Special Events.  Franchisee shall have the right to offer approved products at special events (for example, fairs, athletic events, or conventions) within the Franchisee's Territory if Franchisee gives Franchisor thirty (30) days advance written notice (or such shorter period as may be reasonable under the circumstances) of its intention to sell at such event and obtains Franchisor's prior written approval.  If Franchisor notifies Franchisee of a special event in Franchisee's Territory and requests Franchisee to offer approved products at such event, Franchisee shall notify Franchisor of its intention to sell at such event at least five (5) days prior to the event.  If Franchisee fails to provide such notice, Franchisor shall have the right to sell at the event, or license others to sell at the event, in place of Franchisee.  If Franchisee sells products at a special event, Franchisee shall do so on such terms and conditions as Franchisor shall require in Franchisor's Confidential Operating Manual or otherwise in writing from time to time.

1.5    Supplementing the System.  Franchisee acknowledges that the System may be supplemented, improved, and otherwise modified from time to time by Franchisor; and Franchisee agrees to comply with all reasonable requirements of Franchisor in that regard, including, without limitation, offering and selling new or different products or services as specified by Franchisor.

## 2.    TERM AND RENEWAL

2.1    Term.  This Agreement shall be in effect upon its acceptance and execution by Franchisor and, except as otherwise provided herein, the term of this Agreement shall be ten (10) years from the date first above written.

2.2    Renewal.  Franchisee may, subject to the following conditions, renew the rights granted under this Agreement for three (3) additional consecutive terms of five (5) years each. Franchisor may require, in its sole discretion, that any or all of the following conditions be met prior to such renewal:

2.2.1    Franchisee shall give Franchisor written notice of Franchisee's election to renew not less than nine (9) months nor more than twelve (12) months prior to the end of the then-current term;

2.2.2    Franchisee shall make or provide for, in a manner satisfactory to Franchisor, such renovation and modernization of the premises of the Restaurant (the "Premises") as Franchisor may reasonably require, including, without limitation, installation of new equipment and renovation of signs, furnishings, fixtures, and décor to reflect the then-current standards and image of the System;

2.2.3    Franchisee shall not be in default of any provision of this Agreement, any amendment hereof or successor hereto, or any other agreement between Franchisee and Franchisor or its affiliates; and Franchisee shall have substantially complied with all the terms and conditions of such agreements during the terms thereof;

Initials _____ / _____
          Franchisee   Franchisor

2.2.4    Franchisee shall have satisfied all monetary obligations owed by Franchisee to Franchisor and its affiliates, and shall have timely met those obligations throughout the term of this Agreement;

2.2.5    Franchisee shall present evidence satisfactory to Franchisor that Franchisee has the right to remain in possession of the Premises for the duration of the renewal term or shall obtain Franchisor's approval of a new location for the Restaurant for the duration of the renewal term;

2.2.6    Franchisee shall, at Franchisor's option, execute Franchisor's then-current form of franchise agreement (but only for such renewal terms as are provided by this Agreement), which shall supersede this Agreement in all respects, and the terms of which may differ from the terms of this Agreement including, without limitation, a higher royalty fee and advertising contribution, except that Franchisee shall not be required to pay any initial franchise fee and the Franchisee's Territory shall remain the same;

2.2.7    Franchisee shall execute a general release, in a form prescribed by Franchisor, of any and all claims against Franchisor and its affiliates, and their respective officers, directors, agents, and employees;

2.2.8    Franchisee shall comply with Franchisor's then-current qualification and training requirements;

2.2.9    Franchisee shall pay Franchisor a renewal fee in an amount equal to fifty percent (50%) of Franchisor's then-current initial franchise fee at the time of renewal; and

2.2.10   Franchisee shall be current with respect to its obligations to its lessor, suppliers, and any others with whom Franchisee does business.

## 3.    DUTIES OF FRANCHISOR

3.1    Plans and Specifications.    Franchisor shall make available, at no charge to Franchisee, standard plans and specifications for a prototypical Wings To Go restaurant, including exterior and interior design and layout, fixtures, furnishings and signs.  Franchisee acknowledges that such plans and specifications shall not contain the requirements of any federal, state or local law, code or regulation (including, without limitation, those concerning the Americans with Disabilities Act (the "ADA") or similar rules governing public accommodations or commercial facilities for persons with disabilities) and that compliance with such laws, codes, and regulations is the sole responsibility of Franchisee.

3.2    Initial Training.    Franchisor shall provide training as set forth in Section 6 hereof.

3.3    Opening Assistance.    In connection with the opening of the Restaurant, Franchisor shall provide approximately ten (10) days of on-site training at the Restaurant as set forth in Section 6 hereof.

12421389.1

Initials _____ / _____
        Franchisee   Franchisor

3.4     Ongoing Advice.  Franchisor shall provide such operating advice and training on an ongoing basis after the Restaurant opens as Franchisor deems necessary in its sole discretion, including advice and training regarding new products and equipment, methods of quality control, new developments that Franchisor believes may be beneficial to Franchisee, accounting and business procedures, and methods of processing and marketing approved products.  Such advice and training may be provided by telephone, Internet, or any other means as determined by Franchisor.

3.5     Advertising and Promotional Materials.  Franchisor shall make available to Franchisee advertising and promotional materials as provided in Section 12 hereof.

3.6     Manual.  Franchisor shall provide Franchisee, on loan, one copy of Franchisor's Confidential Operating Manual (the "Manual"), as more fully described in Section 9 hereof.

3.7     Advertising Fund.  If established, Franchisor shall administer an Advertising Fund in the manner set forth in Section 12.3 hereof.

3.8     Inspections.  Franchisor shall conduct, as it deems advisable, inspections of Franchisee's operation of the Restaurant.

3.9     Performance by Designee.  Franchisee acknowledges and agrees that any duty or obligation imposed on Franchisor by this Agreement may be performed by any designee, employee, or agent of Franchisor, as Franchisor may direct.

4.     **FEES**

4.1     Initial Franchise Fee.  In consideration of the franchise granted herein, Franchisee shall pay to Franchisor, on execution of this Agreement, an initial franchise fee of Twenty-Five Thousand Dollars ($25,000), receipt of which is hereby acknowledged, which is fully earned and non-refundable in consideration of administrative and other expenses incurred by Franchisor in entering into this Agreement and for Franchisor's lost or deferred opportunity to enter into this Agreement with others; provided, however, that the initial franchise fee shall be Fifteen Thousand Dollars ($15,000) if this Agreement is not the first franchise agreement entered into between Franchisor and Franchisee pursuant to a multiple store option agreement.

4.2     Royalty Fee.  Franchisee shall pay to Franchisor a continuing monthly royalty fee in an amount equal to **four percent (4%)** of Gross Revenues, which shall be paid to Franchisor in accordance with Section 4.4 below.  For purposes of this Agreement, "Gross Revenues" include the total of all monies and receipts derived from products prepared and services performed at the Restaurant, delivered from the Restaurant (if authorized by Franchisor), at special events, or from catering (if authorized by Franchisor), and from all sales and orders made, solicited or received at the Restaurant or at special events and from all other business whatsoever conducted at or from the Restaurant, whether such revenues are evidenced by cash, credit, checks, gift certificates, script, food stamps, coupons (but not promotional or discount coupons to the extent that the Franchisee realizes no revenue therefrom through issuance, redemption or otherwise), services, property or other means of exchange, and whether such sales are of food, beverages, services, merchandise or products of any nature whatsoever.  Cash

5

*Initials*
*Franchisee* *Franchisor*

refunded and credit given to customers, and receivables uncollectible from customers shall be deducted in computing Gross Revenues to the extent that such cash, credit or receivables represent amounts previously included in Gross Revenues on which royalties were paid. Gross Revenues shall not include sales or merchants' or other taxes measured on the basis of the Gross Revenues of the business imposed by governmental authorities. Gross Revenues shall be deemed received by the Franchisee at the time the products, merchandise or services from which they derive are delivered or rendered or at the time the relevant sale takes place, whichever occurs first. Gross Revenues consisting of property or services shall be valued at the prices applicable, at the time such Gross Revenues are received, to the products or services exchanged for such Gross Revenues.

4.3     <u>Advertising Expenditures and Contributions</u>. Franchisee shall make monthly expenditures and contributions for advertising and promotion as specified in Section 12 hereof.

4.4     <u>Payments</u>. All payments to Franchisor or its designee required by Sections 4.2 and Section 12 hereof shall be paid by the fifteenth (15th) day of each month ("Due Date") based on the Gross Revenues from the preceding month. Franchisor reserves the right to require all such payments to be made on a weekly basis as Franchisor determines and notifies Franchisee in writing from time to time. All payments to Franchisor shall be made by electronic fund transfer or pre-authorized auto-draft arrangement, unless Franchisor specifies other means of payment in the Manual or otherwise in writing. Any payment not actually received in full by Franchisor on or before the Due Date shall be deemed overdue. If any payment is overdue, Franchisee shall pay Franchisor or its designee immediately upon demand, in addition to the overdue amount, interest on such amount at the rate of eighteen percent (18%) per annum thereafter until paid, or the maximum rate permitted by law, whichever is less. In addition, Franchisee shall pay Franchisor a late payment charge of fifteen percent (15%) of the overdue portion of the required payment. Entitlement to such interest shall be in addition to any other remedies Franchisor or its designee may have. Franchisee shall not be entitled to set-off any payments required to be made under this Section 4 against any monetary claim it may have against Franchisor. Any monthly report required under Section 11.1 of this Agreement that is not actually received by Franchisor on or before the due date is deemed overdue, and all monthly payments to Franchisor for that month, whether or not timely received, shall also deemed overdue, and Franchisee must pay interest and late fees on those payments until the required reports are submitted.

4.5     <u>Bank Account</u>. Franchisee shall maintain sufficient funds in a bank account from which it can pay all royalty fees, advertising fees, and other fees to Franchisor required by this Agreement. Franchisee shall furnish to Franchisor, upon Franchisor's request, such bank and account number, a voided check from such bank account, and written authorization for Franchisor to withdraw funds from such bank account via electronic funds transfer without further consent or authorization for Franchisee's royalty fees due to Franchisor based upon Franchisee's Gross Revenues reports for the relevant time periods. Franchisee agrees to execute any and all documents as may be necessary to effectuate and maintain the electronic funds transfer arrangement, as required by Franchisor. Franchisee agrees to pay all costs associated with any such transfer. In the event Franchisee changes banks or accounts for the bank account required by this Section 4.5, Franchisee shall, prior to such change, provide such information concerning the new account and an authorization to make withdrawals therefrom. Franchisee's

12421389.1

*Initials* _____ / _____
        Franchisee   Franchisor

failure to provide such information concerning the bank account required by this Section 4.5 or any new account, or Franchisee's withdrawal of consent to withdrawals for whatever reason and by whatever method shall be a breach of this Agreement.

## 5.   **OPENING OF FRANCHISED BUSINESS**

5.1   <u>Construction</u>.  Franchisee shall renovate or construct, and equip, the Restaurant at Franchisee's own expense.   Before commencing any renovation or construction of the Restaurant, Franchisee, at its expense, shall employ a qualified, licensed architect or engineer, who is reasonably acceptable to Franchisor, to prepare preliminary and final architectural drawings and specifications of the Premises in accordance with Franchisor's standard plans and specifications for a Wings To Go restaurant, which shall be supplied to Franchisee.   Such preliminary and final drawings and specifications shall be submitted to Franchisor for its prior written approval, which will not be unreasonably withheld.   The drawings and specifications shall not thereafter be changed or modified without the prior written approval of Franchisor. Franchisee or its contractor, at Franchisee's or its contractor's expense, shall obtain such insurance, as described in Section 13.1, prior to commencement of construction of the Restaurant.   Franchisor has the right to oversee any renovation or construction and visit the site at any time to ensure compliance with Franchisor's standard plans.   Franchisor also has the right to require Franchisee to submit periodic progress reports in such form and at such times as Franchisor determines in its sole discretion.

5.2   <u>Permits</u>.  Franchisor's approval of architectural plans and specifications submitted by Franchisee shall be limited to conformance with Franchisor's standard plans and specifications and shall not relate to Franchisee's obligations with respect to any federal, state, or local laws, codes, or regulations, including without limitation the applicable provisions of the ADA regarding the construction, design and operation of the Restaurant, which shall be Franchisee's sole responsibility.   Franchisee shall be responsible, at Franchisee's expense, for obtaining all zoning classifications, permits, certifications, and clearances required for the lawful construction and operation of the Restaurant, including, but not limited to, certificates of occupancy and certificates of health, which may be required by federal, state or local laws, ordinances, or regulations, or which may be necessary or advisable owing to any restrictive covenants relating to the Premises or required by the lessor.

5.3   <u>Opening Deadline</u>.  If Franchisee has selected an approved site prior to the execution of this Agreement, Franchisee shall commence operation of the Restaurant not later than one hundred eighty (180) days after the date of execution of this Agreement.  If Franchisee has not selected an approved site prior to the execution of this Agreement, Franchisee shall commence operation of the Restaurant by the earlier of:  (a) one hundred eighty (180) days after such location is approved by Franchisor; or (b) ten (10) days after construction is completed and Franchisee has obtained Franchisor's approval to open pursuant to Section 5.5 below.   The parties agree that time is of the essence in the opening of the Restaurant and that Franchisee's failure to open the Restaurant within the time periods described in this Section 5.3 shall be considered a material breach and default under this Agreement and will entitle Franchisor to terminate this Agreement pursuant to Section 15 hereof.

12421389.1

7

Initials _____ / _____
Franchisee   Franchisor

5.4     ADA Certification.  Prior to opening the Restaurant, and after any renovation, as described in Section 5.1 above, Franchisee shall execute and deliver to Franchisor an ADA Certification in the form attached to this Agreement as Exhibit C, to certify to Franchisor that the Restaurant and any proposed renovations comply with the ADA.

5.5     Opening Approval.  Franchisor shall inspect the Restaurant prior to the opening of the Restaurant to determine whether all construction has been substantially completed, and that such construction conforms to Franchisor's standards and specifications, including, but not limited to, materials, quality of work, signage, décor, paint, and equipment.  Franchisee shall obtain Franchisor's written approval prior to first opening the Restaurant, which approval shall not be unreasonably withheld.  Franchisee shall provide at least thirty (30) days prior notice to Franchisor of the date on which Franchisee proposes to first open the Restaurant for business.  Unless Franchisor waives in writing the foregoing requirement, Franchisee shall not open the Restaurant without the on-site presence of a representative of Franchisor, provided that Franchisor will not unreasonably delay the opening of the Restaurant.  In the event there is a change in the opening date of the Restaurant, not caused by Franchisor, Franchisee shall reimburse Franchisor its actual out-of-pocket costs and expenses incurred by Franchisor due to such delay, including travel costs and expenses for Franchisor's representatives.

6.     **TRAINING**

6.1     Initial Training Program.  Prior to the opening of the Restaurant, either Franchisee (or, if Franchisee is a corporation, partnership or limited liability company, a principal of Franchisee designated by Franchisee and approved by Franchisor) or Franchisee's full-time manager shall attend and successfully complete to Franchisor's satisfaction the initial training program for franchisees offered by Franchisor, which will be held at a location designated by Franchisor.  Additional employees of Franchisee may also attend the initial training program, but Franchisor shall have the right to approve those persons who attend and to require fewer or additional persons to attend the initial training program as Franchisor determines in its sole discretion.  In the event any manager fails to successfully complete the initial training program, Franchisee must immediately replace the individual and have the replacement immediately attend the initial training program at Franchisee's expense.

6.2     Subsequent Employees.     At Franchisor's option, any persons subsequently employed by Franchisee in the position of manager or other position as Franchisor determines in its sole discretion, shall, prior to the assumption of duties, also attend and complete the initial training program to Franchisor's satisfaction.

6.3     On-Site Training Program.  In addition to the training requirements in Sections 6.1 and 6.2 hereof, in connection with the opening the Restaurant, Franchisee, Franchisee's manager, and such other of Franchisee's employees as determined by Franchisor shall attend approximately ten (10) days of on-site training offered by Franchisor at the Restaurant.

6.4     Food Safety Certification.  Prior to the opening of the Restaurant, Franchisee (or, if Franchisee is a corporation, partnership or limited liability company, a principal of Franchisee designated by Franchisee and approved by Franchisor) and Franchisee's manager must attend

12421389.1

Initials _____ / _____
Franchisee    Franchisor

and successfully complete a ServSafe® or comparable food safety certification program, at Franchisee's sole expense. In addition, such additional employees must attend and successfully complete a ServSafe® or comparable food safety certification program, at Franchisee's expense, to ensure that at least one (1) certified employee is present at the Restaurant during all business hours.

6.5     Additional Programs.    Franchisee, Franchisee's manager and other employees who attend the initial training program or are designated by Franchisor from time to time shall attend such additional courses, seminars and other training programs as Franchisor may reasonably require from time to time. Such additional training will be held at Franchisor's headquarters or at other regional locations selected by Franchisor.

6.6     Training Expenses.    Franchisor does not charge a fee for Franchisee or Franchisee's manager to attend the initial training program. However, Franchisee shall be required to pay the then-current training fee designated in the Manual or otherwise in writing from time to time by Franchisor for any person who is subsequently employed by Franchisee in the position of manager and for Franchisee's and Franchisee's employees' attendance at all other courses, seminars and training programs as described in this Section 6. Franchisee shall also be responsible for any and all expenses incurred by Franchisee or Franchisee's employees in connection with attending such additional courses, seminars and training programs, including, without limitation, the costs of transportation, lodging, meals, and wages. Franchisee shall also be responsible for Franchisor's actual out-of-pocket costs and expenses incurred by Franchisor in connection with the on-site training program described in Section 6.3, including, without limitation, the costs of transportation, lodging, and meals.

## 7.     **DUTIES OF FRANCHISEE**

7.1     Operating Standards.    Franchisee understands and acknowledges that every detail of the Franchised Business is important to Franchisee, Franchisor and other franchisees in order to develop and maintain high operating standards, to increase the demand for the products sold by all franchised businesses operating under the System, and to protect Franchisor's reputation and goodwill.

7.2     Restaurant Operations.    Franchisee shall use the Premises solely for the operation of the business franchised hereunder; shall keep the Restaurant open and in normal operation for such minimum hours and days as Franchisor may specify; shall refrain from using or permitting the use of the Premises for any other purpose or activity at any time without first obtaining the written consent of Franchisor; and shall operate the Restaurant in strict conformity with such methods, standards, and specifications as Franchisor may from time to time prescribe in the Manual or otherwise in writing. Franchisee shall refrain from deviating from such standards, specifications, and procedures without Franchisor's prior written consent.

7.3     Adherence to Standards and Specifications.    To insure that the highest degree of quality and service is maintained, Franchisee shall operate the Restaurant in strict conformity with such methods, standards, and specifications as Franchisor may from time to time prescribe in the Manual or otherwise in writing. Franchisee agrees:

9

*Initials* _____ / _____
        Franchisee   Franchisor

7.3.1    To maintain in sufficient supply as Franchisor may prescribe in the Manual or otherwise in writing, and to use at all times, only use signs, menu boards, advertising, promotional material, equipment, supplies, uniforms, paper goods, packaging, furnishings, fixtures, recipes, and food ingredients at the Restaurant or in connection with your business as conform with Franchisor's standards and specifications, and to refrain from deviating therefrom by the use of nonconforming items, without Franchisor's prior written consent.

7.3.2    To sell or offer for sale only such Wings To Go menu items and other products and services, including, without limitation, take-out services, as have been expressly approved for sale in writing by Franchisor; to sell or offer for sale all types of Wings To Go menu items and other products, and services specified by Franchisor; to refrain from any deviation from Franchisor's standards and specifications without Franchisor's prior written consent; and to discontinue selling and offering for sale any Wings To Go menu items and other products or services which Franchisor may, in its discretion, disapprove in writing at any time.

7.3.3    Franchisee agrees that all Wings To Go menu items and other items shall be stored, maintained and served in strict conformity with Franchisor's standards, specifications and procedures, including appearance and quality standards prescribed in the Manual or otherwise in writing from time to time.

7.3.4    To use and display only the standard menu format required by Franchisor, as the same may be revised by Franchisor from time to time.  Any change in the menu format must be approved in writing by Franchisor prior to use.

7.3.5    To provide delivery and catering services, at Franchisee's option, upon Franchisor's prior written approval.

7.3.6    To use, in the operation of the Franchised Business, such standards, specifications, and procedures as prescribed by Franchisor.

7.4    Fixtures, Furnishings, and Equipment.  Franchisee shall purchase and install, at Franchisee's expense, all fixtures, furnishings, supplies, equipment, décor, and signs as Franchisor may reasonably direct from time to time; and shall refrain from installing or permitting to be installed on or about the Premises, without Franchisor's prior written consent, any fixtures, furnishings, equipment, décor, signs or other items not previously approved as meeting Franchisor's standards and specifications.

7.5    Sources of Products.  All products sold or offered for sale at the Restaurant, and other products, materials, supplies, paper goods, fixtures, furnishings and equipment used at the Restaurant, shall meet Franchisor's then-current standards and specifications, as established in the Manual or otherwise in writing.  Franchisee shall purchase all food and beverage items, ingredients, supplies, materials, and other products and equipment used or offered for sale at the Restaurant for which Franchisor has established standards or specifications solely from suppliers (including manufacturers, distributors and other sources) that demonstrate, to the continuing reasonable satisfaction of Franchisor, the ability to meet Franchisor's standards and specifications, who possess adequate quality controls and capacity to supply Franchisee's needs promptly and reliably, and who have been approved by Franchisor in the Manual or otherwise in

12421389.1

*Initials* ____ / ____
    *Franchisee*    *Franchisor*

writing. If Franchisee desires to purchase products from a party other than an approved supplier, Franchisee shall submit to Franchisor a written request to approve the proposed supplier, together with such evidence of conformity with Franchisor's specifications as Franchisor may reasonably require. Franchisor shall have the right to require that its representatives be permitted to inspect the supplier's facilities, and that samples from the supplier be delivered for evaluation and testing either to Franchisor or to an independent testing facility designated by Franchisor. Franchisor shall use its best efforts, within thirty (30) days after its receipt of such completed request and completion of such evaluation and testing (if required by Franchisor), to notify Franchisee in writing of its approval or disapproval of the proposed supplier. Franchisee shall pay Franchisor a fee not to exceed the reasonable cost of such evaluation and testing. Approval shall not be unreasonably withheld.  Franchisee shall not sell or offer for sale any products of the proposed supplier until Franchisor's written approval of the proposed supplier is received. Franchisor may from time to time revoke its approval of particular products or suppliers when Franchisor determines, in its sole discretion, that such products or suppliers no longer meet Franchisor's standards. Upon receipt of written notice of such revocation, Franchisee shall cease to sell any disapproved products and cease to purchase from any disapproved supplier. Franchisee agrees that it shall use products purchased from approved suppliers solely for the purpose of operating the Restaurant and not for any other purpose, including, without limitation, resale. Nothing in the foregoing shall be construed to require Franchisor to make available to prospective suppliers, standards and specifications for formulas that Franchisor, in its sole discretion, deems confidential.

7.6     Proprietary Sauces.  Franchisee acknowledges and agrees that the Wings To Go sauces, which are manufactured according to Franchisor's standards and specifications ("Sauces"), are proprietary to Franchisor and are an integral part of the System and the operation of all Wings To Go restaurants.  Accordingly, Franchisee shall purchase all Sauces from a supplier or suppliers designated by Franchisor.  All Sauces sold to Franchisee by such supplier(s) shall be sold and delivered to Franchisee on the terms and conditions of, and at the invoice price being charged by, such supplier(s) as described and amended in the then-current price list and terms of sale communicated to Franchisee by such supplier(s) in writing from time to time.

7.7     Initial Inventory.  At the time the Restaurant opens, Franchisee shall stock the initial inventory of products and supplies prescribed by Franchisor in the Manual or otherwise in writing. Thereafter, Franchisee shall stock and maintain all types of approved products in quantities sufficient to meet reasonably anticipated customer demand.

7.8     Inspections.  Franchisee shall permit Franchisor and its agents to enter upon the Restaurant premises at any time during normal business hours for the purpose of conducting inspections; shall cooperate with representatives of Franchisor in such inspections by rendering such assistance as they may reasonably request; and, upon notice from Franchisor or its agents, and without limiting Franchisor's other rights under this Agreement, shall take such steps as may be necessary to correct immediately any deficiencies detected during any such inspection. Should Franchisee, for any reason, fail to correct such deficiencies within a reasonable time as determined by Franchisor, Franchisor shall have the right, but not the obligation, to correct any deficiencies which may be susceptible to correction by Franchisor and to charge Franchisee a

Initials _____ / _____
          Franchisee   Franchisor

reasonable fee for Franchisor's expenses in so acting, payable to Franchisee upon demand. The foregoing shall be in addition to such other remedies Franchisor may have.

7.9    <u>Advertising and Promotional Materials</u>.    Franchisee shall ensure that all advertising and promotional materials, signs, decorations and other items specified by Franchisor bear the Proprietary Marks in the form, color, location, and manner prescribed by Franchisor.

7.10    <u>Maintenance of Premises</u>.    Franchisee shall maintain the Restaurant premises (including the adjacent public areas) in a clean, orderly condition and in excellent repair; and, in connection therewith, Franchisee shall, at its expense, make such additions, alterations, repairs and replacements thereto (but no others without Franchisor's prior written consent) as may be required for that purpose, including, without limitation, such periodic repainting or replacement of obsolete signs, furnishings, equipment and décor as Franchisor may reasonably direct.

7.11    <u>Refurbishment</u>.    At Franchisor's request, but no more than once every five (5) years, unless sooner required by Franchisee's lease, Franchisee shall refurbish the Restaurant premises, at its expense, to conform to the building design, trade dress, color schemes and presentation of the Proprietary Marks in a manner consistent with the then-current image for new Wings To Go franchised businesses.    Such refurbishment may include, without limitation, structural changes, installation of new equipment, remodeling, redecoration and modifications to existing improvements.

7.12    <u>On-Premises Supervision</u>.    The Restaurant shall at all times be under the direct, on-premises supervision of an individual who has satisfactorily completed the training as required by Section 6.1 hereof.    Franchisee shall maintain a competent, conscientious, trained staff, including a manager (who may be Franchisee) who has completed the training described in Section 6.1 hereof.    Franchisee shall take such steps as are necessary to ensure that its employees preserve good customer relations; render competent, prompt, courteous and knowledgeable service; and meet such minimum standards, including, without limitation, such attire as Franchisor reasonably requires, as Franchisor may establish from time to time in the Manual. Franchisee and its employees shall handle all customer complaints, refunds, returns and other adjustments in a manner that will not detract from the name and goodwill of Franchisor. Franchisee shall be solely responsible for all employment decisions and functions of the Restaurant, including, without limitation, those related to hiring, firing, training, wage and hour requirements, record-keeping, supervision, and discipline of employees.

7.13    <u>Changes to the System</u>.    Franchisee shall not implement any change, amendment or improvement to the System without the express prior written consent of Franchisor. Franchisee shall notify Franchisor in writing of any change, amendment or improvement in the System which Franchisee proposes to make, and shall provide to Franchisor such information as Franchisor requests regarding the proposed change, amendment or improvement. Franchisee acknowledges and agrees that Franchisor shall have the right to incorporate the proposed change, amendment or improvement into the System and shall thereupon obtain all right, title and interest therein without compensation to Franchisee.

7.14    <u>Compliance With Lease</u>. Franchisee shall comply with all the terms of its lease or sublease and all other agreements affecting the operation of the Restaurant; shall promptly

12421389.1

Initials _____ / _____
         Franchisee   Franchisor

furnish Franchisor a copy of its lease, upon request; shall undertake best efforts to maintain a good and positive working relationship with its landlord and/or lessor; and shall refrain from any activity which may jeopardize Franchisee's right to remain in possession of, or to renew the lease or sublease for, the Restaurant premises.

7.15    Health and Safety Standards.  Franchisee shall meet and maintain the highest health standards and ratings applicable to the operation of the Restaurant.  Franchisee shall furnish to Franchisor within five (5) business days after receipt thereof, a copy of any violation or citation which indicates Franchisee's failure to maintain local health or safety standards in the operation of the Restaurant.  Franchisee shall staff the Restaurant such that during all hours of operation at least one on-duty employee has a valid food safety certification license or the equivalent from the appropriate governmental authority.

7.16    Pricing and Coupon Sales.  Franchisor shall have the right to determine the prices of the products and services offered and sold by Franchisee.  Franchisor also shall have the right to establish minimum prices and/or maximum prices of the products and services offered and sold by Franchisee.  Franchisee shall strictly adhere to the prices (including minimum and/or maximum prices) established by Franchisor.  Franchisor retains the right to modify the prices from time to time in its absolute discretion.    Franchisee must comply with all of Franchisor's policies regarding advertising and promotion, including the use and acceptance of coupons.

7.18    Gift Card Programs.  Franchisee shall offer for sale, and will honor for purchases by customers, any incentive or convenience programs (including "gift card" programs), or customer loyalty programs, which Franchisor may institute from time to time, and Franchisee shall do so in compliance with Franchisor's standards and procedures for such programs.

# 8.    PROPRIETARY MARKS AND TECHNOLOGY

8.1    Franchisor Representations.  Franchisor represents with respect to the Proprietary Marks:

8.1.1    Franchisor has the right to use, and to license others to use, the Proprietary Marks; and

8.1.2    The trademark owner has taken and will take all steps reasonably necessary to preserve and protect the ownership and validity of the Proprietary Marks.

8.2    Franchisee's Use of Marks.  With respect to Franchisee's use of the Proprietary Marks, Franchisee agrees that:

8.2.1    Franchisee shall use only the Proprietary Marks designated by Franchisor, and shall use them only in the manner authorized and permitted by Franchisor;

8.2.2    Franchisee shall use the Proprietary Marks only for the operation of the Restaurant and only at the Approved Location, or in advertising for the Restaurant conducted at or from the Approved Location;

13

12421389.1

Initials _____ / _____
Franchisee    Franchisor

8.2.3    Unless otherwise authorized or required by Franchisor, Franchisee shall operate and advertise the Restaurant only under the name "Wings To Go" and shall use all Proprietary Marks without prefix or suffix.   Franchisee shall not use the Proprietary Marks as part of its corporate or other legal name;

8.2.4    During the term of this Agreement and any renewal or extension hereof, Franchisee shall identify itself as the owner of the Restaurant (in the manner required by Franchisor) in conjunction with any use of the Proprietary Marks, including, but not limited to, on invoices, order forms, receipts, business stationery, and contracts with all third parties or entities, as well as the display of such notices in such content and form and at such conspicuous locations as Franchisor may designate in writing;

8.2.5    Franchisee's right to use the Proprietary Marks is limited to such uses as are authorized under this Agreement, and any unauthorized use thereof shall constitute an infringement of the trademark owner's rights and will entitle Franchisor to exercise all of its rights under this Agreement in addition to all rights available at law or in equity;

8.2.6    Franchisee shall not use the Proprietary Marks to incur any obligation or indebtedness on behalf of Franchisor;

8.2.7    Franchisee shall execute any documents deemed necessary by Franchisor to obtain protection for the Proprietary Marks or to maintain their continued validity and enforceability;

8.2.8    Franchisee shall promptly notify Franchisor of any suspected unauthorized use of the Proprietary Marks, any challenge to the validity of the Proprietary Marks, or any challenge to Franchisor's ownership of, Franchisor's right to use and to license others to use, or Franchisee's right to use, the Proprietary Marks.   Franchisee acknowledges that Franchisor has the sole right to direct and control any administrative proceeding or litigation involving the Proprietary Marks, including any settlement thereof.   Franchisor has the right, but not the obligation, to take action against uses by others that may constitute infringement of the Proprietary Marks.   Franchisor shall defend Franchisee against any third-party claim, suit, or demand arising out of Franchisee's use of the Proprietary Marks.   If Franchisor, in its sole discretion, determines that Franchisee has used the Proprietary Marks in accordance with this Agreement, the cost of such defense, including the cost of any judgment or settlement, shall be borne by Franchisor.   If Franchisor, in its sole discretion, determines that Franchisee has not used the Proprietary Marks in accordance with this Agreement, the cost of such defense, including the cost of any judgment or settlement, shall be borne by Franchisee.   In the event of any litigation relating to Franchisee's use of the Proprietary Marks, Franchisee shall execute any and all documents and do such acts as may, in the opinion of Franchisor, be necessary to carry out such defense or prosecution, including, but not limited to, becoming a nominal party to any legal action.   Except to the extent that such litigation is the result of Franchisee's use of the Proprietary Marks in a manner inconsistent with the terms of this Agreement, Franchisor agrees to reimburse Franchisee for its out-of-pocket costs in doing such acts; and

14

*Initials*
Franchisee   Franchisor

8.2.9   Franchisee shall not attempt to register or otherwise obtain any interest in any Internet domain name or URL containing any of the Proprietary Marks or any other word, name, symbol or device which is likely to cause confusion with any of the Proprietary Marks.

8.3   <u>Acknowledgements</u>.  Franchisee expressly understands and acknowledges that:

8.3.1   Franchisor is the owner of all right, title, and interest in and to the Proprietary Marks and the goodwill associated with and symbolized by them, and Franchisor has the right to use, and license others to use, the Proprietary Marks;

8.3.2   The Proprietary Marks are valid and serve to identify the System and those who are authorized to operate under the System;

8.3.3   During the term of this Agreement and after its expiration or termination, Franchisee shall not directly or indirectly contest the validity of the trademark owner's ownership of, or Franchisor's right to use and to license others to use, the Proprietary Marks;

8.3.4   Franchisee's use of the Proprietary Marks does not give Franchisee any ownership interest or other interest in or to the Proprietary Marks;

8.3.5   Any and all goodwill arising from Franchisee's use of the Proprietary Marks shall inure solely and exclusively to the benefit of the trademark owner, and upon expiration or termination of this Agreement and the license granted herein, no monetary amount shall be assigned to Franchisee or any of its principals, affiliates, subsidiaries, successors, licensees or assigns as attributable to any goodwill associated with Franchisee's use of the System or the Proprietary Marks;

8.3.6   Except as specified in Section 1.3 hereof, the license of the Proprietary Marks granted hereunder to Franchisee is nonexclusive, and Franchisor thus has and retains the rights, among others: (a) to use the Proprietary Marks itself in connection with selling products and services; (b) to grant other licenses for the Proprietary Marks; and (c) to develop and establish other systems using the Proprietary Marks, similar proprietary marks, or any other proprietary marks, and to grant licenses thereto without providing any rights therein to Franchisee; and

8.3.7   Franchisor reserves the right, in Franchisor's sole discretion, to modify, add to, or discontinue use of the Proprietary Marks, or to substitute different proprietary marks, for use in identifying the System and the businesses operating thereunder.  Franchisee agrees promptly to comply with such changes, revisions and/or substitutions, and to bear all the costs of modifying Franchisee's signs, advertising materials, interior graphics and any other items which bear the Proprietary Marks to conform therewith.

8.4   <u>Computer System and Required Software.</u>

8.4.1   Franchisor shall have the right to specify or require that certain brands, types, makes, and/or models of communications, computer systems, and hardware be used by Franchisee, including without limitation:  (a) back office and point of sale systems, data, audio,

15

*Initials* ___/___
       *Franchisee*   *Franchisor*

and video, systems for use at the Franchised Business; (b) printers and other peripheral hardware or devices; (c) archival back-up systems; (d) Internet access mode and speed; and (e) physical, electronic, and other security systems (collectively, the "Computer System").

8.4.2   Franchisor shall have the right, but not the obligation, to develop or have developed for it, or to designate: (a) computer software programs that Franchisee must use in connection with the Computer System (the "Required Software"), which Franchisee shall install at its expense; (b) updates, supplements, modifications, or enhancements to the Required Software, which Franchisee shall install at its expense; (c) the tangible media upon which Franchisee shall record data; and (d) the database file structure of the Computer System.

8.4.3   At Franchisor's request, Franchisee shall purchase or lease, and thereafter maintain, the Computer System and, if applicable, the Required Software. Franchisor shall have the right at any time to remotely retrieve and use such data and information from Franchisee's Computer System or Required Software that Franchisor deems necessary or desirable. Franchisee expressly agrees to strictly comply with Franchisor's standards and specifications for all items associated with Franchisee's Computer System and any Required Software in accordance with Franchisor's standards and specifications.   Franchisee agrees, at its own expense, to keep the Computer System in good maintenance and repair and install such additions, changes, modifications, substitutions, and/or replacements to the Computer System or Required Software as Franchisor directs from time to time in writing.  Franchisee agrees that its compliance with this Section 8.4 shall be at Franchisee's sole cost and expense.

8.5   Data. All data provided by Franchisee, uploaded to Franchisor's system from Franchisee's system, and/or downloaded from Franchisor's system to Franchisor's system, is and will be owned exclusively by Franchisor, and Franchisor will have the right to use such data in any manner that Franchisor deems appropriate without compensation to Franchisee.  In addition, all other data created or collected by Franchisee in connection with the System, or in connection with Franchisee's operation of the Franchised Business (including but not limited to consumer and transaction data), is and will be owned exclusively by Franchisor during the term of, and following termination or expiration of, this Agreement.  Copies and/or originals of such data must be provided to Franchisor upon Franchisor's request.   Franchisor hereby licenses use of such data back to Franchisee, at no additional cost, solely for the term of this Agreement and solely for Franchisee's use in connection with the establishment and operation of the Franchised Business pursuant to this Agreement.

8.6   Privacy. Subject to commercial standards of reasonableness based upon local business practices in the Territory, Franchisor may, from time-to-time, specify in the Manual (or otherwise in writing) the information that Franchisee shall collect and maintain on the Computer System installed at the Franchised Business, and Franchisee shall provide to Franchisor such reports as Franchisor may reasonably request from the data so collected and maintained. All data pertaining to or derived from the Franchised Business (including, without limitation, data pertaining to or otherwise about customers) is and shall be the exclusive property of Franchisor, and Franchisor hereby grants a royalty-free nonexclusive license to Franchisee to use said data during the term of this Agreement.  Franchisee shall abide by all applicable laws pertaining to the privacy of consumer, employee, and transactional information.  Franchisee shall not publish,

Initials _____ / _____
Franchisee   Franchisor

disseminate, implement, revise, or rescind a data privacy policy without Franchisor's prior written consent as to said policy.

8.7   Extranet. Franchisor may, but is not obligated to, establish an Extranet. The term "Extranet" means a private network based upon Internet protocols that will allow users inside and outside of Franchisor's headquarters to access certain parts of Franchisor's computer network via the Internet. If Franchisor does establish an Extranet, then Franchisee shall comply with Franchisor's requirements (as set forth in the Manual or otherwise in writing) with respect to connecting to the Extranet and utilizing the Extranet in connection with the operation of the Franchised Business. The Extranet may include, without limitation, the Manual, training and other assistance materials, and management reporting solutions (both upstream and downstream, as Franchisor may direct). Franchisee shall purchase and maintain such computer software and hardware (including, but not limited to, telecommunications capacity) as may be required to connect to and utilize the Extranet. Franchisor shall have the right to require Franchisee to install a video, voice and data system that is accessible by both Franchisor and Franchisee on a secure Internet website, in real-time, all in accordance with Franchisor's then-current written standards as set forth in the Manual or otherwise in writing. Franchisee shall comply with Franchisor's requirements (as set forth in the Manual or otherwise in writing) with respect to establishing and maintaining telecommunications connections between Franchisee's Computer System and Franchisor's Extranet and/or such other computer systems as Franchisor may reasonably require.

8.8   Websites. Unless otherwise approved in writing by Franchisor, Franchisee shall not establish a separate Website. However, Franchisor shall have the right to require that Franchisee have one or more references or webpage(s), as designated and approved in advance by Franchisor, within Franchisor's Website. The term "Website" means a group of related documents that can be accessed through a common internet address. Franchisor shall have the right to require that Franchisee not have any Website other than the webpage(s), if any, made available on Franchisor's Website. However, if Franchisor approves a separate Website for Franchisee (which Franchisor is not obligated to approve; and, which approval, if granted, may later be revoked by Franchisor), then each of the following provisions shall apply:

8.8.1   Franchisee specifically acknowledges and agrees that any Website owned or maintained by or for the benefit of Franchisee shall be deemed "advertising" under this Agreement and will be subject to, among other things, Franchisor's prior review and approval;

8.8.2   Before establishing any Website, Franchisee shall submit to Franchisor, for Franchisor's prior written approval, a sample of the proposed Website domain name, format, visible content (including, without limitation, proposed screen shots), and non-visible content (including, without limitation, meta tags) in the form and manner Franchisor may reasonably require;

8.8.3   If approved, Franchisee shall not subsequently modify such Website without Franchisor's prior written approval as to such proposed modification;

12421389.1

17

*Initials* _____ / _____
*Franchisee*   *Franchisor*

8.8.4  Franchisee shall comply with the standards and specifications for Websites that Franchisor may periodically prescribe in the Manual or otherwise in writing; and

8.8.5  If required by Franchisor, Franchisee shall establish such hyperlinks to Franchisor's Website and other Websites as Franchisor may request in writing.

8.9     <u>Domain Names</u>.  Franchisee acknowledges and agrees that if Franchisor grants its approval for Franchisee's use of a generic, national, and/or regionalized domain name, Franchisor shall have the right to own and control said domain name at all times and may license it to Franchisee for the term of this Agreement on such terms and conditions as Franchisor may reasonably require (including, but not limited to, the requirement that Franchisee reimburse Franchisor's costs for doing so).  If Franchisee already owns any domain names, or hereafter registers any domain names, then Franchisee agrees that it shall notify Franchisor in writing and assign said domain names to Franchisor and/or a designee that Franchisor specifies in writing.

8.10    <u>Online Use of Proprietary Marks and E-mail Solicitations</u>.  Franchisee shall not use the Proprietary Marks or any abbreviation or other name associated with Franchisor and/or the System as part of any e-mail address, domain name, and/or other identification of Franchisee in any electronic medium.  Franchisee agrees not to transmit or cause any other party to transmit advertisements or solicitations by e-mail or other electronic media without first obtaining Franchisor's written consent as to:  (a) the content of such e-mail advertisements or solicitations; and (b) Franchisee's plan for transmitting such advertisements.  In addition to any other provision of this Agreement, Franchisee shall be solely responsible for compliance with all laws pertaining to e-mails, including, but not limited to, the U.S. Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 (known as the "CAN-SPAM Act of 2003").

8.11    <u>No Outsourcing without Prior Written Approval</u>. Franchisee shall not hire third party or outside vendors to perform any services or obligations in connection with the Computer System, Required Software, or any other of Franchisee's obligations without Franchisor's prior written approval.  Franchisor's consideration of any proposed outsourcing vendor(s) may be conditioned upon, among other things, such third party or outside vendor's entry into a confidentiality agreement with Franchisor and Franchisee in a form that is provided by Franchisor. The provisions of this Section 8.11 are in addition to and not instead of any other provision of this Agreement.

8.12    <u>Changes to Technology</u>. Franchisee and Franchisor acknowledge and agree that changes to technology are dynamic and not predictable within the term of this Agreement.  In order to provide for inevitable but unpredictable changes to technological needs and opportunities, Franchisee agrees that Franchisor shall have the right to establish, in writing, reasonable new standards for the implementation of technology in the System; and Franchisee agrees that it shall abide by those reasonable new standards established by Franchisor as if this Agreement were periodically revised by Franchisor for that purpose.

## 9.     CONFIDENTIAL OPERATING MANUAL

9.1     <u>Standards of Operation</u>.  In order to protect the reputation and goodwill of Franchisor and to maintain high standards of operation under the System, Franchisee shall

12421389.1

*Initials* ___ / ___
*Franchisee*  *Franchisor*

operate the Restaurant in accordance with the standards, methods, policies, and procedures specified in the Manual, one copy of which Franchisee shall receive on loan from Franchisor for the term of this Agreement upon completion by Franchisee or its manager of the initial training program to Franchisor's satisfaction. The Manual may consist of multiple volumes of printed text, computer disks, other electronically stored data, DVDs, and videotapes, and may contain information related to ingredients, recipes, restaurant operations, and restaurant management. Franchisee acknowledges and agrees that Franchisor may provide a portion or all of the Manual (including updates and amendments), and other instructional information and materials, in or via electronic media, including, without limitation, through the Internet.

9.2     Confidentiality.  Franchisee shall treat the Manual, any other manuals created for or approved for use in the operation of the Restaurant, and the information contained therein, as confidential, and shall use all reasonable efforts to maintain such information as secret and confidential pursuant to Section 10 below. Franchisee shall not copy, duplicate, record or otherwise reproduce the foregoing materials, in whole or in part, or otherwise make the same available to any unauthorized person.

9.3     Exclusive Property.  The Manual shall remain the sole property of Franchisor and shall be kept in a secure place on the Restaurant premises.

9.4     Revisions to Manual.  Franchisor may from time to time revise the contents of the Manual, and Franchisee expressly agrees to comply with each new or changed standard. Franchisee shall ensure that the Manual is kept current at all times. In the event of any dispute as to the contents of the Manual, the terms of the master copy maintained by Franchisor at Franchisor's home office shall be controlling.

## 10.     **CONFIDENTIAL INFORMATION**

10.1     Confidential Information.  Franchisee shall not, during the term of this Agreement or thereafter, communicate, divulge or use for the benefit of any other person, partnership, association, limited liability company or corporation any confidential information, knowledge or know-how concerning the methods of operation of the business franchised hereunder, including, without limitation, the Manual, recipes, cooking methods, preparation of menu items, drawings, suppliers, customer information, e-mail database information, equipment, product costs, accounting methods, management tools, or advertising, which may be communicated to Franchisee or of which Franchisee may be apprised by virtue of Franchisee's operation under the terms of this Agreement ("Confidential Information").    Franchisee shall divulge such Confidential Information only to such of its employees as must have access to it in order to operate the Franchised Business.  Any and all information, knowledge, know-how, techniques and other data which Franchisor designates as confidential shall be deemed confidential for purposes of this Agreement.

10.2     Confidentiality Agreements.  Franchisee shall require Franchisee's manager and other such personnel having access to any of Franchisor's Confidential Information as Franchisor requires to execute non-competition covenants and covenants that they will maintain the confidentiality of information they receive in connection with their employment by Franchisee at the Restaurant.  Franchisee shall use the form attached hereto as Exhibit D.

19

Initials _____ / _____
Franchisee    Franchisor

10.3    Irreparable Injury.  Franchisee acknowledges that any failure to comply with the requirements of this Section 10 will cause Franchisor irreparable injury, and Franchisee agrees to pay all court costs and reasonable attorneys' fees incurred by Franchisor in obtaining specific performance of, or an injunction against violation of, the requirements of this Section 10, or such other relief sought by Franchisor.

# 11.    ACCOUNTING AND RECORDS

11.1    Gross Revenues Reports.  All Gross Revenues, sales tax, and charges collected on behalf of third parties shall be recorded by Franchisee in accordance with the procedures prescribed herein and in the Manual.  Franchisee shall record all sales on a computer-based point-of-sale record keeping and control system designated by Franchisor, or on any other equipment specified by Franchisor in the Manual or otherwise in writing.  Franchisee shall maintain a record of all Gross Revenues and expenses for the month using a sales summary spreadsheet provided to Franchisee by Franchisor.  Franchisee shall provide Franchisor with such monthly record by the tenth (10th) day of the following month by such means as designated by Franchisor in the Manual or otherwise in writing, including, but not limited to, a Web-based management system or other system that allows Franchisor unrestricted access to Franchisee's sales information.  Any report not actually received by Franchisor on or before such date shall be deemed overdue.  If a report is overdue, all payments to Franchisor for that week, whether or not timely received, shall be deemed overdue until such time as Franchisor has received the required report, and interest and late fees shall be chargeable as provided in Section 4.4.  Franchisor shall have the right to access any business information or data collected and generated on Franchisee's point-of-sale system.

11.2    Other Reports.  Franchisee shall, at Franchisee's expense, submit to Franchisor in the form prescribed by Franchisor, the following reports, financial statements, and other data:

11.2.1    Within seventy-five (75) days after the end of each fiscal year, Franchisee's financial statements for the preceding fiscal year, including, without limitation, a complete and accurate profit and loss statement and balance sheet, which may be unaudited but, upon Franchisor's request, shall be reviewed in accordance with generally accepted accounting principles;

11.2.2    Upon Franchisor's request, within ten (10) days after their timely completion, all federal, state and local sales, income or other tax returns filed by Franchisee; and

11.2.3    Such other forms, reports, records, information, and data as Franchisor may reasonably designate from time to time or as may be described in the Manual.

11.3    Recordkeeping.  Franchisee shall prepare, and shall preserve for at least three (3) years from the dates of their preparation complete and accurate books, records and accounts in accordance with generally accepted accounting principles and in the form and manner prescribed by Franchisor in the Manual or otherwise from time to time in writing, including but not limited to:  (a) daily cash reports; (b) cash receipts journals; (c) cash disbursements and weekly payroll journals and schedules; (d) general ledgers; (e) monthly bank statements, daily deposit slips, and cancelled checks; (f) all personal and business tax returns; (g) suppliers' invoices (paid and

12421389.1

*Initials* _____ / _____
*Franchisee*   *Franchisor*

unpaid); (h) dated daily and weekly cash register journals; (i) monthly fiscal period balance sheets and fiscal period profit and loss statements; and (j) such other records as Franchisor may from time to time require.

11.4     Inspection and Audit.  Franchisor and its designated agents shall have the right at all reasonable times to examine, copy, and/or personally review at Franchisor's expense, the books, records, accounts, and tax returns of Franchisee.  Franchisor shall have the right at all reasonable times to remove such books, records, accounts and tax returns for copying. Franchisor shall also have the right, at any time, to have an independent audit made of the books and records of Franchisee.  If an inspection or audit should reveal that any income or sales have not been reported or have been understated in any report to Franchisor, then Franchisee shall immediately pay to Franchisor the amount underpaid upon demand, in addition to interest from the date such amount was due until paid, at the rate of eighteen percent (18%) per annum, or the maximum rate permitted by law, whichever is less.   In addition, if the audit reveals an understatement of two percent (2%) or more of Gross Revenues, Franchisee shall also pay immediately to Franchisor the entire cost of such inspection or audit (including travel, lodging, meals, salaries, reasonable accounting and legal fees and costs, and other expenses of the inspecting or auditing personnel).  The foregoing remedies shall be in addition to any other remedies Franchisor may have under this Agreement or otherwise at law or in equity.

## 12.     ADVERTISING AND PROMOTION

Recognizing the value of advertising and promotion, and the importance of the standardization of advertising and promotion programs to the furtherance of the goodwill and public image of the System, and for the protection of Franchisor's Proprietary Marks, the parties agree as follows:

12.1     Local Advertising.  In addition to the expenditure required by Section 12.2 hereof, Franchisee shall monthly spend two percent (2%) of Gross Revenues on local advertising and promotion.  Franchisee understands and acknowledges that such required expenditure is a minimum requirement only. Franchisee shall submit verification of the expenditure required by this Section 12.1 to Franchisor in the form and manner prescribed by Franchisor in the Manual or otherwise in writing on a quarterly basis.  Franchisor shall have the right to audit Franchisee's expenditures hereunder from time to time at Franchisee's cost and expense.

12.2     Advertising Fee.  Except as otherwise provided in Section 12.3 hereof, Franchisee shall pay Franchisor a monthly advertising fee in the amount of **one percent (1%)** of Gross Revenues for the preceding month**.   Such advertising fee shall be in addition to the expenditures required by Section 12.1 hereof and shall be paid in accordance with Section 4.4. Franchisor shall use these monies to direct advertising programs, with sole discretion over the concepts, materials, and media used in such programs and the placement and allocation thereof. Franchisee agrees and acknowledges that such advertising programs are intended to maximize general public recognition, acceptance, and use of the System, and that Franchisor is not obligated to make expenditures for Franchisee which are equivalent or proportionate to Franchisee's contribution, or to ensure that any particular franchisee benefits directly or from advertising expenditures by Franchisor.  All advertising fees shall be used exclusively to meet

12421389.1

*Initials* _____ / _____
        *Franchisee*    *Franchisor*

any and all costs of maintaining, administering, directing, conducting and preparing advertising, marketing, public relations, and/or promotional programs and materials, and any other activities which Franchisor believes will enhance the image of the System, including, among other things, the costs of preparing and conducting media advertising campaigns; developing, maintaining, and updating a Website on the Internet; direct mail advertising; marketing surveys; employing advertising and/or public relations agencies to assist therein; purchasing promotional items; providing promotional and other marketing materials and services to the businesses operating under the System; and advertising for the sale of franchises. ** **Contract is up for review one year from date of this contract to determine if a one percent (1%) increase will be imposed.**

12.3    <u>Wings To Go Advertising Fund</u>.  Franchisor reserves the right to establish and administer a Wings To Go Advertising Fund (the "Advertising Fund") as follows:

12.3.1  Franchisee shall contribute a monthly fee to the Advertising Fund in the amount of one percent (1%) of Gross Revenues for the preceding month, which shall replace Franchisee's obligation under Section 12.2 hereof.  Such contributions to the Advertising Fund shall be in addition to the expenditures required by Section 12.1 hereof and shall be paid in accordance with Section 4.4.

12.3.2  Franchisor shall direct all advertising programs, with sole discretion over the concepts, materials, and media used in such programs and the placement and allocation thereof. Franchisee agrees and acknowledges that the Advertising Fund is intended to maximize general public recognition, acceptance, and use of the System; and that Franchisor is not obligated, in administering the Advertising Fund, to make expenditures for Franchisee which are equivalent or proportionate to Franchisee's contribution, or to ensure that any particular franchisee benefits directly or from expenditures by the Advertising Fund.

12.3.3  The Advertising Fund, all contributions thereto, and any earnings thereon, shall be used exclusively to meet any and all costs of maintaining, administering, directing, conducting and preparing advertising, marketing, public relations, and/or promotional programs and materials, and any other activities which Franchisor believes will enhance the image of the System, including, among other things, the costs of preparing and conducting media advertising campaigns; developing, maintaining, and updating a Website on the Internet; direct mail advertising; marketing surveys; employing advertising and/or public relations agencies to assist therein; purchasing promotional items; providing promotional and other marketing materials and services to the businesses operating under the System; and advertising for the sale of franchises.

12.3.4  All sums paid by Franchisee to the Advertising Fund shall be maintained in an account separate from the other monies of Franchisor and shall not be used to defray any of Franchisor's expenses, except for such reasonable costs and overhead, if any, as Franchisor may incur in activities reasonably related to the direction and implementation of the Advertising Fund and advertising programs for franchisees and the System, including, among other things, costs of personnel for creating and implementing advertising, promotional and marketing programs. The Advertising Fund and any earnings thereon shall not otherwise inure to the benefit of Franchisor. Franchisor shall maintain separate bookkeeping accounts for the Advertising Fund.  Franchisee

12421389.1

*Initials* _____ / _____
    Franchisee   Franchisor

acknowledges that Franchisor is not a fiduciary to Franchisee of the monies in the Advertising Fund.

12.3.5 It is anticipated that all contributions to and earnings of the Advertising Fund will be expended for advertising and/or promotional purposes during the taxable year within which the contributions are made. If, however, excess amounts remain in the Advertising Fund at the end of such taxable year, all expenditures in the following taxable year(s) will be made first out of accumulated earnings from previous years, next out of earnings in the current year, and finally from contributions.

12.3.6 Although the Advertising Fund is intended to be of perpetual duration, Franchisor maintains the right to terminate the Advertising Fund. The Advertising Fund shall not be terminated, however, until all monies in the Advertising Fund have been expended for advertising and/or promotional purposes.

12.4     Advertising Materials. All advertising and promotion by Franchisee shall be in such media and of such type and format as Franchisor may approve, shall be conducted in a dignified manner and shall conform to such standards and requirements as Franchisor may specify. Franchisee shall not use any advertising or promotional plans or materials unless and until Franchisee has received written approval from Franchisor, pursuant to the procedures and terms set forth in Section 12.5 hereof. Franchisor may make available to Franchisee from time to time, at Franchisee's expense, samples of such promotional materials (including ad slicks, coupons, merchandising materials, and point-of-purchase materials, including takeout and catering menus), special promotions, and similar advertising and promotional materials for Franchisee to produce promotional materials for the Franchised Business.

12.5     Franchisor Approval. Franchisee shall submit to Franchisor samples of all advertising and promotional plans and materials for any print, broadcast, cable, electronic, computer or other media (including, without limitation, the Internet) that Franchisee desires to use and that have not been prepared or previously approved by Franchisor within the preceding six (6) months (as provided in Section 21 hereof), for Franchisor's prior approval. Franchisee shall also submit to Franchisor the name of the advertising vendor that Franchisee intends to use for Franchisor's prior approval. Franchisee shall not use such plans or materials until they have been approved in writing by Franchisor. If written notice of approval is not received by Franchisee from Franchisor within fifteen (15) days of the date of receipt by Franchisor of such samples or materials, Franchisor shall be deemed to have disapproved them.

12.6     In-Store Promotion. Franchisee shall post such promotional materials in Franchisee's Restaurant as are required at various times by Franchisor, including without limitation information on buying and owning a Wings To Go franchise.

12.7     Advertising Cooperative. Franchisor reserves the right, in its discretion, to designate any geographical area for purposes of establishing a regional advertising and promotional cooperative ("Cooperative"), and to determine whether a Cooperative is applicable to the Restaurant. If a Cooperative has been established applicable to the Restaurant at the time the Franchisee commences operations hereunder, Franchisee shall immediately become a member of the Cooperative. If a Cooperative applicable to the Restaurant is established at any

12421389.1

Initials _____ / _____
         Franchisee   Franchisor

later time during the term of this Agreement, Franchisee shall become a member of such Cooperative no later than thirty (30) days after the date on which the Cooperative commences operation. If the Restaurant is within the territory of more than one Cooperative, Franchisee may be a member of one or both Cooperatives.

12.7.1 Each Cooperative shall be organized and governed in a form and manner, shall commence operation on a date, and shall operate pursuant to written governing documents, all of which must be approved in advance by Franchisor in writing.

12.7.2 Each Cooperative shall be organized for the exclusive purpose of administering regional advertising programs and developing, subject to Franchisor's approval, standardized advertising materials for use by the members in local advertising.

12.7.3 No promotional or advertising plans or materials may be used by a Cooperative or furnished to its members without the prior approval of Franchisor. All such plans and materials shall be submitted to Franchisor in accordance with the procedure set forth in Section 12.5 hereof.

12.7.4 Each Cooperative shall have the right to require its members to make contributions to the Cooperative in such amounts as are determined by the Cooperative.

12.7.5 Each member franchisee shall submit to the Cooperative the amount invoiced by the Cooperative or Franchisor within ten (10) days from the date of receipt of such invoice, its contribution as provided in Section 12.7.4 hereof, together with such other statements or reports as may be required by Franchisor or by the Cooperative with Franchisor's prior approval.

12.7.6 Franchisor, in its sole discretion, may grant to any franchisee an exemption for any length of time from the requirement of membership in a Cooperative, upon written request of such franchisee stating the reasons supporting such exemption. Franchisor's decision concerning such request for exemption shall be final. If an exemption is granted to a franchisee, such franchisee shall be required to expend on local promotion and advertising in the full amount provided for in Section 12.2 hereof. Franchisor reserves the right to require Cooperatives to be changed, dissolved, or merged.

## 13.   INSURANCE

13.1   <u>Minimum Insurance Requirements</u>.   Franchisee shall procure, prior to the commencement of any operations under this Agreement, and shall maintain in full force and effect at all times during the term of this Agreement, at Franchisee's expense, an insurance policy or policies protecting Franchisee, Franchisor, and their respective officers, directors, partners, agents and employees against any demand or claim with respect to personal injury, death or property damage, or any loss, liability or expense whatsoever arising or occurring upon or in connection with the Restaurant and any catering services provided, including, but not limited to, comprehensive general liability insurance, property and casualty insurance, business interruption insurance, statutory workers' compensation insurance, employer's liability insurance, product liability insurance, alcoholic beverage liability (if applicable), and automobile

24

*Initials* _____ / _____
*Franchisee*   *Franchisor*

insurance coverage for all vehicles used in connection with the Restaurant and any catering or delivery services provided. Such policy or policies shall be written by a responsible carrier or carriers acceptable to Franchisor, shall name Franchisor as an additional insured as specified by Franchisor, and shall provide at least the following types and minimum amounts of coverage, which may be changed at any time by Franchisor in the Manual or otherwise in writing:

| Type of Risk | Limit of Liability |
|---|---|
| General Aggregate | $2,000,000 |
| Bodily Injury and Property Damage | $1,000,000 per occurrence |
| Fire | $300,000 per occurrence |
| Medical Payments | $5,000 per person |
| Liquor Liability | $1,000,000 per person |

13.2   Non-Waiver. Franchisee's obligation to obtain and maintain the policy or policies in the amounts specified in the Manual shall not be limited in any way by reason of any insurance which may be maintained by Franchisor, nor shall Franchisee's performance of that obligation relieve it of liability under the indemnity provisions set forth in Section 20.3 of this Agreement.

13.3   Franchisor Entitled to Recover. All public liability and property damage policies shall contain a provision that Franchisor, although named as an insured, shall nevertheless be entitled to recover under such policies on any loss occasioned to Franchisor or its servants, agents or employees by reason of the negligence of Franchisee or its servants, agents or employees.

13.4   Certificates of Insurance. Prior to the commencement of any operations under this Agreement, and thereafter at least thirty (30) days prior to the expiration of any policy, Franchisee shall deliver to Franchisor (as specified in the Manual) Certificates of Insurance evidencing the proper types and minimum amounts of coverage. All Certificates shall expressly provide that no less than thirty (30) days' prior written notice shall be given Franchisor in the event of material alteration to or cancellation of the coverages evidenced by such Certificates. Franchisee acknowledges and agrees that any product delivery will not commence under this Agreement until Franchisee has provided evidence of the required product liability insurance coverage to Franchisor as specified by the Manual. Franchisee shall provide Franchisor with updated copies of all Certificates of Insurance during the term of this Agreement.

13.5   Franchisor's Right to Procure. Should Franchisee, for any reason, fail to procure or maintain the insurance required by this Agreement, as such requirements may be revised from time to time by Franchisor in the Manual or otherwise in writing, Franchisor shall have the right and authority (but not the obligation) to procure such insurance and to charge same to Franchisee, which charges, together with a reasonable fee for Franchisor's expenses in so acting, shall be payable by Franchisee immediately upon notice. The foregoing remedies shall be in addition to any other remedies Franchisor may have.

12421389.1

Initials
Franchisee   Franchisor

## 14.  **TRANSFER OF INTEREST**

14.1    Franchisor's Right to Transfer.  Franchisor shall have the right to transfer or assign this Agreement and all or any part of its rights or obligations herein to any person or legal entity, and any designated assignee of Franchisor shall become solely responsible for all obligations of Franchisor under this Agreement from the date of assignment. Franchisee shall execute such documents of attornment or otherwise as Franchisor shall request.

14.2    Franchisee's Conditional Right to Transfer.    Franchisee understands and acknowledges that the rights and duties set forth in this Agreement are personal to Franchisee, and that Franchisor has granted this franchise in reliance on Franchisee's (or, if Franchisee is a corporation, partnership, or limited liability company, its principals') business skill, financial capacity and personal character.  Accordingly, neither Franchisee nor any immediate or remote successor to any part of Franchisee's interest in this Agreement, nor any individual, partnership, limited liability company, corporation or other legal entity which directly or indirectly owns any interest in Franchisee or in the Franchised Business shall sell, assign, transfer, convey, pledge, encumber, merge or give away (collectively, "transfer") any direct or indirect interest in this Agreement, in Franchisee, or in all or substantially all of the assets of the Franchised Business without the prior written consent of Franchisor.  Any purported assignment or transfer not having the written consent of Franchisor required by this Section 14.2 shall be null and void and shall constitute a material breach of this Agreement, for which Franchisor may immediately terminate without opportunity to cure pursuant to Section 15.2.7 of this Agreement.

14.3    Conditions of Transfer.  Franchisee shall notify Franchisor orally and in writing sent by certified mail, return receipt requested, of any proposed transfer of any direct or indirect interest in this Agreement, in Franchisee, or in all or substantially all of the assets of the Franchised Business (a) at least thirty (30) days before such transfer is proposed to take place, and (b) prior to Franchisee's advertising for any offer or sale of the Restaurant, as applicable. Franchisor shall not unreasonably withhold its consent to any transfer.  Franchisor may, in its sole discretion, require any or all of the following as conditions of its approval:

14.3.1  That all of Franchisee's accrued monetary obligations and all other outstanding obligations to Franchisor and its affiliates have been satisfied;

14.3.2  That Franchisee is not in default of any provision of this Agreement, any amendment hereof or successor hereto, or any other agreement between Franchisee and Franchisor or its affiliates;

14.3.3  That the transferor shall have executed a general release, in a form satisfactory to Franchisor, of any and all claims against Franchisor and its affiliates, and their respective officers, directors, agents, shareholders, and employees;

14.3.4  That the transferee (and, if the transferee is other than an individual, such owners of a beneficial interest in the transferee as Franchisor may request) demonstrate to Franchisor's satisfaction that it meets Franchisor's educational, managerial and business standards; possesses a good moral character, business reputation and credit rating; has the aptitude and ability to operate the Franchised Business (as may be evidenced by prior related

26

*Initials*  ____ / ____
*Franchisee*  *Franchisor*

business experience or otherwise), and has adequate financial resources and capital to operate the Franchised Business;

14.3.5  That (1)(a) the transferee (and, if the transferee is other than an individual, such owners of a beneficial interest in the transferee as Franchisor may request) enter into a written assignment, in a form satisfactory to Franchisor, assuming and agreeing to discharge all of Franchisee's obligations under this Agreement, or (b) the transferee execute, for a term ending on the expiration date of this Agreement and with such renewal term(s) as may be provided by this Agreement, the Franchisor's then-current form of franchise agreement and other ancillary agreements as Franchisor may require for the Franchised Business, which agreements shall supersede this Agreement in all respects, and the terms of which may differ from the terms of this Agreement including, without limitation, a higher royalty fee and advertising contribution, except that the transferee shall not be required to pay any initial franchise fee and the Franchisee's Territory shall remain the same; and (2) the transferee or its principals guaranty the performance of all such obligations in writing in a form satisfactory to Franchisor;

14.3.6  That Franchisee remain liable for all of the obligations to Franchisor in connection with the Franchised Business which arose prior to the effective date of the transfer and execute any and all instruments reasonably requested by Franchisor to evidence such liability;

14.3.7  That the transferee (or, if the transferee is a corporation, partnership or limited liability company, a principal of the transferee acceptable to Franchisor), or the transferee's manager (if transferee or transferee's principal will not manage the Restaurant), at the transferee's expense, complete any training programs then in effect upon such terms and conditions as Franchisor may reasonably require;

14.3.8  That Franchisee pay to Franchisor a non-refundable transfer fee in the amount of Seven Thousand Five Hundred Dollars ($7,500) no later than at the time of transfer. However, in the case of a transfer to a corporation formed by Franchisee for the convenience of ownership, no such transfer fee shall be required; and

14.3.9  That the transferee provide Franchisor with copies of all transfer documents must prior to the date of transfer.

14.4   No Security Interest.  Franchisee shall not grant a security interest in the Restaurant or in any of the assets of the Restaurant unless the secured party agrees that in the event of any default by Franchisee under any documents related to the security interest, Franchisor shall have the right and option (but not the obligation) to be substituted as obligor to the secured party and to cure any default of Franchisee, and, in the event Franchisor exercises such option, any acceleration of indebtedness due to Franchisee's default shall be void.

14.5   Franchisor's Right of First Refusal.  If any party holding any direct or indirect interest in this Agreement, in Franchisee, or in all or substantially all of the assets of the Franchised Business desires to accept any bona fide offer from a third party to purchase such interest, Franchisee shall notify Franchisor as provided in Section 14.3 hereof, and shall provide such information and documentation relating to the offer as Franchisor may require.  Franchisor

12421389.1

27

Initials _____  _____
Franchisee  Franchisor

shall have the right and option, exercisable within thirty (30) days after receipt of such written notification, to send written notice to the seller that Franchisor intends to purchase the seller's interest on the same terms and conditions offered by the third party.  If Franchisor elects to purchase the seller's interest, closing on such purchase shall occur within thirty (30) days from the date of notice to the seller of the election to purchase by Franchisor. If Franchisor elects not to purchase the seller's interest, any material change thereafter in the terms of the offer from a third party shall constitute a new offer subject to the same rights of first refusal by Franchisor as in the case of the third party's initial offer. Failure of Franchisor to exercise the option afforded by this Section 14.5 shall not constitute a waiver of any other provision of this Agreement, including all of the requirements of this Section 14, with respect to a proposed transfer.  In the event the consideration, terms and/or conditions offered by a third party are such that Franchisor may not reasonably be required to furnish the same consideration, terms and/or conditions, then Franchisor may purchase the interest proposed to be sold for the reasonable equivalent in cash. If the parties cannot agree within thirty (30) days on the reasonable equivalent in cash of the consideration, terms and/or conditions offered by the third party, the fair market value of such interest shall be determined by three (3) appraisers chosen in the following manner:  Franchisee shall select one appraiser, at Franchisee's expense; Franchisor shall select one appraiser, at Franchisor's expense; and the two appraisers so chosen shall select a third appraiser.  The decision of the majority of the appraisers so chosen shall be conclusive.  The cost of the third appraiser shall be shared equally by the parties.

14.6    Death or Incapacity.  Upon the death or physical or mental incapacity of any person with an interest in this Agreement, in Franchisee, or in all or substantially all of the assets of the Franchised Business, the executor, administrator, or personal representative of such person shall transfer such interest to a third party approved by Franchisor within six (6) months after such death or incapacity.  Such transfers, including, without limitation, transfers by devise or inheritance, shall be subject to the same conditions as any inter vivos transfer. In the case of transfer by devise or inheritance, if the heirs or beneficiaries of any such person are unable to meet the conditions in this Section 14, the executor, administrator, or personal representative of the decedent shall transfer the decedent's interest to another party approved by Franchisor within a reasonable time, which disposition shall be subject to all the terms and conditions for transfers contained in this Agreement.   If the interest is not disposed of within a reasonable time, Franchisor may terminate this Agreement, pursuant to Section 15.2.8 hereof.

14.7    Non-Waiver. Franchisor's consent to a transfer of any interest in this Agreement, in Franchisee, or in all or substantially all of the assets of the Franchised Business shall not constitute a waiver of any claims it may have against the transferring party, nor shall it be deemed a waiver of Franchisor's right to demand exact compliance with any of the terms of this Agreement by the transferor or transferee.

## 15.    DEFAULT AND TERMINATION

15.1    Automatic Termination.  Franchisee shall be deemed to be in default under this Agreement, and all rights granted to Franchisee herein shall automatically terminate without notice to Franchisee, if Franchisee shall become insolvent or make a general assignment for the benefit of creditors; if a petition in bankruptcy is filed by Franchisee or such a petition is filed

12421389.1

Initials _____ / _____
        Franchisee   Franchisor

against and not opposed by Franchisee; if Franchisee is adjudicated a bankrupt or insolvent; if a bill in equity or other proceeding for the appointment of a receiver of Franchisee or other custodian for Franchisee's business or assets is filed and consented to by Franchisee; if a receiver or other custodian (permanent or temporary) of Franchisee's assets or property, or any part thereof, is appointed by any court of competent jurisdiction; if proceedings for a composition with creditors under any state or federal law should be instituted by or against Franchisee; if a final judgment remains unsatisfied or of record for thirty (30) days or longer (unless supersedeas bond is filed); if Franchisee is dissolved; if execution is levied against Franchisee's business or property; if suit to foreclose any lien or mortgage against the premises of the Franchised Business or equipment is instituted against Franchisee and not dismissed within thirty (30) days; or if the real or personal property of the Franchised Business shall be sold after levy thereupon by any sheriff, marshal, or constable.

15.2   <u>Notice Without Opportunity to Cure</u>.   In addition to the foregoing, upon the occurrence of any of the following events of default, Franchisor may, at its option, terminate this Agreement and all rights granted hereunder, without affording Franchisee any opportunity to cure the default, effective immediately upon the provision of notice to Franchisee (in the manner provided under Section 23 hereof):

15.2.1  If Franchisee fails to locate an approved site or to construct and open the Restaurant within the time limits provided in the Site Selection Addendum or Section 5.3 hereof;

15.2.2  If Franchisee or Franchisee's designated trainees fail to complete the initial training programs described in Section 6.1 hereof to Franchisor's satisfaction;

15.2.3  If Franchisee at any time ceases to operate or otherwise abandons the Franchised Business, or loses the right to possession of the premises of the Franchised Business, or otherwise forfeits the right to do or transact business in the jurisdiction where the Franchised Business is located. However, if, through no fault of Franchisee, the premises of the Franchised Business are damaged or destroyed by an event such that repairs or reconstruction cannot be completed within sixty (60) days thereafter, then Franchisee shall have thirty (30) days after such event in which to apply for Franchisor's approval to relocate and/or reconstruct the premises of the Franchised Business, which approval shall not he unreasonably withheld;

15.2.4  If Franchisee loses the lease for the premises of the Franchised Business or otherwise forfeits the right to do or transact business in the jurisdiction where the Franchised Business is located;

15.2.5  If Franchisee is convicted of a felony, a crime involving moral turpitude, or any other crime or offense that Franchisor believes is reasonably likely to have an adverse effect on the System, the Proprietary Marks, the goodwill associated therewith or Franchisor's interest therein;

15.2.6  If a threat or danger to public health or safety results from the operation of the Franchised Business;

12421389.1

*Initials* _____ / _____
       *Franchisee*   *Franchisor*

15.2.7  If any purported assignment or transfer of any direct or indirect interest in this Agreement, in Franchisee, or in all or substantially all of the assets of the Franchised Business is made to any third party without Franchisor's prior written consent, contrary to the terms of Section 14 hereof;

15.2.8  If an approved transfer is not effected within the time provided following death or mental incapacity, as required by Section 14.6 hereof;

15.2.9  If Franchisee fails to comply with the covenants in Section 17.2 hereof or fails to obtain execution of the covenants required under Section 10.2 hereof;

15.2.10      If, contrary to the terms of Sections 9 or 10 hereof, Franchisee discloses or divulges the contents of the Manual or other confidential information provided to Franchisee by Franchisor;

15.2.11      If Franchisee knowingly maintains false books or records or submits any false reports to Franchisor;

15.2.12      If Franchisee misuses or makes any unauthorized use of the Proprietary Marks or any other identifying characteristics of the System, or otherwise materially impairs the goodwill associated therewith or Franchisor's rights therein;

15.2.13      If Franchisee refuses to permit Franchisor to inspect the Restaurant premises, or the books, records or accounts of Franchisee upon demand;

15.2.14      If Franchisee, upon receiving a notice of default under Section 15.3 hereof, fails to initiate immediately a remedy to cure such default;

15.2.15      If Franchisee, after curing any default pursuant to Section 15.3 hereof, commits the same default again, whether or not cured after notice; or

15.2.16      If Franchisee fails to procure the minimum insurance required by Section 13 or fails to provide Franchisor with current Certificates of Insurance.

15.3   <u>Notice With Opportunity to Cure</u>.  Except as otherwise provided in Sections 15.1 and 15.2 of this Agreement, upon any other default by Franchisee, Franchisor may terminate this Agreement by giving written notice of termination (in the manner set forth under Section 23 hereof) stating the nature of the default to Franchisee at least thirty (30) days prior to the effective date of termination; provided, however, that Franchisee may avoid termination by immediately initiating a remedy to cure such default, curing it to Franchisor's satisfaction, and by promptly providing proof thereof to Franchisor within the applicable cure period.  If any such default is not cured within the specified time, or such longer period as applicable law may require, this Agreement shall terminate without further notice to Franchisee, effective immediately upon the expiration of the applicable cure period or such longer period as applicable law may require.  Defaults which are susceptible of cure hereunder include the following illustrative events:

12421389.1

Initials _____ / _____
        Franchisee   Franchisor

15.3.1 If Franchisee fails to maintain the cleanliness of the Restaurant, or fails to comply with any of Franchisor's specifications;

15.3.2 If Franchisee fails to substantially comply with any of the requirements imposed by this Agreement, as it may from time to time reasonably be supplemented by the Manual, or failure to carry out the terms of this Agreement in good faith;

15.3.3 If Franchisee fails, refuses or neglects promptly to pay any monies owing to Franchisor or its affiliates when due, or to submit the financial or other information required by Franchisor under this Agreement;

15.3.4 If Franchisee fails to submit financial reports pursuant to Section 11 hereof;

15.3.5 If Franchisee fails to obtain Franchisor's prior written approval or consent as required in any of the Sections contained herein;

15.3.6 If Franchisee fails to maintain or observe any of the standards or procedures prescribed by Franchisor in this Agreement, the Manual or otherwise in writing;

15.3.7 Except as provided in Section 15.2.7 hereof, if Franchisee fails, refuses or neglects to obtain Franchisor's prior written approval or consent as required by this Agreement;

15.3.8 If Franchisee acts, or fails to act, in any manner which is inconsistent with or contrary to its lease or sublease for the premises, or in any way jeopardizes its right to renewal of such lease or sublease;

15.3.9 If Franchisee engages in any business or markets any service or product under a name or mark which, in Franchisor's opinion, is confusingly similar to the Proprietary Marks; or

15.3.10 If Franchisee receives any citation or notice of potential health code violation from the local board of health or Franchisor.

## 16.    OBLIGATIONS UPON TERMINATION OR EXPIRATION

Upon termination or expiration of this Agreement, all rights granted hereunder to Franchisee shall forthwith terminate, and:

16.1    Cease Operations.  Franchisee shall immediately cease to operate the Franchised Business, and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former franchisee of Franchisor.  Immediately upon the expiration or termination hereof, Franchisee shall dispose of, and not sell, any products sold hereunder.

16.2    Cease Use of Confidential Information and Marks.  Franchisee shall immediately and permanently cease to use, in any manner whatsoever, any Confidential Information, methods, procedures and techniques associated with the System; the Proprietary Marks and all distinctive forms, slogans, signs, symbols and devices associated with the System.  In particular,

31

12421389.1

Initials _____ / _____
Franchisee   Franchisor

Franchisee shall cease to use, without limitation, all signs, advertising materials, displays, stationery, forms, products and any other articles which display the Proprietary Marks.

16.3    <u>Cancellation of Registrations</u>.    Franchisee shall take such action as may be necessary to cancel any assumed name registration or equivalent registration obtained by Franchisee which contains the mark "Wings To Go" or any other Proprietary Marks, and Franchisee shall furnish Franchisor with evidence satisfactory to Franchisor of compliance with this obligation within thirty (30) days after termination or expiration of this Agreement.

16.4    <u>Assignment of Lease</u>.    Franchisee shall, at Franchisor's option, assign to Franchisor any interest which Franchisee has in any lease or sublease for the Restaurant premises.  In the event Franchisor does not elect to exercise its option to acquire the lease or sublease for the Restaurant premises, Franchisee shall make such modifications or alterations to the premises (including, without limitation, the changing of, and the assigning to Franchisor of, the telephone number) immediately upon termination or expiration of this Agreement as may be necessary to distinguish the appearance of the premises from that of the Restaurant under the System, and shall make such specific additional changes thereto as Franchisor may reasonably request for that purpose.  In the event Franchisee fails or refuses to comply with the requirements of this Section 16.4, Franchisor shall have the right to enter upon the premises, without being guilty of trespass or any other tort, for the purpose of making or causing to be made such changes as may be required, at the expense of Franchisee, which expense Franchisee agrees to pay upon demand.

16.5    <u>Franchisor's Option to Purchase Assets</u>.    Franchisor shall have the option, to be exercised within thirty (30) days after termination, to purchase from Franchisee any or all of the equipment, fixtures, furnishings, and signs related to the operation of the Restaurant at fair market value or at Franchisee's depreciated book value, whichever is less, and to purchase any or all supplies and inventory of the Franchised Business at fair market value or at Franchisee's depreciated book value, whichever is less. If the parties cannot agree on the price of any such items within a reasonable time, their fair market value shall be determined by three (3) appraisers chosen in the following manner: Franchisee shall select one appraiser, at Franchisee's expense; Franchisor shall select one appraiser, at Franchisor's expense; and the two appraisers so chosen shall select a third appraiser. The decision of the majority of the appraisers so chosen shall be conclusive. The cost of the third appraiser shall be shared equally by the parties. If Franchisor elects to exercise any option to purchase herein provided, it shall have the right to set off all amounts due from Franchisee, and the cost of the appraisal, if any, against any payment therefor.

16.6    <u>Subsequent Use of Proprietary Marks Prohibited</u>.    Franchisee agrees, in the event it continues to operate or subsequently begins to operate any other business, not to use any reproduction, counterfeit, copy or colorable imitation of the Proprietary Marks, either in connection with such other business or the promotion thereof, which, in Franchisor's sole discretion, is likely to cause confusion, mistake or deception, or which, in Franchisor's sole discretion, is likely to dilute Franchisor's rights in and to the Proprietary Marks.  Franchisee further agrees not to utilize any designation of origin, description or representation (including but not limited to reference to the Franchisor, the System or the Proprietary Marks) which, in

32

Initials _____ / _____
Franchisee      Franchisor

Franchisor's sole discretion, suggests or represents a present or former association or connection with Franchisor, the System or the Proprietary Marks.

16.7     Payment.   Franchisee shall promptly pay all sums owing to Franchisor and its affiliates. In the event of termination for any default of Franchisee, such sums shall include all damages, costs, and expenses, including reasonable attorneys' fees, incurred by Franchisor as a result of the default, which obligation shall give rise to and remain, until paid-in-full, a lien in favor of Franchisor against any and all of the personal property, furnishings, equipment, signs, fixtures, and inventory owned by Franchisee and on the premises operated hereunder at the time of default.

16.8     Liquidated Damages.   In the event this Agreement is terminated prior to the end of its term due to Franchisee's default hereunder, in addition to the amounts set forth in Section 16.7 above, Franchisee shall promptly pay to Franchisor a lump sum payment (as damages and not as a penalty) for breaching this Agreement in an amount equal to the average monthly continuing royalty fees and advertising fees payable by you under Sections 4.2 and 12 above over the twelve (12) month period immediately preceding the date of termination (or such shorter time period if the Franchised Business has been open less than twelve (12) months), multiplied by the lesser of (a) thirty-six (36) months, or (b) the number of months then remaining in the then-current term of this Agreement.  Franchisee acknowledges that a precise calculation of the full extent of the damages Franchisor will incur in the event of termination of this Agreement as a result of Franchisee's default is difficult to determine and that this lump sum payment is reasonable in light of the damages Franchisor will incur for Franchisee's pre-mature termination of this Agreement.  This lump sum payment shall be in lieu of any damages we may incur as a result of Franchisee's default, but it shall be in addition to all amounts provided above in Section 16.7 and any attorneys' fees and other costs and expenses to which Franchisor is entitled under the terms of this Agreement, including but not limited to, Section 26.8 below.  Franchisee's payment of this lump sum shall not affect Franchisor's right to obtain appropriate injunctive relief and remedies to enforce this Section 16 and the covenants set forth in Sections 10 and 17.

16.9     Return Manual.   Franchisee shall immediately deliver to Franchisor the Manual and all other records, correspondence and instructions containing confidential information relating to the operation of the Restaurant (and any copies thereof, even if such copies were made in violation of this Agreement), all of which are acknowledged to be the property of Franchisor, and shall retain no copy or record of any of the foregoing, with the exception of Franchisee's copy of this Agreement, any correspondence between the parties and any other documents which Franchisee reasonably needs for compliance with any provision of law.

16.10     Transfer Websites.   Franchisee shall immediately irrevocably assign and transfer to Franchisor or its designee any and all interests Franchisee may have in the Website maintained by Franchisee in connection with the Franchised Business and in the domain name and home page address related to such Website.  Franchisee shall immediately execute any documents and perform any other actions required by Franchisor to effectuate such assignment and transfer and otherwise ensure that all rights in such Website revert to Franchisor or its designee, and hereby appoints Franchisor as its attorney-in-fact to execute such documents on Franchisee's behalf if

Initials _____ / _____
            Franchisee    Franchisor

Franchisee fails to do so.  Franchisee may not establish any Website using any similar or confusing domain name and/or home page address.

16.11  <u>Compliance With Covenants</u>.  Franchisee shall comply with the covenants contained in Sections 10.1 and 17.3 of this Agreement.

## 17.  <u>COVENANTS</u>

17.1  <u>Best Efforts</u>.  Franchisee covenants that, during the term of this Agreement, except as otherwise approved in writing by Franchisor, Franchisee (or, if Franchisee is a corporation, partnership or limited liability company, a principal, general partner or member of Franchisee) or Franchisee's fully-trained manager shall devote full time and best efforts to the management and operation of the Franchised Business.  Such person must reside in the general locality of the Franchised Business and, if such person is a principal, general partner or member of Franchisee, must own at least a twenty-five percent (25%) equity interest in Franchisee.

17.2  <u>In-Term Covenants</u>.  Franchisee specifically acknowledges that, pursuant to this Agreement, Franchisee will receive valuable, specialized training and confidential information, including, without limitation, information regarding the operational, sales, promotional, and marketing methods and techniques of Franchisor and the System.  Franchisee covenants that during the term of this Agreement, except as otherwise approved in writing by Franchisor, Franchisee shall not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person or legal entity:

17.2.1  Divert or attempt to divert any present or prospective business or customer of any Wings To Go restaurant to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Proprietary Marks and the System;

17.2.2  Employ or seek to employ any person who is at that time employed by Franchisor or by any other franchisee of Franchisor, or otherwise directly or indirectly induce such person to leave his or her employment; or

17.2.3  Own, maintain, operate, engage in, be employed by, provide assistance to, or have any interest in (as owner or otherwise) any business that offers, sells or manufactures products or services which are the same as or similar to the products and services being offered by the Restaurant under the System, including, without limitation, chicken wings.

17.3  <u>Post-Term Covenants</u>.  Franchisee covenants that, except as otherwise approved in writing by Franchisor, Franchisee shall not, for a continuous uninterrupted period of two (2) years commencing upon the date of: (a) a transfer permitted under Section 14 of this Agreement; (b) expiration of this Agreement; (c) termination of this Agreement (regardless of the cause for termination); (d) a final order of a duly authorized court of competent jurisdiction (after all appeals have been taken) with respect to any of the foregoing or with respect to enforcement of this Section 17.3; or (e) any or all of the foregoing; either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person or legal entity, own, maintain, operate, engage in, be employed by, provide assistance to, or have any interest in (as owner or otherwise)

34

*Initials* _____ / _____
<u>Franchisee</u>    <u>Franchisor</u>

any business that: (i) offers, sells or manufactures products or services which are the same as or similar to the products and services offered by the Restaurant under the System, including, but not limited to, chicken wings; and (ii) is, or is intended to be, located at or within:

       17.3.1  the Franchisee's Territory; or

       17.3.2  ten (10) miles of the Restaurant; or

       17.3.3  ten (10) miles of any Wings To Go restaurant;

provided, however, that Sections 17.2.3 and this Section 17.3 shall not apply to the operation by Franchisee of any business under the System which may be franchised by Franchisor to Franchisee under a written Franchise Agreement.

    17.4    <u>No Application to Equity Securities</u>.  Sections 17.2.3 and 17.3 shall not apply to ownership by Franchisee of a less than five percent (5%) beneficial interest in the outstanding equity securities of any corporation which has securities registered under the Securities Exchange Act of 1934.

    17.5    <u>Reduction of Scope of Covenants</u>.  Franchisee understands and acknowledges that Franchisor shall have the right, in its sole discretion, to reduce the scope of any covenant set forth in Sections 17.2 and 17.3, or any portion thereof, without Franchisee's consent, effective immediately upon receipt by Franchisee of written notice thereof; and Franchisee agrees that it shall comply forthwith with any covenant as so modified, which shall be fully enforceable notwithstanding the provisions of Section 23 hereof.

    17.6    <u>No Defense</u>.  Franchisee expressly agrees that the existence of any claims it may have against Franchisor, whether or not arising from this Agreement, shall not constitute a defense to the enforcement by Franchisor of the covenants in this Section 17.  Franchisee agrees to pay all costs and expenses (including reasonable attorneys' fees) incurred by Franchisor in connection with the enforcement of this Section 17.

## 18.  CORPORATE, PARTNERSHIP OR LIMITED LIABILITY COMPANY FRANCHISEE

    18.1    <u>Franchisee Corporation</u>.  If Franchisee is a corporation, Franchisee shall comply with the following requirements:

       18.1.1  Franchisee shall be newly organized and its charter shall at all times provide that its activities are confined exclusively to operating the Franchised Business.

       18.1.2  Copies of Franchisee's Articles of Incorporation, and other governing documents, and any amendments thereto, including the resolution of the Board of Directors authorizing entry into this Agreement, shall be promptly furnished to Franchisor.

       18.1.3  Franchisee shall issue no certificates for voting securities upon the face of which the following printed legend does not legibly and conspicuously appear:

*Initials* _____ / _____
       Franchisee    Franchisor

The transfer of this stock is subject to the terms and conditions of a Franchise Agreement with Wings To Go, Inc., dated 4-1-10 . Reference is made to the provisions of the said Franchise Agreement and to the Articles and Bylaws of this Corporation.

Notwithstanding the above, the requirements of this Section 18.1.3 shall not apply to a publicly-held corporation. A "publicly-held corporation" for purposes of this Agreement shall mean a corporation registered pursuant to the Securities and Exchange Act of 1934.

18.1.4 Franchisee shall maintain a current list of all owners of record and all beneficial owners of any class of voting securities or securities convertible into voting securities of Franchisee and shall furnish the list to Franchisor upon request.

18.2 <u>Franchisee Partnership</u>. If Franchisee or any successor to or assignee of Franchisee is a partnership, it shall comply with the following requirements:

18.2.1 Franchisee shall furnish Franchisor with a copy of its partnership agreement as well as such other documents as Franchisor may reasonably request, and any amendments thereto.

18.2.2 The partnership agreement shall at all times note conspicuously that partnership rights are held subject to, and that further assignment or transfer thereof are subject to, all restrictions imposed upon assignments by the Franchise Agreement.

18.2.3 Franchisee shall prepare and furnish to Franchisor, upon request, a list of all general and limited partners in Franchisee.

18.3 <u>Franchisee Limited Liability Company</u>. If Franchisee or any successor to or assignee of Franchisee is a limited liability company, it shall comply with the following requirements:

18.3.1 Franchisee must be newly organized and its operating agreement must at all times provide that its activities are confined exclusively to operating the franchised business.

18.3.2 Franchisee shall furnish Franchisor with a copy of its articles of organization as well as such other documents as Franchisor may reasonably request, and any amendments thereto.

18.3.3 The articles of organization shall at all times note conspicuously that membership rights are held subject to, and that further assignment or transfer thereof are subject to, all restrictions imposed upon assignments by the Franchise Agreement.

18.3.4 Franchisee shall prepare and furnish to Franchisor, upon request, a list of all members in Franchisee.

36

12421389.1

*Initials* ____ / ____
*Franchisee*   *Franchisor*

18.4   <u>Guaranty and Indemnification</u>.   If Franchisee is a corporation, partnership or limited liability corporation, or if any successor to or assignee of Franchisee is a partnership or limited liability corporation, then all of the principals thereto shall execute a Guarantee, Indemnification, and Acknowledgment in the form attached hereto as Exhibit E.   Franchisee shall also complete the Disclosure of Principals form attached hereto as Exhibit F.

## 19.   TAXES, PERMITS, AND INDEBTEDNESS

19.1   <u>Payment of Taxes</u>.   Franchisee shall promptly pay when due all taxes levied or assessed, including, without limitation, unemployment and sales taxes, and all accounts and other indebtedness of every kind incurred by Franchisee in the operation of the Franchised Business. Franchisee shall pay to Franchisor an amount equal to any sales tax, gross receipts tax, or similar tax (other than income tax) imposed on Franchisor with respect to any payments to Franchisor required under this Agreement, unless the tax is credited against income tax otherwise payable by Franchisor.

19.2   <u>Contesting Taxes</u>.   In the event of any bona fide dispute as to Franchisee's liability for taxes assessed or other indebtedness, Franchisee may contest the validity or the amount of the tax or indebtedness in accordance with procedures of the taxing authority or applicable law, but in no event shall Franchisee permit a tax sale or seizure by levy or execution or similar writ or warrant, or attachment by a creditor, to occur against the premises of the Franchised Business, or any improvements thereon.

19.3   <u>Permits and Licenses</u>.   Franchisee shall comply with all federal, state, and local laws, rules, and regulations (including, without limitation, the applicable provisions of the ADA regarding the construction, design and operation of the Restaurant), and shall timely obtain any and all permits, certificates, or licenses necessary for the full and proper conduct of the Franchised Business, including, without limitation, licenses to do business, fictitious name registrations, sales tax permits, health permits, building permits, handicap permits, fire clearances and food safety certification licenses from the applicable governmental authority.

19.4   <u>Notification of Adverse Action</u>.   Franchisee shall immediately notify Franchisor in writing of the commencement of any action, suit, or proceeding, and of the issuance of any order, writ, injunction, award, or decree of any court, agency, or other governmental instrumentality, which may adversely affect the operation or financial condition of the Franchised Business.

## 20.   INDEPENDENT CONTRACTOR AND INDEMNIFICATION

20.1   <u>Independent Contractor</u>.   Franchisor and Franchisee agree that this Agreement does not create a special or fiduciary relationship between them, that Franchisee shall be an independent contractor, and that nothing in this Agreement is intended to constitute either party an agent, legal representative, subsidiary, joint venturer, partner, employee, or servant of the other for any purpose whatsoever.   During the term of this Agreement, Franchisee shall hold itself out to the public as an independent contractor operating the Franchised Business pursuant to a franchise agreement from Franchisor. Franchisee agrees to take such action as may be necessary to do so, including, without limitation, exhibiting a notice of that fact in a conspicuous

12421389.1

*Initials* _____ / _____
*Franchisee*   *Franchisor*

place at the premises of the Franchised Business, the content of which Franchisor reserves the right to specify.

20.2   No Authority to Contract.  Nothing in this Agreement authorizes Franchisee to make any contract, agreement, warranty or representation on Franchisor's behalf, or to incur any debt or other obligation in Franchisor's name; and Franchisor shall in no event assume liability for, or be deemed liable hereunder as a result of, any such action; nor shall Franchisor be liable by reason of any act or omission of Franchisee in its operation of the business franchised hereunder or for any claim or judgment arising therefrom against Franchisee or Franchisor.

20.3   Indemnification.  Franchisee shall indemnify and hold harmless Franchisor and its affiliates, and their respective officers, directors and employees against any and all claims, losses, costs, expenses, liabilities and damages arising directly or indirectly from, as a result of, or in connection with Franchisee's operation of the Franchised Business, the business conducted under this Agreement, or Franchisee's breach of this Agreement, including, but not limited to, those alleged to be caused by Franchisor's negligence, unless (and then only to the extent that) the claims, obligations, and damages are determined to be caused solely by Franchisor's gross negligence or willful misconduct according to a final, unappealable ruling issued by a court with competent jurisdiction, as well as the costs, including reasonable attorneys' fees, of defending against them.  In the event Franchisor incurs any costs or expenses, including, without limitation, legal fees, travel expenses, and other charges, in connection with any proceeding involving Franchisee in which Franchisor is not a party, Franchisee shall reimburse Franchisor for all such costs and expenses promptly upon presentation of invoices.  Franchisee acknowledges and agrees that Franchisee's indemnification and hold harmless obligations under this Section shall survive the termination or expiration of this Agreement.  Nothing herein shall preclude Franchisor from choosing its own legal counsel to represent it in any lawsuit, arbitration, or other dispute resolution.

20.4   Force Majeure.  Neither Franchisor, Franchisor's affiliates, nor Franchisee shall be responsible or liable for any delays in the performance of any duties under this Agreement which are not the fault or within the reasonable control of that party including, but not limited to, fire, flood, natural disasters, acts of God, acts of war, terrorism, or insurrection, delays in deliveries by common carriers, governmental acts or orders, late deliveries of products or goods or furnishing of services by third party vendors, civil disorders, or strikes and any other labor-related disruption, and in any event said time period for the performance of an obligation hereunder shall be extended for the amount of time of the delay or impossibility.  Provided, however, this clause shall not apply to and not result in an extension of:  (1) the time for payments to be made by Franchisee as required by Section 4.4 hereof; or (2) the term of this Agreement.

## 21.   APPROVALS AND WAIVERS

21.1   Approval and Consent.  Whenever this Agreement requires the prior approval or consent of Franchisor, Franchisee shall make a timely written request to Franchisor therefor, and such approval or consent must be obtained in writing.

21.2   No Warranties or Guarantees.  Franchisor makes no warranties or guarantees upon which Franchisee may rely, and assumes no liability or obligation to Franchisee, by

12421389.1

Initials
Franchisee   Franchisor

providing any waiver, approval, consent, or suggestion to Franchisee in connection with this Agreement, or by reason of any neglect, delay or denial of any request therefor.

21.3   <u>No Waiver</u>.  No failure of Franchisor to exercise any power reserved to it by this Agreement, or to insist upon strict compliance by Franchisee with any obligation or condition hereunder, and no custom or practice of the parties at variance with the terms hereof, shall constitute a waiver of Franchisor's right to demand exact compliance with any of the terms hereof. Waiver by Franchisor of any particular default of Franchisee shall not affect or impair Franchisor's rights with respect to any subsequent default of the same, similar, or different nature; nor shall any delay, force, or omission of Franchisor to exercise any power or right arising out of any breach of default by Franchisee of any of the terms, provisions, or covenants hereof, affect or impair Franchisor's right to exercise the same, nor shall such constitute a waiver by Franchisor of any right hereunder, or the right to declare any subsequent breach or default and to terminate this Agreement prior to the expiration of its term. Subsequent acceptance by Franchisor of any payments due to it hereunder shall not be deemed to be a waiver by Franchisor of any preceding breach by Franchisee of any terms, covenants, or conditions of this Agreement.

## 22.   **GRANT OF SECURITY INTEREST**

As security for the payment of all amounts from time to time owing by Franchisee to Franchisor under this Agreement and all other agreements between the parties, and performance of all obligations to be performed by Franchisee, Franchisee hereby grants to Franchisor a security interest in all of the assets of Franchisee, including, without limitation, all equipment, furniture, fixtures, and building and road signs, as well as all proceeds of the foregoing (the "Collateral").  Franchisee warrants and represents that the security interest granted hereby is prior to all other security interests in the Collateral except any bona fide purchase money security interests and any security interest belonging to the U.S. Small Business Administration. Franchisee agrees not to remove the Collateral, or any portion thereof, from the Premises without the prior written consent of Franchisor. Upon the occurrence of any event entitling Franchisor to terminate this Agreement or any other agreement between the parties, Franchisor shall have all the rights and remedies of a secured party under the Uniform Commercial Code of the State in which the Franchised Business is located, including, without limitation, the right to take possession of the Collateral. Franchisee agrees to execute and deliver to Franchisor financing statements or such other documents as Franchisor reasonably deems necessary to perfect Franchisor's interest in the Collateral within ten (10) days of receipt by Franchisee of such documents from Franchisor.  Any notices delivered or mailed in accordance with Section 23 hereof at least five (5) days prior to disposition of the Collateral, or any portion thereof, and, in reference to a private sale, need state only that Franchisee intends to negotiate such a sale.

## 23.   **NOTICES**

Any and all notices required or permitted under this Agreement shall be in writing and shall be personally delivered, sent by registered mail, or sent by other means which affords the sender evidence of delivery or rejected delivery (but shall not be sent by e-mail) to the respective parties at the following addresses, unless and until a different address has been designated by written notice to the other party:

12421389.1

*Initials* _____ / _____
*Franchisee*   *Franchisor*

Notices to Franchisor:     Wings To Go, Inc.
                           846 Ritchie Highway, Suite 1B
                           Severna Park, MD 21146
                           Attn: President

Notices to Franchisee:     2927 Kensington
                           Ave Phila PA 19134
                           Attn: RJ-

Any notice by a means which affords the sender evidence of delivery or rejected delivery shall be deemed to have been given and received at the date and time of receipt or rejected delivery.

## 24.   ENTIRE AGREEMENT

This Agreement, the attachments hereto, and the documents referred to herein constitute the entire Agreement between Franchisor and Franchisee concerning the subject matter hereof, and supersede any prior agreements, no other representations having induced Franchisee to execute this Agreement. Except for those permitted to be made unilaterally by Franchisor hereunder, no amendment, change, or variance from this Agreement shall be binding on either party unless mutually agreed to by the parties and executed by their authorized officers or agents in writing. Nothing in this Agreement or in any related agreement between Franchisor and Franchisee is intended to disclaim the representations made in Franchisor's Franchise Disclosure Document.

## 25.   SEVERABILITY AND CONSTRUCTION

25.1   Severability.   If, for any reason, any section, part, term, provision, and/or covenant herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation by a court or agency having valid jurisdiction, such shall not impair the operation of, or have any other effect upon, such other portions, sections, parts, terms, provisions, and/or covenants of this Agreement as may remain otherwise intelligible; and the latter shall continue to be given full force and effect and bind the parties hereto; and said invalid portions, sections, parts, terms, provisions, and/or covenants shall be deemed not to be a part of this Agreement.

25.2   Survival.   Any provision or covenant in this Agreement which expressly or by its nature imposes obligations beyond the expiration, termination or assignment of this Agreement (regardless of cause for termination), shall survive such expiration, termination or assignment, including but not limited to Sections 10, 17, and 26.

25.3   No Rights or Remedies Conferred.   Except as expressly provided to the contrary herein, nothing in this Agreement is intended, nor shall be deemed, to confer upon any person or legal entity other than Franchisee, Franchisor, Franchisor's officers, directors, shareholders, agents, and employees, and such of Franchisor's successors and assigns as may be contemplated by Section 14 hereof, any rights or remedies under or by reason of this Agreement.

40

12421389.1

Initials _____ / _____
       Franchisee    Franchisor

25.4   <u>Promises and Covenants</u>.   Franchisee expressly agrees to be bound by any promise or covenant imposing the maximum duty permitted by law which is subsumed within the terms of any provision hereof, as though it were separately articulated in and made a part of this Agreement, that may result from striking from any of the provisions hereof any portion or portions which a court or agency having valid jurisdiction may hold to be unreasonable and unenforceable in an unappealed final decision to which Franchisor is a party, or from reducing the scope of any promise or covenant to the extent required to comply with such a court or agency order.

25.5   <u>Captions and Headings</u>.   All captions in this Agreement are intended solely for the convenience of the parties, and none shall be deemed to affect the meaning or construction of any provision hereof.

## 26.   <u>APPLICABLE LAW AND CHOICE OF VENUE</u>

26.1   <u>Applicable Law</u>.   This Agreement shall be interpreted and construed exclusively under the laws of the State of Maryland.   In the event of any conflict of law, the laws of Maryland shall prevail, without regard to the application of Maryland conflict-of-law rules.   If, however, any provision of this Agreement would not be enforceable under the laws of Maryland and if Franchisee is located outside of Maryland and such provision would be enforceable under the laws of the state in which Franchisee is located, then such provision shall be interpreted and construed under the laws of that state.

26.2   <u>Jurisdiction and Venue</u>.   Any action, whether or not arising out of, or relating to, this Agreement, brought by Franchisee (or any principal thereof) against Franchisor shall be brought in the state or federal court in the judicial district in which Franchisor has, at the time of commencement of such action, its principal place of business.   Franchisor shall have the right to commence any action against Franchisee in any court of competent jurisdiction.   Franchisee hereby agrees to submit to the personal jurisdiction of such court, and waives all objections to personal jurisdiction or venue for purposes of this Section 26.2 and agrees that nothing in this Section 26.2 shall be deemed to prevent Franchisor from removing an action from state court to federal court.

26.3   <u>Waiver of Right to Jury Trial and Punitive Damages</u>.   FRANCHISOR AND FRANCHISEE KNOWINGLY, VOLUNTARILY, AND INTELLIGENTLY WAIVE THEIR RIGHT TO A TRIAL BY JURY IN ANY JUDICIAL PROCEEDING, WHETHER AT LAW OR IN EQUITY, ABOUT ALL ISSUES THAT ARISE OUT OF, CONCERN, OR RELATE TO, THIS AGREEMENT, ANY AND ALL TRANSACTIONS CONTEMPLATED IN THIS AGREEMENT, THE PARTIES' PERFORMANCE UNDER THIS AGREEMENT, OR OTHERWISE, DURING THE TERM OF THIS AGREEMENT AND AFTERWARDS. THE PARTIES ALSO WAIVE TO THE FULLEST EXTENT PERMITTED BY LAW ANY RIGHT TO OR CLAIM OF ANY PUNITIVE OR EXEMPLARY DAMAGES AGAINST THE OTHER AND AGREE THAT IN THE EVENT OF A DISPUTE BETWEEN THEM EACH SHALL BE LIMITED TO THE RECOVERY OF ANY ACTUAL DAMAGES SUSTAINED BY IT.

26.4   <u>No Class Actions</u>.   Franchisee shall not initiate or participate in any class action litigation claim against or involving the Franchisor, and no action, arbitration  or proceeding

12421389.1

*Initials* ___ / ___
Franchisee   Franchisor

under this Agreement shall add as a party, consolidation, joinder, or in any other manner, any person or party other than Franchisee and Franchisor and any person in privity with, or claiming through, in the right of, or on behalf of, Franchisee or Franchisor, unless both parties consent in writing.

26.5   <u>No Exclusivity</u>.  No right or remedy conferred upon or reserved to Franchisor or Franchisee by this Agreement is intended to be, nor shall be deemed, exclusive of any other right or remedy herein or by law or equity provided or permitted, but each shall be cumulative of every other right or remedy.

26.6   <u>Limitation of Claims</u>.   FRANCHISOR AND FRANCHISEE HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY AGREE THAT ANY AND ALL CLAIMS AND ACTIONS ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE RELATIONSHIP OF FRANCHISEE AND FRANCHISOR, OR FRANCHISEE'S OPERATION OF THE FRANCHISED BUSINESS, BROUGHT BY FRANCHISEE AGAINST FRANCHISOR, SHALL BE COMMENCED WITHIN ONE (1) YEAR FROM THE OCCURRENCE OF THE FACTS GIVING RISE TO SUCH CLAIM OR ACTION, OR SUCH CLAIM OR ACTION SHALL BE BARRED.

26.7   <u>Injunctive Relief</u>.  Nothing herein contained shall bar Franchisor's right to obtain injunctive relief from a court of competent jurisdiction against threatened conduct that will cause it loss or damage, under the usual equity rules, including the applicable rules for obtaining specific performance, restraining orders, and preliminary injunctions.

26.8   <u>Franchisor's Costs and Expenses</u>.  Franchisee shall pay to Franchisor all damages, costs, and expenses, including all court costs and reasonable attorney's fees, and all other expenses incurred by Franchisor in enforcing any obligation or in defending against any claim, demand, action, or proceeding related to this Agreement, including, but not limited to the obtaining of injunctive relief.

## 27.   <u>FRANCHISEE'S ACKNOWLEDGMENTS AND REPRESENTATIONS</u>

27.1   <u>Independent Investigation</u>.  Franchisee acknowledges that it has conducted an independent investigation of the business franchised hereunder, and recognizes that the business venture contemplated by this Agreement involves business risks and that its success will be largely dependent upon the ability of Franchisee (or, if Franchisee is a corporation, partnership or limited liability company, the ability of its principals) as an independent businessperson. Franchisor expressly disclaims the making of, and Franchisee acknowledges that it has not received, any warranty or guarantee, express or implied, as to the potential volume, profits, or success of the business venture contemplated by this Agreement.

27.2   <u>Site Approval</u>.  Franchisee hereby acknowledges and agrees that Franchisor's approval of a site does not constitute an assurance, representation or warranty of any kind, express or implied, as to the suitability of the site for the Restaurant or for any other purpose. Franchisor's approval of a site indicates only that Franchisor believes the site complies with acceptable minimum criteria established by Franchisor solely for its purposes as of the time of the evaluation.  Both Franchisee and Franchisor acknowledge that application of criteria that may

42

12421389.1

*Initials* ____ / ____
*Franchisee*   *Franchisor*

have been effective with respect to other sites and premises may not be predictive of potential for all sites and that, subsequent to Franchisor's approval of a site, demographic and/or economic factors, such as competition from other similar businesses, included in or excluded from Franchisor's criteria could change, thereby altering the potential of a site or lease. Such factors are unpredictable and are beyond Franchisor's control. Franchisor shall not be responsible for the failure of a site approved by Franchisee to meet Franchisee's expectations as to revenue or operational criteria. Franchisee further acknowledges and agrees that its acceptance of a franchise for the operation of the Restaurant at the site is based on its own independent investigation of the suitability of the site.

27.3   <u>Acknowledgement of Receipt</u>.   Franchisee acknowledges that it received Franchisor's current Franchise Disclosure Document at least fourteen (14) calendar days prior to the date on which this Agreement was executed or Franchisee paid any money to Franchisor. Franchisee further acknowledges that it received a complete copy of this Agreement, the attachments hereto, and all related agreements attached to the Franchise Disclosure Document, and that Franchisee waited at least seven (7) calendar days prior to executing them if any changes to such agreements were unilaterally and materially made by Franchisor.

27.4   <u>Acknowledgement of Understanding</u>.   Franchisee acknowledges that it has read and understood this Agreement, the attachments hereto, and agreements relating thereto, if any, and that Franchisor has accorded Franchisee ample time and opportunity to consult with advisors of Franchisee's own choosing about the potential benefits and risks of entering into this Agreement.

27.5   <u>Compliance With Anti-Terrorism Laws</u>.   Franchisee acknowledges that under applicable U.S. law, including, without limitation, Executive Order 13224, signed on September 23, 2001 (the "Order"), Franchisor is prohibited from engaging in any transaction with any Specially Designated National or Blocked Person. "Specially Designated National" or "Blocked Person" shall mean (1) those persons designated by the U.S. Department of Treasury's Office of Foreign Assets Control from time to time as a "specially designated national" or "blocked person" or similar status, (2) a person engaged in, or aiding any person engaged in, acts of terrorism, as defined in the Order, or (3) a person otherwise identified by government or legal authority as a person with whom Franchisor is prohibited from transacting business. Currently, a listing of such designations and the text of the Order are published at the Internet website address, www.ustreas.gov/offices/enforcement/ofac. Accordingly, Franchisee represents and warrants to Franchisor that as of the date of this Agreement, neither Franchisee nor any person holding any ownership interest in Franchisee, controlled by Franchisee, or under common control with Franchisee is a Specially Designated National or Blocked Person, and that Franchisee (1) does not, and hereafter shall not, engage in any terrorist activity; (2) is not affiliated with and does not support any individual or entity engaged in, contemplating, or supporting terrorist activity; and (3) is not acquiring the rights granted under this Agreement with the intent to generate funds to channel to any individual or entity engaged in, contemplating, or supporting terrorist activity, or to otherwise support or further any terrorist activity. Franchisee agrees that Franchisee shall immediately provide written notice to Franchisor of the occurrence of any event which renders the representations and warranties in this Section 27.5 incorrect.

43

12421389.1

Initials _____ / _____
Franchisee   Franchisor

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement in duplicate on the date first above written.

**FRANCHISEE**                                    **WINGS TO GO, INC.**

By: _____    By: _____

Name: _RETEP J. SAYIN_    Name: _John BRINTON_

Title: _OWNER_    Title: _VP Operators_

44

12421389.1

**EXHIBIT A TO**
**WINGS TO GO**
**FRANCHISE AGREEMENT**

**SITE SELECTION ADDENDUM**

Wings To Go, Inc. (hereinafter the "Franchisor") and _RS Kitchen LLC_ (hereinafter "Franchisee"), have this date, _____, 20___, entered into a certain Wings To Go Restaurant Franchise Agreement (the "Franchise Agreement") and desire to supplement its terms, as set forth below.  The parties hereto therefore agree as follows:

      1.     Within one hundred eighty (180) days months after Franchisee's execution of the Franchise Agreement, Franchisee shall obtain a site, at Franchisee's expense, for the Wings To Go restaurant (the "Restaurant") franchised under the Franchise Agreement, which premises shall be approved by Franchisor as hereinafter provided.   The premises shall be within the following territory ("Site Selection Territory"):

_____

_____

Franchisee acknowledges and agrees that the Franchisee's Territory described in Exhibit B of the Franchise Agreement will not be the same as the Site Selection Area and the Franchisee's Territory may be significantly smaller than the Site Selection Area.

      2.     Failure by Franchisee to obtain premises for the Restaurant within the time required in Paragraph 1 hereof shall constitute a default under the Franchise Agreement and this Site Selection Addendum.  Time is of the essence.

      3.     Franchisor shall not establish, nor franchise another to establish, a Wings To Go restaurant within the Site Selection Territory until Franchisor approves a location for the Restaurant, or until the time set forth in Paragraph 1 hereof expires, whichever event first occurs.

      4.     Prior to Franchisee's acquisition by lease or purchase of a site for the Restaurant, Franchisee shall submit to Franchisor, in the form specified by Franchisor, a completed site review form, such other information or materials as Franchisor may reasonably require, and a letter of intent or other evidence satisfactory to Franchisor which confirms Franchisee's favorable prospects for obtaining the proposed site.  Recognizing that time is of the essence, Franchisee agrees that Franchisee must submit a proposed site, together with the information and materials required by this Paragraph 4, to Franchisor for its approval within one hundred fifty (150) days after execution of this Site Selection Addendum.  Franchisor shall have thirty (30) days after receipt of such information and materials from Franchisee to approve or disapprove, in Franchisor's sole discretion, the site as a location for the Restaurant.  No proposed site shall be deemed approved unless it has been expressly approved in writing by Franchisor.

10792739.1

Initials _____/ _____
           Franchisee   Franchisor

5.      Franchisor shall furnish to Franchisee the following:

        a.      Such site selection guidelines and consultation as Franchisor deems advisable;

        b.      Such on-site evaluation as Franchisor deems advisable as part of its evaluation of Franchisee's request for site approval; provided, however, that Franchisor shall not provide on-site evaluation for any proposed site prior to Franchisor's receipt of the information or materials required by Paragraph 4 hereof.  If on-site evaluation is deemed necessary and appropriate by Franchisor, Franchisor shall conduct up to three (3) on-site evaluations at no additional cost to Franchisee; for each additional on-site evaluation (if any), Franchisee shall pay Franchisor an evaluation fee of One Thousand Dollars ($1,000).

6.      If Franchisee will occupy the premises of the Restaurant under a lease, Franchisee shall, prior to the execution thereof, (1) execute the Conditional Assignment of Lease and obtain the Lessor's execution of the Consent and Agreement of Lessor, in the forms attached as Exhibit G to the Franchise Agreement, and (2) submit the lease to Franchisor for its approval. Franchisor's approval of the lease may be conditioned upon the inclusion of the following terms and conditions:

        a.      That the initial term of the lease, or the initial term together with renewal terms, shall be for not less than the term of the Franchise Agreement;

        b.      That the lessor consents to Franchisee's use of such Proprietary Marks and initial signage as Franchisor may prescribe for the Restaurant;

        c.      That the use of the premises be restricted solely to the operation of the Restaurant;

        d.      That Franchisee be prohibited from subleasing or assigning all or any part of its occupancy rights or extending the term of or renewing the lease without Franchisor's prior written consent;

        e.      That lessor provide to Franchisor copies of any and all notices of default given to Franchisee under the lease;

        f.      That Franchisor have the right to enter the premises to make modifications necessary to protect the Proprietary Marks or the System or to cure any default under the Franchise Agreement or under the lease;

        g.      That Franchisor (or Franchisor's designee) have the option, upon default, expiration or termination of the Franchise Agreement, and upon notice to the lessor, to assume all of Franchisee's rights under the lease terms, including the right to assign or sublease.

7.      Franchisee shall furnish Franchisor with a copy of any executed lease within ten (10) days after execution thereof.

12421389.1

Initials _____ / _____
        Franchisee   Franchisor

8.     After a site for the Restaurant has been approved in writing by Franchisor and obtained by Franchisee pursuant to Paragraph 4 hereof, the site shall constitute the Approved Location referred to in Section 1.2 of the Franchise Agreement.

9.     Franchisee hereby acknowledges and agrees that Franchisor's approval of a site does not constitute an assurance, representation or warranty of any kind, express or implied, as to the suitability of the site for the Restaurant or for any other purpose.  Franchisor's approval of the site indicates only that Franchisor believes the site complies with acceptable minimum criteria established by Franchisor solely for its purposes as of the time of the evaluation.  Both Franchisee and Franchisor acknowledge that application of criteria that may have been effective with respect to other sites and premises may not be predictive of potential for all sites and that, subsequent to Franchisor's approval of a site, demographic and/or economic factors, such as competition from other similar businesses, included in or excluded from Franchisor's criteria could change, thereby altering the potential of a site or lease.  Such factors are unpredictable and are beyond Franchisor's control.  Franchisor shall not be responsible for the failure of a site approved by Franchisee to meet Franchisee's expectations as to revenue or operational criteria.  Franchisee further acknowledges and agrees that its acceptance of a franchise for the operation of the Restaurant at the site is based on its own independent investigation of the suitability of the site.

10.     This Site Selection Addendum constitutes an integral part of the Franchise Agreement between the parties hereto, and the terms of this Site Selection Addendum shall be controlling with respect to the subject matter hereof.  Except as modified or supplemented by this Site Selection Addendum, the terms of the Franchise Agreement are hereby ratified and confirmed.

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement in duplicate on the date first above written.

**FRANCHISEE**

**WINGS TO GO, INC.**

By:_____

By:_____

Name:_____

Name:_____

Title:_____

Title:_____

12421389.1

3

*Initials* _____ / _____
*Franchisee*          *Franchisor*

**EXHIBIT B TO**
**WINGS TO GO**
**FRANCHISE AGREEMENT**

**<u>TERRITORY</u>**

**Within a one mile radius of the location listed in Section 1.1 of this Agreement**

10792739.1

*Initials* _____ / _____
*Franchisee   Franchisor*

**EXHIBIT C TO**
**WINGS TO GO**
**FRANCHISE AGREEMENT**

**ADA CERTIFICATION**

Wings To Go, Inc. ("Franchisor") and ____RS Kitchen LLC____
("Franchisee") are parties to a franchise agreement dated ____4-1____, 20_10_ (the
"Franchise Agreement") for the operation of a Wings To Go restaurant at

**7109 Frankford Avenue Mayfair, PA 19135** (the "Restaurant"). In accordance with Section
5.4 of the Franchise Agreement, Franchisee certifies to Franchisor that, to the best of
Franchisee's knowledge, the Restaurant and its adjacent areas comply with all applicable federal,
state and local accessibility laws, statutes, codes, rules, regulations and standards, including but
not limited to the Americans with Disabilities Act. Franchisee acknowledges that Franchisor has
relied on the information contained in this certification. Furthermore, Franchisee agrees to
indemnify Franchisor and the officers, directors, and employees of Franchisor in connection with
any and all claims, losses, costs, expenses, liabilities, compliance costs, and damages incurred by
the indemnified party(ies) as a result of any matters associated with Franchisee's compliance
with the Americans with Disabilities Act, as well as the costs, including attorneys' fees, related
to the same.

IN WITNESS WHEREOF, the undersigned has duly executed this ADA Certification on the
date first above written.

**FRANCHISEE**

_____          By: _____

Witness/Attest                    Name: _____

                                  Title: _____Owner_____

10792739.1

*Initials* _____ / _____
            *Franchisee    Franchisor*

**EXHIBIT D TO**
**WINGS TO GO**
**FRANCHISE AGREEMENT**

**CONFIDENTIALITY AND NON-COMPETITION AGREEMENT**

In consideration of my position as stockholder, director, officer, member and/or employee of _KS Kitchen LLC_ (the "Franchisee"), and other good and valuable consideration, the receipt and sufficiency of which is acknowledged, I hereby acknowledge and agree that:

1.      Wings To Go, Inc. (the "Franchisor"), as the result of the expenditure of time, skill, effort, and money, has developed, and continues to develop, a distinctive system relating to the establishment and operation of Wings To Go restaurants, which feature "Buffalo-style" chicken wings, boneless tenders, "Buffalo-style" shrimp, and other food items and beverages on a take-out or dine-in basis, all under the trade name "Wings To Go" (the "System").

2.      As a stockholder, director, officer, member and/or employee of Franchisee, I will receive valuable confidential information, disclosure of which would be detrimental to Franchisor and Franchisee, including, without limitation, the Manual, recipes, cooking methods, preparation of menu items, drawings, suppliers, equipment, product costs, accounting methods, management tools, or advertising, which may be communicated to me or of which I may be apprised by virtue of my position with Franchisee, which are beyond the present skills and experience possessed by me. This list of confidential matters is illustrative only and does not include all matters considered confidential by Franchisor and Franchisee.

3.      I will hold in strict confidence all information designated by Franchisor or Franchisee as confidential. Unless Franchisor otherwise agrees in writing, I will disclose and/or use the confidential information only in connection with my duties as an employee of Franchisee. My undertaking not to disclose confidential information is a condition of my position with Franchisee, and continues even after I cease to be in that position.

4.      While in my position with Franchisee, I will not do anything which may injure Franchisee or Franchisor, such as (a) divert or attempt to divert any present or prospective business or customer of any Wings To Go restaurant to any competitor, by direct or indirect inducement or otherwise; (b) do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with Franchisor's marks and the System; or (c) employ or seek to employ any person who is at that time been employed by Franchisor or any franchisee of Franchisor (including Franchisee), or otherwise directly or indirectly induce such person to leave his or her employment.

5.      While in my position with Franchisee, I will not own, maintain, operate, engage in, be employed by, provide assistance to, or have any interest in (as owner or otherwise) any business that offers, sells or manufactures products or services which are the same as or similar to the products and services offered by the Restaurant under the System, including, but not

Initials _____ / _____
Franchisee   Franchisor

limited to, chicken wings.  Provided, however, that this Paragraph 5 shall not apply to my current position with Franchisee.

6.     For two (2) years after I cease to be in my position with Franchisee, I will not own, maintain, operate, engage in, be employed by, provide assistance to, or have any interest in (as owner or otherwise) any business that:  (a)(i) is the same as, or substantially similar to, a Wings To Go restaurant; or (ii) offers, sells or manufactures products or services which are the same as or similar to the products and services offered by the Restaurant under the System, including, but not limited to, chicken wings; and (b) is, or is intended to be, located at or within: (i) Franchisee's Territory, which I acknowledge has been described to me; (ii) ten (10) miles of the Restaurant; or ten (10) miles of any Wings To Go restaurant.

7.     Franchisor is a third-party beneficiary of this Agreement and may enforce it, solely and/or jointly with Franchisee.  I am aware that my violation of this Agreement will cause Franchisor and Franchisee irreparable harm; therefore, I acknowledge and agree that Franchisor and/or Franchisee may apply for the issuance of an injunction preventing me from violating this Agreement in addition to any other remedies it may have hereunder, at law or in equity; and I agree to pay Franchisor and Franchisee all the costs it/they incur/s, including without limitation attorneys' fees, if this Agreement is enforced against me.  Due to the importance of this Agreement to Franchisor and Franchisee, any claim I have against Franchisor or Franchisee is a separate matter and does not entitle me to violate, or justify any violation of, this Agreement.  If any part of this Agreement is held invalid by a court or agency having valid jurisdiction, the rest of the Agreement is still enforceable and the part held invalid is enforceable to the extent found reasonable by the court or agency.  I agree that all the words and phrases used in this Agreement will have the same meaning as used in the Franchise Agreement, and that such meaning has been explained to me.

8.     Franchisor may, in its sole discretion, reduce the scope of any covenant set forth in this Agreement, without my consent, effective immediately upon my receipt of written notice thereof; and I agree to comply with any covenant as so modified.

**[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]**

Initials _____ / _____
                  Franchisee    Franchisor

9.    This Agreement shall be construed under the laws of the State of Maryland. Except as provided in Paragraph 8 above, the only way this Agreement can be changed is in a writing signed by both Franchisee and me.

Signature:_____

Name:_____

Address:_____

Title:_____

**ACKNOWLEDGED BY FRANCHISEE**

By:_____

Name:_____

Initials _____ / _____
       Franchisee   Franchisor

### EXHIBIT E TO
### WINGS TO GO
### FRANCHISE AGREEMENT

### GUARANTEE, INDEMNIFICATION, AND ACKNOWLEDGMENT

As an inducement to Wings To Go, Inc. ("Franchisor") to execute the Franchise Agreement between Franchisor and PS Kitchen LLC ("Franchisee") dated 4-1, 20 10 (the "Agreement"), the undersigned, jointly and severally, hereby unconditionally guarantee to Franchisor and its successors and assigns that all of Franchisee's obligations under the Agreement will be punctually paid and performed.

Upon demand by Franchisor, the undersigned will immediately make each payment to Franchisor required of Franchisee under the Agreement. The undersigned hereby waive any right to require Franchisor to: (a) proceed against Franchisee for any payment required under the Agreement; (b) proceed against or exhaust any security from Franchisee; or (c) pursue or exhaust any remedy, including any legal or equitable relief, against Franchisee. Without affecting the obligations of the undersigned under this Guarantee, Franchisor may, without notice to the undersigned, extend, modify, or release any indebtedness or obligation of Franchisee, or settle, adjust, or compromise any claims against Franchisee. The undersigned waive notice of amendment of the Agreement and notice of demand for payment by Franchisee, and agree to be bound by any and all such amendments and changes to the Agreement.

The undersigned hereby agree to defend, indemnify, and hold Franchisor harmless against any and all losses, damages, liabilities, costs, and expenses (including, but not limited to, reasonable attorneys' fees, reasonable costs of investigation and court costs) resulting from, consisting of, or arising out of or in connection with any failure by Franchisee to perform any obligation of Franchisee under the Agreement, any amendment thereto, or any other agreement executed by Franchisee referred to therein.

The undersigned hereby acknowledge and agree to be individually bound by all of the confidentiality provisions and non-competition covenants contained in Sections 10 and 17 of the Agreement.

This Guarantee shall terminate upon the termination or expiration of the Agreement, except that all obligations and liabilities of the undersigned which arose from events which occurred on or before the effective date of such termination shall remain in full force and effect until satisfied or discharged by the undersigned, and all covenants which by their terms continue in force after the expiration or termination of the Agreement shall remain in force according to their terms. Upon the death of an individual guarantor, the estate of such guarantor shall be bound by this Guarantee, but only for defaults and obligations hereunder existing at the time of death; and the obligations of the other guarantors will continue in full force and effect.

The undersigned guarantors agree that the dispute resolution and attorney fee provisions in Section 26 of the Agreement are hereby incorporated into this Guarantee by reference, and references to "Franchisee" and the "Agreement" therein shall be deemed to apply to the

Initials _____ / _____
          Franchisee    Franchisor

undersigned "Guarantors" and this "Guarantee," respectively, herein.  Unless specifically stated otherwise, the terms used in this Guarantee shall have the same meaning as in the Agreement.

This Guarantee shall be interpreted and construed under the laws of the State of Maryland.  In the event of any conflict of law, the laws of Maryland shall prevail, without regard to, and without giving effect to, the application of the State of Maryland conflict of law rules.  Franchisor shall have the right to commence an action against the undersigned Guarantors in any court of competent jurisdiction, and the undersigned hereby agrees to submit to the personal jurisdiction of such court, and waives all objections to personal jurisdiction or venue for purposes hereof.  GUARANTORS KNOWINGLY, VOLUNTARILY, AND INTELLIGENTLY WAIVE THEIR RIGHT TO A TRIAL BY JURY IN ANY JUDICIAL PROCEEDING CONCERNING THIS GUARANTEE OR THE FRANCHISE AGREEMENT.

Any and all notices required or permitted under this Guarantee shall be in writing and shall be personally delivered, sent by registered mail, or sent by other means which afford the sender evidence of delivery or rejected delivery (but shall not be sent by e-mail), to the respective parties at the following addresses unless and until a different address has been designated by written notice to the other party:

Notices to Franchisor:     Wings To Go, Inc.
                           846 Ritchie Highway, Suite 1B
                           Severna Park, MD 21146
                           Attn:  President

Notices to Guarantors:     2927 Kensington Avenue
                           Philadelphia, PA 19134

                           Attn:  Recep S. Sayin

Any notice by a method which affords the sender evidence of delivery or rejected delivery shall be deemed to have been given at the date and time of receipt or rejected delivery.

**[REMAINDER OF PAGE LEFT INTENTIONALLY BLANK]**

Initials _____ / _____
       Franchisee  /Franchisor

IN WITNESS WHEREOF, each of the undersigned has signed this Guarantee as of the date of the Agreement.

**GUARANTORS**

_____     _____
Witness

                                      Name: _Rejep  Sayin_

_____     _____
Witness

                                      Name:_____

_____     _____
Witness

                                      Name:_____

Initials _____ / _____
       Franchisee   Franchisor

**EXHIBIT F TO**
**WINGS TO GO**
**FRANCHISE AGREEMENT**

**DISCLOSURE OF PRINCIPALS**
**(To be completed if Franchisee is a Corporation,**
**Partnership, or Limited Liability Company Only)**

1.  Date:  _4-1-2010_

2.  Franchisee Contact.  The following individual is a shareholder, member, or partner of Franchisee and is the principal person to be contacted on all matters relating to the Franchised Business:

    Name:  _Recep J. Sayin_
    Address:  _2927 Kensington Avenue_
    _Philadelphia, PA 19134_
    Daytime Telephone No.: _____
    Evening Telephone No.: _____
    Facsimile No.: _____
    E-mail Address: _____

3.  Franchisee Owners.  The undersigned agree and acknowledge that the following is a complete list of all of the shareholders, partners, or members ("Owners") of Franchisee and the position and percentage interest of each individual:

| Name | Position | Interest (%) |
|---|---|---|
| YUSUF KARACAOGLU | Shere holder. | %50 |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

4.  Change in Owners.  Franchisee acknowledges and agrees that any proposed change in the Owners listed in Paragraph 3, above, shall require Franchisor's prior written consent in accordance with the terms of Section 14 of the Franchise Agreement.

*Initials* _____ / _____
*Franchisee*   *Franchisor*

IN WITNESS WHEREOF, the undersigned has duly executed this Disclosure of Principals on the date first above written.

**FRANCHISEE**

_____     By_____
Witness/Attest

Name:_____

Title:_____

**OWNERS**

_____     By_____
Witness/Attest

Name:_____

Title:_____

_____     By_____
Witness/Attest

Name:_____

Title:_____

_____     By_____
Witness/Attest

Name:_____

Title:_____

Initials _____ / _____
         Franchisee   Franchisor

**EXHIBIT G TO**
**WINGS TO GO**
**FRANCHISE AGREEMENT**

**CONDITIONAL ASSIGNMENT OF LEASE**

**FOR VALUE RECEIVED,** the undersigned ("Franchisee") hereby assigns and transfers to Wings To Go, Inc., a Delaware corporation ("Assignee"), all of Franchisee's right, title and interest as tenant in, to and under that certain lease, a copy of which is attached hereto as Exhibit 1 (the "Lease") respecting premises commonly known as _____ _____. This Assignment is for collateral purposes only and except as specified herein, Assignee shall have no liability or obligation of any kind whatsoever arising from or in connection with this Assignment or the Lease unless Assignee takes possession of the premises demised by the Lease pursuant to the terms hereof and assumes the obligations of Franchisee thereunder.

Franchisee represents and warrants to Assignee that it has full power and authority to so assign the Lease and its interest therein and that Franchisee has not previously assigned or transferred, and is not obligated to assign or transfer, any of its interest in the Lease or the premises demised thereby.

Upon a default by Franchisee under the Lease or under the franchise agreement for a Wings To Go restaurant between Assignee and Franchisee (the "Franchise Agreement"), or in the event of a default by Franchisee under any document or instrument securing the Franchise Agreement, Assignee shall have the right and is hereby empowered to take possession of the premises demised by the Lease, expel Franchisee therefrom, and, in such event, Franchisee shall have no further right, title or interest in the Lease.

Franchisee agrees that it will not suffer or permit any surrender, termination, amendment or modification of the Lease without the prior written consent of Assignee. Throughout the term of the Franchise Agreement and any renewals thereto, Franchisee agrees that it shall elect and exercise all options to extend the term of or renew the Lease not less than nine (9) months prior to the last day that the option must be exercised, unless Assignee otherwise agrees in writing. If Assignee does not otherwise agree in writing, and upon failure of Franchisee to so elect to extend or renew the Lease as aforesaid, Franchisee hereby appoints Assignee as its true and lawful attorney-in-fact to exercise such extension or renewal options in the name, place and stead of Franchisee for the purpose of effecting such extension or renewal.

**FRANCHISEE**

_____          By_____
Witness/Attest

                                          Name:_____

                                          Title:_____

                                          Initials _____ / _____
                                                  Franchisee   Franchisor

## CONSENT AND AGREEMENT OF LESSOR

The undersigned Lessor under the aforedescribed Lease hereby:

(a)     Agrees to notify Assignee in writing of and upon the failure of Franchisee to cure any default by Franchisee under the Lease;

(b)     Agrees that Assignee shall have the right, but shall not be obligated, to cure any default by Franchisee under the Lease within 30 days after delivery by Lessor of notice thereof in accordance with paragraph (a) above;

(c)     Consents to the foregoing Conditional Assignment and agrees that if Assignee takes possession of the premises demised by the Lease and confirms to Lessor the assumption of the Lease by Assignee as tenant thereunder, Lessor shall recognize Assignee as tenant under the Lease, provided that Assignee cures within the 30-day period the defaults, if any, of Franchisee under the Lease;

(d)     Agrees that Assignee may further assign the Lease to a person, firm or corporation who shall agree to assume the tenant's obligations under the Lease and who is reasonably acceptable to Lessor and upon such assignment Assignee shall have no further liability or obligation under the Lease as assignee, tenant or otherwise.

**LESSOR**

_____     By_____

Witness/Attest                                       Name:_____

                                                             Title:_____

                                                             Date:_____

Initials _____ / _____
           Franchisee     Franchisor

# EXHIBIT "B"

WINGS TO GO

FRANCHISE AGREEMENT

Wings To Go #27

408 Doylestown Rd
Montgomeryville, PA 18936

Terry Jurczak
215-412-9464

## TABLE OF CONTENTS

RECITALS ............................................................................................... 1

1.  LICENSE ........................................................................................ 2

2.  FRANCHISEE'S PRE-OPENING OBLIGATIONS ..................................... 3

3.  TERM AND RENEWAL ..................................................................... 4

4.  COMPLIANCE WITH STANDARDS AND OTHER FRANCHISEE
    OBLIGATIONS ................................................................................ 5

5.  MAINTENANCE AND UPGRADING OF RESTAURANT.......................... 9

6.  SERVICES BY WTG ......................................................................... 9

7.  ROYALTIES .................................................................................... 10

8.  ADVERTISING ................................................................................ 11

9.  RECORDS AND AUDITS.................................................................. 12

10. INSURANCE .................................................................................. 13

11. CONDEMNATION AND CASUALTY ................................................. 14

12. RESTRICTIONS ON CERTAIN ACTIVITIES ...................................... 15

13. ASSIGNMENT ................................................................................ 16

14. TERMINATION .............................................................................. 20

15. MISCELLANEOUS.......................................................................... 24

16. ACKNOWLEDGMENTS BY THE FRANCHISEE ................................. 28

|            |                                                          |
|------------|----------------------------------------------------------|
| EXHIBIT A  | TERRITORY                                                |
| EXHIBIT B  | SITE SELECTION ADDENDUM                                  |
| EXHIBIT C  | GUARANTY                                                 |
| EXHIBIT D  | STOCKHOLDER, DIRECTOR, OFFICER, MEMBER AND EMPLOYEE AGREEMENT |

# WINGS TO GO
## FRANCHISE AGREEMENT

THIS FRANCHISE AGREEMENT ("Agreement"), made and entered into as of the _10_ _HN_
day of _May_____, 199 _9_ , by and between Wings To Go, Inc., a Delaware corporation
having its principal office at 170 Jennifer Road, Suite 250, Annapolis, Maryland 21401 ("WTG"),
and ___HARIBALA  GUNVANT  PATEL_____ ("Franchisee").

## RECITALS

A.    WTG has developed a unique system for preparing and marketing chicken wings
and food products pursuant to trade secrets, standards and specifications designed to maintain a
uniform, high quality of product, service and image ("System").  The distinguishing characteristics
of the System include, but are not limited to,  a distinctive exterior and interior building design,
decor, color scheme, and furnishings; uniform standards, specifications, and procedures for
operations, management training and inventory control; quality and uniformity of products and
services; employee training and assistance; and advertising and promotional programs; all of
which may be changed, improved, and further developed by WTG from time to time.

B.    The System is identified by means of certain trade names, service marks,
trademarks, logos, emblems, and indicia of origin, including but not limited to, the mark "Wings
To Go (and design)" and such other trade names, service marks, and trademarks as are now
designated and may hereinafter be designated by Franchisor in writing for use in connection with
the System (the "Marks").

C.    Franchisee recognizes the value of the System, the Marks and continued uniformity
of image to itself, to WTG, and to other franchisees of WTG.  To enhance the value of the
System and Marks and the goodwill associated therewith, this Agreement places detailed and
substantial obligations on the Franchisee, including, without limitation, strict adherence to WTG's
present and future requirements regarding menu items, advertising, physical facilities, etc.  Future
rights granted to the Franchisee are for a limited time.  Their value derives principally from the
Marks and associated goodwill, designs systems and processes developed at considerable expense
and effort.

D.    The Franchisee, cognizant of the foregoing, desires to obtain a license to install
and operate a Wings To Go restaurant upon the terms and conditions hereinafter set forth.

**NOW, THEREFORE,** in consideration of the promises and mutual covenants herein
contained, the parties hereto agree as follows:

Z:\FILES\WINGS\FTC                     1

1.    <u>LICENSE</u>

1.1    Subject to the provisions and conditions herein, WTG hereby grants to the Franchisee during the term of this Agreement the right and license (the "License") to operate one Wings To Go restaurant utilizing the Marks owned by WTG ("Restaurant"), and to prepare and market Approved Products (as defined in Section 1.3) at the following location

("Approved Location"), which was selected by the Franchisee and which is within the territory described in Exhibit A attached hereto (the "Territory"). · If, at the time of execution of this Agreement, a location for the Restaurant has not been obtained by the Franchisee and approved by WTG, the Franchisee shall lease or acquire a location, subject to WTG's approval, as provided in the Site Selection Addendum, attached hereto as Exhibit B.  Franchisee shall not relocate the Restaurant without the prior written approval of WTG.

1.2    Except as described in this Section 1.2, in consideration of the rights and privileges granted to the Franchisee, the Franchisee shall pay WTG simultaneously with the execution of this Agreement a non-refundable, initial license fee in the sum of $10,000; provided, however, that if this Agreement is not the first Franchise Agreement entered into pursuant to a multiple store option agreement between the Franchisee and WTG ("Multiple Store Option Agreement"), the amount of the initial license fee shall be $10,000.

1.2.1    In the event the Franchisee terminates this Agreement within thirty (30) days of the execution of this Agreement because of its inability to secure a site for the Restaurant, WTG shall refund one hundred percent (100%) of the initial license fee, less its out-of-pocket expenses incurred in connection with this Agreement; and

1.2.2    In the event the Franchisee terminates this Agreement between thirty (30) and one hundred eighty (180) days following the execution of this Agreement because of its inability to secure a site for the Restaurant, WTG shall refund one hundred percent (100%) of the initial license fee, less thirty percent (30%) of such fee as its reasonable compensation for its expenses and loss of time and effort.

1.2.3    Notwithstanding Section 1.2.1 and 1.2.2 to the contrary, if the initial license fee is $10,000, WTG shall retain one hundred percent (100%) of the initial license fee regardless of when this Agreement is terminated.

1.3    The Approved Products shall consist of those products prepared according to WTG's specifications as identified by WTG in the confidential operations manual ("Operations Manual") or otherwise in writing from time to time.

1.4    During the term of this Agreement, WTG shall neither establish and operate nor license another Wings To Go restaurant within the Territory; provided, however, that WTG may

itself, or license another to make sales within the Territory at or in connection with special events, as further described in Section 1.6 hereof.

1.5     This License is a limited grant of right.  Subject to the termination provisions of this Agreement, the Franchisee agrees to operate the Restaurant during the term of this Agreement in accordance with this Agreement.  Franchisee shall sell only the Approved Products and shall operate the Restaurant according to the procedures, system and method of doing business set forth in the Operations Manual, which WTG shall loan to the Franchisee.

1.6     The License does not include the right to sell any product for resale, the right to sell any product at or from any place except the Restaurant, or the right to prepare or deliver product at any place other than the Restaurant, except for catering and special event sales made in strict accordance with WTG's procedures, or as otherwise provided by WTG.  Such procedures are subject to reasonable change from time to time by WTG on at least thirty (30) days notice. If the Franchisee desires to sell the Approved Products at a special event (such as a fair, athletic event or convention) within the Territory, the Franchisee shall give WTG thirty (30) days notice (or such shorter period as may be reasonable under the circumstances) of its plans to sell at such event.  If WTG notifies the Franchisee of a special event in the Territory with sufficient time for the Franchisee to serve the special event, and the Franchisee does not notify WTG of its intention to make sales at such event at least five (5) days prior to such event, then WTG may make such sales itself or license others to make them.  If WTG, in its sole discretion, requires WTG franchisees to deliver the Approved Products, the Franchisee shall offer and sell all Approved Products through delivery, on such terms and conditions as WTG shall require in the Operations Manual or otherwise in writing from time to time.

1.7     Franchisee will strictly comply with the requirements and instructions of WTG regarding the use of the Marks in connection with the Approved Products and the Restaurant. The Franchisee acknowledges that the goodwill associated with the Marks is and will remain the exclusive property of WTG and that the Franchisee will derive no benefit from such goodwill, except through profit received from the operation or possible sale of the Restaurant during the License Term, which is subject to early termination as set forth herein.  Any enhancement of the goodwill associated with the Marks during the License Term will inure to the benefit of WTG, except to the extent of such profits, if any, realized by the Franchisee during the License Term, following which no value shall be attributable to any goodwill of the Marks acquired or enjoyed by the Franchisee pursuant to this Agreement and all right to use the Marks shall revert automatically to WTG at no cost to WTG.

2.     FRANCHISEE'S PRE-OPENING OBLIGATIONS

2.1     Site approval and financing.  The location of, and the documents with respect to the lease of the real property and building for, the Restaurant shall be subject to the approval of WTG, which approval shall be within WTG's absolute discretion.  WTG will endeavor to act upon any written request for approval within a reasonable time.  Upon approval, the specific location of

the Restaurant shall be deemed part of this Agreement.  If the premises are already owned by the Franchisee, the Franchisee shall provide such evidence of ownership as WTG shall request.

2.2    Construction Period.  After a location is selected by the Franchisee and approved by WTG, the Franchisee shall procure or cause the Franchisee's lessor to procure a building contractor to construct or renovate the building as required for the operation of the Restaurant in accordance with plans approved by WTG, which approval shall be within the sole discretion of WTG.  The cost of any construction or modifications, whether required by local zoning or building laws or otherwise, shall be borne solely by the Franchisee.

2.3    Commencement of Business.  The Franchisee shall open the Restaurant for business within twelve (12) months after execution of this Agreement.

3.    <u>TERM AND RENEWAL</u>

3.1    This Agreement shall be in effect upon its execution by WTG and, except as otherwise provided herein, the term of this Agreement shall be ten (10) years from the date first above written ("License Term").

3.2    Franchisee may, subject to the following conditions, renew this Agreement for three (3) additional consecutive terms of five (5) years each. WTG may require, in its sole discretion, that any or all of the following conditions be met no less than one hundred eighty (180) days prior to such renewal:

3.2.1    Franchisee shall have been in substantial compliance with all the terms and conditions of this Agreement throughout its term;

3.2.2    All monetary obligations owed by the Franchisee to WTG and its subsidiaries and affiliates shall be current at the time of renewal;

3.2.3    Franchisee shall, at WTG's option, execute WTG's then-current form of franchise agreement (but only for such renewal terms as are provided by this Agreement), which shall supersede this Agreement in all respects, and the terms of which may differ from the terms of this Agreement including, without limitation, a higher percentage royalty fee and advertising contributions, except that the Franchisee shall not be required to pay any initial license fee;

3.2.4    Franchisee shall agree to make such capital expenditures as may be reasonably required by WTG to renovate and modernize the Restaurant and its signs and equipment so as to reflect the image of Wings To Go restaurants, or, if, in the sole and absolute discretion of WTG, renovation and modernization of the Restaurant is not possible or feasible, the Franchisee shall relocate the Restaurant within the Territory or such other area as may be approved by WTG in writing in accordance with WTG's relocation procedures; and

3.2.5    Franchisee shall not have engaged in chronic repeated breaches of this Agreement of a substantial nature within the preceding twenty-four (24) months prior to renewal.

4.    COMPLIANCE WITH STANDARDS AND OTHER FRANCHISEE OBLIGATIONS

4.1    The Franchisee shall, consistent with the terms of this Agreement, diligently develop the business of the Restaurant and use his best efforts to market and promote the Approved Products which are offered for sale at the Restaurant.

4.2    The Franchisee acknowledges that the essence of this Agreement is the adherence by the Franchisee to standards and policies of WTG providing for the uniform operation of all WTG restaurants, including, without limitation, a designated menu of food and beverage products; uniformity of food specifications, preparation methods, quality and appearance; and uniformity of facilities and service.  Accordingly, during the License Term, the Franchisee will strictly comply with all standards, specifications, processes, procedures, requirements, and instructions of WTG regarding the operation of the Restaurant which now exist or may be established from time to time and in connection therewith and not in limitation thereof, the Franchisee will take such action and precautions as necessary to assure that:

4.2.1    the Franchisee or its fully trained and qualified manager devotes his or her full time to the supervision, management and operation of the Restaurant;

4.2.2    the Franchisee and employees at the Restaurant attend and complete such courses, programs and seminars at such locations as WTG may from time to time reasonably require, in order that such persons may be fully trained and instructed on a continuing basis in various aspects of operating a Wings To Go restaurant, and it is understood that WTG shall not bear the salary, travel, hotel, meal or other expenses of such persons attending such courses, programs or seminars;

4.2.3    all Approved Products offered for sale at the Restaurant are prepared at the Restaurant either for sale to customers at the Restaurant or by delivery, (if authorized by WTG), or upon the prior written approval of WTG;

4.2.4    the Franchisee offers the Approved Products through delivery, if WTG requires delivery of any Approved Products by all restaurants in the System, in the Operations Manual or otherwise in writing;

4.2.5    Franchisee offers all Approved Products specified by WTG, and all the Approved Products are prepared at the Restaurant and served in strict compliance with WTG's requirements;

4.2.6   only the sale of Approved Products is solicited, accepted or made at or from the Restaurant and only Approved Products are prepared at the Restaurant, except as otherwise specifically authorized in writing by WTG;

4.2.7   Franchisee adheres to the provisions of Section 1.6;

4.2.8   if requested by WTG on at least ninety (90) days notice as part of a general program or standardization effort by WTG, the marketing of any product is discontinued, whereupon the discontinued product shall cease to be an Approved Product;

4.2.9   only signs and menu boards, advertising and promotional material, equipment, supplies, uniforms, paper goods, packaging, furnishings, fixtures, recipes, and food ingredients which meet WTG's standards and specifications (as established from time to time) are used at the Restaurant or in connection with the Franchisee's business;

4.2.10  all equipment, signs, menu boards, supplies and other items necessary in connection with adding new Approved Products are acquired, installed and utilized (and that the marketing of such new Approved Products begins) at the Restaurant as soon as possible consistent with the reasonable requirements of WTG;

4.2.11  the Restaurant and everything located at the Restaurant are maintained in first-class condition and repair and are kept clean, neat and sanitary;  the Restaurant is adequately lighted and is operated in a clean, wholesome and sanitary manner consistent with WTG's requirements; all maintenance, repairs and replacements reasonably requested by WTG or needed in connection with the Restaurant are promptly made; and all employees are clean and neat in appearance;

4.2.12  no alterations of the Restaurant affecting the image are made except at WTG's request or with WTG's approval, and that any such alterations strictly conform to specifications and requirements established or approved by WTG;

4.2.13  the Restaurant and its business comply with applicable laws, ordinances and governmental rules, regulations and other requirements, including but not limited to health and sanitation requirements, and WTG is advised promptly in the event of a conflict between this requirement and any other requirement in or pursuant to this Agreement;

4.2.14  Franchisee shall keep the business open and in normal operation for such hours and days as WTG may from time to time specify in the Operations Manual;

4.2.15  the employees and the supplies and other items on hand at the Restaurant are at all times sufficient to meet the anticipated volume of business;

4.2.16  all debts and taxes in connection with the Restaurant and the Franchisee's business, except those duly contested in a bona fide dispute, are paid when due, including, but not limited to, debts payable to WTG and its affiliates; and

4.2.17  all necessary and appropriate measures are taken to avoid an unsatisfactory or equivalent safety, sanitation or health rating at any time from any governmental agency or authority, and conditions or practices disapproved by any such agency or authority are promptly corrected except that, after consultation with WTG by the Franchisee, the Franchisee may contest the action by such agency or authority as being arbitrary, capricious, unfair and unwise.

4.3     In prescribing standards, specifications, processes, procedures, requirements or instructions under this Agreement, WTG acknowledges and agrees that the Franchisee shall have control over the day-to-day managerial operations of the Restaurant and shall have sole discretion as to the prices to be charged to customers.

4.4     WTG will loan to the Franchisee the confidential Operations Manual, and the Franchisee will promptly adopt and use exclusively the methods and policies contained within this Agreement and the Operations Manual, which shall be subject to and which shall be deemed to include such supplements, revisions and later instructions as may be issued from time to time by WTG.  The Franchisee will treat the confidential Operations Manual and trade secrets and know-how of WTG as confidential and will not disclose any such information to anyone except (i) employees of the Franchisee as necessary for the proper operation of the Restaurant and (ii) other persons authorized in writing by WTG to receive such information.

4.5     The Franchisee will take all necessary precautions to cause its employees to keep such information confidential by entering into appropriate agreements, in such form as approved by WTG, with those employees who have access to such information.  The confidential Operations Manual and other information furnished by WTG in connection with the business of WTG or the Restaurant will be and remain the property of WTG and, if in tangible form, will be returned to WTG at the earlier of the end of the License Term or the termination of this Agreement.  The Franchisee shall not, during the term hereof or thereafter, copy, duplicate, record or otherwise reproduce material containing the trade secrets or confidential information concerning WTG or its Marks or processes, and shall take all necessary precautions to prevent the Franchisee's employees from doing so.  The Franchisee shall immediately notify WTG of all infringements or imitations of the Marks or know-how which come to its attention or challenge the Franchisee's use of said Marks or know-how.

4.6     WTG and its representatives shall have the right during business hours and at all other reasonable times to enter and inspect the Restaurant and all other facilities used for the preparation, storage, and transportation of any Approved Products; to discuss with the Franchisee or such other people as the Franchisee may designate all matters that may pertain to compliance with this Agreement and with standards, specifications, requirements, instructions and procedures hereunder; to take photographs of the Restaurant and such other facilities; and to purchase

samples of food products and other items at the Restaurant and other points-of-sale. The Franchisee will in all respects cooperate with WTG in its exercise of rights under this Section 4.6.

4.7     Franchisee acknowledges and agrees that the Wings To Go sauces which are manufactured according to WTG's proprietary standards and specifications ("Sauces") are an integral part of the System and are integral to the operation of the Restaurant. Accordingly, the Franchisee agrees to purchase all Sauces designated by WTG from a supplier designated by WTG. All Sauces sold to the Franchisee by such supplier shall be sold and delivered to the Franchisee on the terms and conditions of, and at the invoice price being charged by, the designated supplier at the date of shipment, as described and amended in the then-current price list and terms of sale communicated to the Franchisee by such supplier in writing from time to time.

4.8     All products sold or offered for sale at the Restaurant, other than described in Section 4.7, shall meet WTG's then-current standards and specifications, as established in the Operations Manual or otherwise in writing. Franchisee shall purchase all products solely from suppliers who demonstrate to WTG's continuing reasonable satisfaction the ability to meet WTG's standards and specifications, who possess adequate quality controls and capacity to supply Franchisee's needs promptly and reliably, and who have been approved by WTG in the Operations Manual or otherwise in writing. If the Franchisee desires to purchase products from other than approved suppliers, the Franchisee shall submit to WTG a written request to approve the proposed supplier, together with such evidence of conformity with WTG's specifications as WTG may reasonably require. WTG shall have the right to require that its representatives be permitted to inspect the supplier's facilities, and that samples from the supplier be delivered for evaluation and testing either to WTG or to an independent testing facility designated by WTG. A charge not to exceed the reasonable cost of the evaluation and testing shall be paid by the Franchisee. WTG shall, within thirty (30) days after its receipt of such completed request and completion of such evaluation and testing (if required by WTG), notify the Franchisee in writing of its approval or disapproval of the proposed supplier. Approval shall not be unreasonably withheld. the Franchisee shall not sell or offer for sale any products of the proposed supplier until WTG's written approval of the proposed supplier is received. WTG may from time to time revoke its approval of particular products or suppliers when WTG determines, in its sole discretion, that such products or suppliers no longer meet WTG's standards. Upon receipt of written notice of such revocation, the Franchisee shall cease to sell any disapproved products and cease to purchase from any disapproved supplier. Franchisee agrees that it shall use products purchased from approved suppliers solely for the purpose of operating the Restaurant and not for any other purpose, including, without limitation, resale.

4.9     Franchisee shall display the Marks and other commercial symbols only in a manner approved by WTG. Franchisee shall not place additional signs on the premises of the Restaurant without WTG's prior written approval. Franchisee shall discontinue the use of such signs as are declared obsolete by WTG.

5.     <u>MAINTENANCE AND UPGRADING OF RESTAURANT</u>

5.1     Franchisee shall at all times comply, and cause the Restaurant to comply, with all standards, specifications, processes, procedures, requirements and reasonable instructions of WTG regarding the Restaurant's physical facilities, including the layout of furniture and fixtures, and facilities at which or by means of which the Franchisee is permitted by WTG to store, handle, prepare or transport Approved Products or ingredients to be used in preparing the Approved Products.

5.2     Recognizing the value of uniform national standards to the Franchisee, WTG and the System, the Franchisee, at its expense, shall refurbish, remodel, and upgrade the Restaurant, and make such additions, alterations, repairs, and replacements thereto (but no others without WTG's prior written consent) as may be required for that purpose, including, without limitation, modifications to existing improvements, such periodic repainting or replacement of obsolete signs, furnishings, equipment, and decor as WTG may reasonably direct. If any changes in or additions of equipment or changes in or additions to the Restaurant, are required by WTG in connection with refurbishing, remodeling, or upgrading, the Franchisee will bear the entire cost thereof.

6.      SERVICES BY WTG

6.1     The initial franchise fee and the royalties hereunder are paid or payable for the License and not for services by WTG, and any failure by WTG to provide services shall not excuse the Franchisee from paying the initial franchise fee or the royalties. WTG shall offer to the Franchisee such initial and continuing services as WTG deems necessary or advisable in connection with furthering the business of the Franchisee and the System and in connection with protecting the Marks and goodwill of WTG. Among such continuing services shall be the furnishing of operating advice and training on a continuing basis, undertaking further refinement of products and equipment and informing the Franchisee of WTG's methods of quality control, informing the Franchisee of such developments which in WTG's opinion may be beneficial to the Franchisee's operations, recommending such accounting and business procedures which WTG believes may be of value, and scheduling and holding from time to time meetings and seminars for the advancement and dissemination of its methods in processing and marketing Approved Products. WTG currently does not provide mandatory continuing training; however, when WTG determines, in its sole discretion, to require mandatory continuing training, either (i) the Franchisee or, if the Franchisee is a corporate, partnership or limited liability franchisee, the Control Person, as such term is defined in Section 13.6, or (ii) the employee who will manage the Restaurant, must complete the mandatory continuing training to the satisfaction of WTG. The mandatory continuing training will be held at WTG's headquarters in Annapolis, Maryland or at other regional locations selected by WTG. The Franchisee must pay all cost associated with the mandatory continuing training incurred by the Franchisee, the Control Person and the Franchisee's employees, including, without limitation, travel and lodging costs.

6.2     ~~WTG will supply an initial technical training program available to the Franchisee and all of his employees and consisting of training for three (3) weeks, eight (8) hours per day, one (1) week of which will take place prior to opening of the Restaurant and two (2) weeks of~~

~~which will follow the opening.  For purposes of this Section 6.2 and Section 6.3 hereof, a week shall consist of any five (5) days of a consecutive seven-day period.  Either (i) the Franchisee or, if the Franchisee is a corporate, partnership, or limited liability franchisee, the Control Person, as such term is defined in Section 13.6, or (ii) the employee who will manage the Restaurant, must complete the initial technical training to the satisfaction of WTG.  The pre-opening technical training will be held at a location approved by WTG which will be a WTG restaurant (either WTG owned or a franchise) with a sufficient volume of business to provide an adequate training environment.  Technical training after the opening of the Restaurant will take place at the Restaurant.  The Franchisee must pay all cost associated with the initial technical training incurred by the Franchisee, the Control Person and the Franchisee's employees, including, without limitation, travel and lodging costs.  The initial technical training and the initial management training may occur within the same time period, at the discretion of WTG.~~

~~6.3    WTG shall also offer initial management training to the Franchisee or the employee who will manage the Restaurant.  WTG, in its sole discretion, shall determine the duration of the initial management training, but in any event, the training will last at least one (1) day and no more than one (1) week, eight (8) hours per day, and must be completed to the satisfaction of WTG by either (i) the Franchisee or, if the Franchisee is a corporate, partnership, or limited liability franchisee, the Control Person, as such term is defined in Section 13.6, or (ii) the manager of the Restaurant.  Initial management training will be held at a location decided upon by WTG.  The Franchisee must pay all costs associated with the initial management training incurred by the Franchisee, the Control Person, and the Franchisee's employee, including, without limitation, travel and lodging costs.~~

6.4    WTG shall also provide a representative to assist the Franchisee in the opening of the Restaurant.

7.    <u>ROYALTIES</u>

7.1    Franchisee shall pay to WTG a continuing weekly royalty fee for the License at the rate of four percent (4%) of Gross Revenues (as defined in Section 7.3) for each week or partial week that the Restaurant is in operation, on or before the Monday for the seven-day period ending on the preceding Saturday or for such other period specified by WTG.  Each payment of royalties shall be accompanied by a statement as to the relevant Gross Revenues, *plus 3 days for mailing* and the statement shall be in such form and detail as may be required by WTG from time to time.

7.2    Although each failure to pay royalties when due will be a material breach of this Agreement, to encourage prompt payment and to cover the costs and expenses involved in handling and processing late payments, the Franchisee shall, if the royalty payment is not received by WTG on or before the day for which said payment is due, also pay a late payment charge of fifteen percent (15%) of the unpaid portion of the regularly scheduled royalty payment.

7.3    For purposes of this Agreement, "Gross Revenues" include the total of all monies and receipts derived from products prepared and services performed at the Restaurant, delivered from the Restaurant (if authorized hereunder by WTG), at special events, or from catering and from all sales and orders made, solicited or received at the Restaurant or at special events and from all other business whatsoever conducted at or from the Restaurant, whether such revenues are evidenced by cash, credit, checks, gift certificates, script, food stamps, coupons (but not promotional or discount coupons to the extent that the Franchisee realizes no revenue therefrom through issuance, redemption or otherwise), services, property or other means of exchange, and whether such sales are of food, beverages, tobacco products, vending machine items, services, merchandise or products of any nature whatsoever.  Cash refunded and credit given to customers, and receivables uncollectible from customers shall be deducted in computing Gross Revenues to the extent that such cash, credit or receivables represent amounts previously included in Gross Revenues on which royalties were paid.  Gross Revenues shall not include sales or merchants' or other taxes measured on the basis of the Gross Revenues of the business imposed by governmental authorities.  Gross Revenues shall be deemed received by the Franchisee at the time the products, merchandise or services from which they derive are delivered or rendered or at the time the relevant sale takes place, whichever occurs first.  Gross Revenues consisting of property or services shall be valued at the prices applicable, at the time such Gross Revenues are received, to the products or services exchanged for such Gross Revenues.

7.4    WTG shall have the right to require, in the Operations Manual or otherwise in writing, that the Franchisee make such payments specified in this Section 7 and in Section 8 to WTG or to a bank account specified by WTG on a weekly basis by electronic fund transfer, pre-authorized auto-draft arrangement, or such other means as WTG may specify from time-to-time in writing.  Franchisee shall report its Gross Revenues for such week to WTG by telefax on the day following the end of such period.  Franchisee agrees to maintain sufficient funds in its bank account designated for such payments to cover all amounts payable.  Franchisee shall furnish WTG, WTG's bank, and any other recipients of payment with such information and authorizations as may be necessary to permit such persons to make withdrawals by electronic fund transfer or auto-draft arrangement.  Franchisee shall bear any expenses associated with such authorizations and payments.

8.    <u>ADVERTISING</u>

8.1    The Franchisee shall use only advertising and promotional materials and programs provided by WTG or approved in advance, in writing, by WTG.  Neither the approval by WTG of the Franchisee's advertising and promotional material nor the providing of such material by WTG to the Franchisee shall directly or indirectly require WTG to pay for such advertising or promotion.  Further, any advertising or promotional material provided to WTG by or on behalf of the Franchisee which is approved for use by WTG may be used by WTG and other franchisees of WTG at no cost or expense to WTG or any other franchisees of WTG.

8.2     During the License Term, the Franchisee shall pay to WTG two percent (2%) of Gross Revenues for regional advertising and promotion, and shall spend at least two percent (2%) of Gross Revenues on other advertising and marketing activities. WTG shall determine, in its sole discretion, how the payments from the Franchisee for regional advertising shall be used. WTG is not obligated to make expenditures for the Franchisee which are equivalent or proportionate to the Franchisee's contribution, or to ensure that any particular franchise benefits directly or from advertising expenditures by WTG. Amounts paid to WTG for regional advertising shall be paid in the manner and on the schedule set forth for the payment of royalties.

8.3     WTG currently does not engage in national advertising; however, if WTG determines in its sole discretion that national advertising would benefit WTG, its affiliates and franchises, the Franchisee shall, upon reasonable notice, make additional payments to WTG of one percent (1%) of Gross Revenues for such national advertising.

90      RECORDS AND AUDITS

9.1     All Gross Revenues shall be recorded on cash registers. The Franchisee shall, in a manner and form satisfactory to WTG, prepare on a current basis (and preserve for no less than three (3) years) complete and accurate records concerning Gross Revenues and all financial, operating, marketing and other aspects of the Restaurant and the business conducted under this Agreement, and maintain an accounting system which fully and accurately reflects all aspects of the Restaurant and such business. Such records shall include but not be limited to books of account, tax returns, daily reports, statements of Gross Revenues (to be prepared each month for the preceding month), profit and loss statements (to be prepared at least annually), and balance sheets (to be prepared at least annually). Franchisee shall also submit to WTG current financial statements and other such reports as WTG may reasonably request to evaluate or compile research data on any aspects of the Restaurant or the Franchisee's business.

9.2     From the date hereof until three (3) years elapse following the end of the License Term, WTG or its authorized agent shall have the right to request, receive, inspect, audit, and copy at all reasonable times, any or all of the records referred to above wherever they may be located or at any other mutually agreeable location. If any such inspection or audit discloses a deficiency in the payment of any royalty, advertising or other amount required to be paid under this Agreement, the Franchisee shall pay the deficiency to WTG within fifteen (15) days after receipt of demand plus an interest payment equal to five (5) percentage points over the federal discount rate in effect when the payment was originally due multiplied by the amount of the deficiency, from the date the payment was originally due. In addition, if the audit reveals an understatement of two percent (2%) or more of Gross Revenues (for any time period), the Franchisee shall also pay immediately to WTG the entire cost of such inspection or audit (including, but not limited to travel, lodging, meals, salaries, and other expenses of the inspecting or auditing personnel.) For purposes of the preceding sentence, an audit period shall be each fiscal year of the Franchisee and the current fiscal year of the Franchisee even if less than a year.

If the audit discloses an overpayment of royalties, WTG will promptly pay the amount of such overpayment to the Franchisee.

9.3     Within seventy-five (75) days after the close of the Franchisee's fiscal year, the Franchisee shall furnish to WTG complete annual financial statements to include a balance sheet and profit and loss statement, and a statement identifying all persons holding any interest in the Restaurant including their respective percentage ownership interests.  The annual financial statements shall be prepared in accordance with generally accepted accounting principles consistently applied and certified to be correct by a certified independent accountant acceptable to WTG; provided, however, the Franchisee may furnish WTG unaudited statements if such statements are (a) verified by the Franchisee to be true and correct to the best of his knowledge and belief and (b) the Franchisee represents that said statements reflect accurately the operations of the Franchisee for the periods indicated therein.

100     <u>INSURANCE</u>

10.1     All insurance required hereunder must be placed with a reputable insurance company approved by WTG and licensed to do business in the state in which the Restaurant is located, having a Policyholders Rating of "A+" or "A" (Excellent) as determined by Alfred M. Best and Company, Inc.  At all times during the License Term, the Franchisee shall maintain in effect such insurance as may be required by the terms of any lease or mortgage covering the Restaurant, and in any event the Franchisee shall maintain:

10.1.1  fire, extended coverage and vandalism and malicious mischief at eighty percent (80%) of actual cash value of building, contents and improvements;

10.1.2  employer's liability and worker's compensation insurance as prescribed by applicable law;  and

10.1.3  comprehensive general liability and automobile insurance on an occurrence basis naming WTG as an additional insured, covering the following risks in no less than the following amounts, subject to reasonable increase by WTG from time to time as specified in the Operations Manual:

| <u>Type of Risk</u> | <u>Limit of Liability</u> |
|---|---|
| Bodily injury to or death of one or more persons | $300,000 each accident or each person |
| Property damage or destruction | $100,000 each accident |
| Public and product liability | $300,000 each occurrence |

10.2    Simultaneously herewith, annually hereafter and at each time a change is made in such insurance or insurance carrier, the Franchisee shall furnish WTG with certifications by the insurance carrier evidencing the term and coverage of the insurance in force and the persons insured. Such certificates shall provide that the insurance coverage will not be canceled, altered, or permitted to lapse or expire without thirty (30) days' advance written notice to WTG. WTG, or its insurer, shall have the right to participate in discussions with the Franchisee's insurance company or any claimant (in conjunction with the Franchisee's insurance company) regarding any product liability claim and the Franchisee agrees to adopt WTG's reasonable recommendations to its insurance carrier regarding the settlement of any such claims.

110    CONDEMNATION AND CASUALTY

11.1    The Franchisee shall give WTG notice of any proposed taking through the exercise of the power of eminent domain, at the earliest possible time. If the Restaurant or a substantial part thereof is to be taken, the Restaurant may be relocated within the Territory or elsewhere only with WTG's prior written approval. If such relocation is authorized by WTG and the Franchisee opens a new outlet at such other location within one (1) year of the closing of the old Restaurant, the new restaurant will thenceforth be deemed to be the Restaurant licensed under this Agreement. If such a condemnation takes place and a new restaurant does not, for whatever reason, become the Restaurant under this Agreement and in strict accordance with this Section 11.1, then the License shall terminate forthwith upon notice thereof by WTG to the Franchisee.

11.2    If the Restaurant is damaged by fire or other casualty, the Franchisee will expeditiously repair the damage. If the damage or repair requires closing the Restaurant, the Franchisee will immediately notify WTG, will repair or rebuild the Restaurant, and will reopen the Restaurant for continuous business operations as soon as practicable (but in any event within one (1) year after closing of the Restaurant), giving WTG advance notice of the date of reopening. If the Restaurant is not reopened in accordance with this Section 11.2, the License shall terminate forthwith upon notice thereof by WTG to the Franchisee.

11.3    The License Term shall not be extended by any interruption in the Restaurant's operations except by an act of God that results in the Restaurant being closed not less than sixty (60) days nor more than three hundred sixty-five (365) days. Franchisee must apply for any such extension within sixty (60) days following the reopening of the Restaurant.

120    RESTRICTIONS ON CERTAIN ACTIVITIES

12.1    Irrespective of whether the Franchisee is an individual, corporation, partnership, or limited liability company, at least one individual, shareholder, partner, or member, as the case may be, must reside in the general locality of the Restaurant, beneficially own at least a 25% equity interest in the Franchisee, and devote substantially his full time and best efforts to the operation and management of the Restaurant with no operational or managerial commitment in any business other than the Restaurant. Notwithstanding anything contained in the immediately preceding sentence to the contrary, the Franchisee may hire an individual to manage and operate the

Restaurant (the "Manager") and the Franchisee will not be bound by the requirements set forth in the immediately preceding sentence if and for so long as (i) the Franchisee makes significant managerial efforts in the operation of the Restaurant that may be expected to affect the success or failure of the Restaurant, (ii) the individual chosen by the Franchisee as the Manager is approved in writing by WTG, (iii) the Manager resides in the general locality of the Restaurant, devotes substantially his full time and best efforts to the operation and management of the Restaurant with no operational or managerial commitment in any business other than the Restaurant, and (iv) the Franchisee provides to WTG a writing executed by the Manager which states that the Manager agrees to be bound by Section 12 of this Agreement to the same extent as if it were the Franchisee.

12.2    Franchisee specifically acknowledges that, pursuant to this Agreement, the Franchisee will receive valuable, specialized training and confidential information, including, without limitation, information regarding the operational, sales, promotional, and marketing methods and techniques of WTG and System. Franchisee covenants that during the term of this Agreement, and for two (2) years following the expiration or termination (for any reason) of this Agreement, except as otherwise approved in writing by WTG, the Franchisee shall not, either directly or indirectly, for itself, or through, on behalf of, or in conjunction with any person or legal entity:

12.2.1  Divert or attempt to divert any present or prospective business or customer of any Restaurant to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks and System;

12.2.2  Employ or seek to employ any person who is at that time employed by WTG or by any other franchisee of WTG, or otherwise directly or indirectly induce such person to leave his or her employment; or

12.2.3  Own, maintain, operate, engage in, be employed by, provide any assistance to, or have any more than a five percent (5%) interest in (as owner or otherwise) in any restaurant business offering for sale any food products which are the same as, or substantially similar to, the food products for sale, at any time, at any Wings To Go restaurant within the System, and which business is, or is intended to be, located within:

12.2.3.1        the Territory;

12.2.3.2        a radius of ten (10) miles from the Restaurant; or

12.2.3.3        a radius of ten (10) miles of any Wings To Go restaurant.

12.3    Franchisee hereby certifies that he has substantial skill and knowledge which will enable him to earn a living while being in full compliance with Section 12.2 of this Agreement and that compliance with Section 12.2 does not and will not create a hardship on him or his family.

12.4    The parties agree that each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement.  If all or any portion of a covenant in this Section 12 is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an unappealed final decision to which WTG is a party, the Franchisee expressly agrees to be bound by any lesser covenant subsumed with the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Section 12.

12.5    Franchisee acknowledges that, as a WTG franchisee, he will have access to WTG's trade secrets and confidential practices and, therefore, is in a unique position to use the special knowledge he will have gained while a franchisee.  Franchisee covenants that a breach of covenants contained in this Section 12 will be deemed to threaten immediate and substantial irreparable injury to WTG giving WTG the right to obtain immediate injunctive relief without limiting any other rights or remedies of WTG.

130    ASSIGNMENT

13.1    Neither this Agreement, nor any of the Franchisee's rights or obligations under this Agreement, all of which are personal in nature, may be the subject of any pledge, lien, levy, attachment, or security interest or arrangement, or acquired through execution, foreclosure, or like action or event.  Without WTG's prior written consent and compliance in all other respects with the terms in this Section 13, neither this Agreement, nor any of the Franchisee's rights or obligations hereunder, nor the Restaurant shall be sold, assigned, transferred, sublicensed, shared or divided by the Franchisee, in whole or in part, voluntarily or involuntarily, by operation of law or otherwise in any manner.  Any purported transaction, interest or action contrary to this Section 13 will be a breach of this Agreement and will be void.

13.2    Upon and after each valid assignment of this Agreement or the Franchisee's rights or obligations hereunder pursuant to this Section 13, the assignee or assignees shall be deemed to be the Franchisee hereunder and shall be bound by and liable for all existing and future obligations of the Franchisee.

13.3    Neither this Agreement, the Franchisee's rights and obligations hereunder or the restaurant business may be sold, assigned, transferred, sublicensed, shared or divided by the Franchisee, in whole or in part, to a non-party to this Agreement, whether by sale or otherwise unless the Franchisee has (i) received a bona fide written offer ("Offer") therefor from a third party (the "third party"), (ii) offered to transfer the restaurant business to WTG, upon the same terms, conditions and price (less any amount that would otherwise be payable as and by way of commission or finder's fee to a broker or like representative) as set forth in the offer and (iii) not

received, within sixty (60) days of receipt by WTG of the offer, a written notice from WTG stating that WTG shall exercise its option to purchase. In the event the Offer provides for payment of consideration other than cash or involves certain intangible benefits, WTG may elect to purchase the interest proposed to be sold for the reasonable equivalent in cash. If the parties cannot agree within a reasonable time on the reasonable equivalent in cash of the non-cash part of the Offer, an independent appraiser shall be designated by WTG and his determination shall be final and binding. Upon expiration of the time period for WTG to exercise its right of first refusal and upon WTG's failure to exercise the right, this Agreement, the Franchisee's rights and obligations thereunder and the restaurant business may be assigned or transferred only (a) to the Third Party whose Offer therefor was submitted to WTG, but only upon the exact terms, conditions and price set forth in such Offer, and (b) subject to the conditions set forth in Section 13.7. The Third Party may only be (x) a corporation, partnership, or limited liability company in which the Franchisee is the Control Person (as defined in Section 13.6), (y) an individual who is determined by WTG to meet the requirements of an individual assignee or transferee under Section 13.7, or (z) a corporation, partnership, or limited liability company in which the Control Person is determined by WTG to meet the requirements of a Control Person under Section 13.6. Any change in the Control Person of the Franchisee shall be deemed to be a transfer for purposes of this Section 13. If WTG fails to exercise its option and the Restaurant is not subsequently sold to the Third Party whose Offer was submitted to WTG and in accordance with said Offer, WTG shall continue to have upon the same conditions, a first option to purchase the Restaurant upon the terms and conditions of any subsequent Offer.

     13.4    Notwithstanding Section 13.3, upon the death or permanent incapacity of the Franchisee, this Agreement and the restaurant business may, subject to the conditions of Section 13.7, be assigned, transferred or bequeathed by the Franchisee to one or more of the following persons: the Franchisee's spouse, sibling, child or parent. If, in WTG's sole discretion, such person cannot devote his full time and best efforts to the operation of the Restaurant or lacks the capacity to operate the Restaurant in accordance with this Agreement, WTG shall have an option to operate and/or manage the deceased or incapacitated the Franchisee's interest is transferred to another party acceptable to WTG in accordance with the terms and conditions of this Agreement. However, in no event shall WTG's operation and management of the Restaurant continue for a period in excess of twelve (12) full calendar months without the consent of the Franchisee or his estate. In the event that WTG so operates and/or manages the Restaurant, WTG shall make a complete account to and return the net income from such operation to the Franchisee or to his estate, less a reasonable management fee and expenses. If the disposition of the Restaurant to a party acceptable to WTG  has not taken place within twelve (12) months from the date that WTG has commenced the operation or management of the Restaurant on behalf of the deceased or incapacitated Franchisee, then, in that event, WTG shall have the option to purchase the Restaurant at fair market value less any amounts which are in recognition of goodwill or other intangibles associated with the restaurant business or terminate this Agreement.

13.5    If the Franchisee is a corporation, partnership, or limited liability company, a Control Person, as defined in Section 13.6 hereof, shall be established as of or prior to the date of this Agreement.

13.6    As used in this Agreement, the term "Control Person" means the individual who has the authority to, and does in fact, actively direct the business affairs of a corporation, partnership or limited liability company with respect to the Restaurant and on the date hereof and until changed in accordance with the terms hereof, the Control Person shall be the individual whose name and signature appear on the signature page to this Agreement.  Such authority may arise by reason of the ability to vote a majority of the voting stock of the corporation, by the majority of the partners of the partnership, by the majority of the membership interest of the limited liability company, by contract, or as otherwise may be determined by WTG.

13.7    Notwithstanding anything contained in this Agreement to the contrary, the following conditions apply to all assignments and transfers:

13.7.1    No assignment or transfer of this Agreement, any of the Franchisee's rights or obligations thereunder or the restaurant business shall be approved by WTG unless and until (i) all accrued obligations, monetary and non-monetary, of the Franchisee to WTG under this Agreement shall have been satisfied in full, and (ii) a general release of claims, in a form approved by WTG, has been executed by the Franchisee and all guarantors of the Franchisee's obligations. WTG may conduct an investigation and audit under Section 9 in order to determine the extent of accrued obligations.

13.7.2    A proposed Control Person or a proposed individual assignee or transferee must demonstrate to WTG's satisfaction that he meets in all respects WTG's high standards applicable to new franchisees regarding experience in the food business, personal and financial reputation and stability, willingness and ability to devote adequate time and best efforts to the operation of the Restaurant, and such other criteria and conditions as WTG may reasonably apply in evaluating new franchisees.  WTG must be provided such information about the proposed individual as it may reasonably require.

13.7.3    A proposed Control Person or a proposed individual assignee or transferee must (i) agree in writing satisfactory to WTG to assume all of the obligations and liabilities of the Franchisee under this Agreement and to promptly attend the training required of new franchisees and to pay all costs and expenses associated therewith, and (ii) demonstrate to WTG's satisfaction that he meets in all respects WTG's standards applicable to new franchisees regarding financial resources.  In addition, the Franchisee shall continue to remain personally liable for all affirmative obligations, covenants and agreements contained herein for the full term of this Agreement or for such shorter period as WTG may, in its sole discretion, determine.

13.7.4    A proposed assignee or transferee which is a corporation, partnership, or limited liability company must provide to WTG prior to the assignment or transfer (i) a guaranty,

in the form substantially similar to the one attached hereto as Exhibit D, executed by each of the stockholders, partners, or members of the proposed assignee or transferee, (ii) an agreement, in the form substantially similar to the one attached hereto as Exhibit E, executed by each of the stockholders, directors, officers, partners, members, managers, and employees of the proposed assignee or transferee, and (iii) a list containing the names and addresses of the stockholders, partners, or members of the proposed transferee or assignee together with the amount of stock, partnership interest or membership interest owned by each stockholder, partner or member.

13.7.5  No sale, transfer, conveyance or assignment of the capital stock of a corporate franchisee, the partnership interest of a partnership franchisee, or membership interest of a limited liability franchisee shall be made to any entity prior to the Franchisee notifying WTG of such proposed change in stock, partnership interest, or membership interest ownership and WTG shall have the right to approve of such change before it becomes effective and require that the proposed stockholder or interest holder comply with certain conditions established by WTG, including, without limitation, the execution by the proposed stockholder of the guaranty and the agreement referenced in Section 13.7.4.  Further, no sale, transfer, conveyance or assignment of the capital stock of a corporate, partnership, or limited liability franchisee shall be made to any entity (other than by the Control Person to the Control Person's spouse, sibling, child or parent as a gift or bequest ) if the result of such sale, transfer, conveyance or assignment results in a change in the ownership of a controlling interest in the corporation, partnership, or limited liability company; unless and until (a) the parties to the proposed transaction have entered a binding agreement with respect thereto, subject only to the rights of WTG hereunder, including, without limitation, that the proposed assignee or transferee meets, in all respects, WTG's high standards regarding financial reputation and stability, (b) WTG has been furnished a copy of said binding agreement, and (c) WTG has been offered in writing a 60-day period in which to acquire the capital stock upon the same or equivalent terms and conditions specified in the binding agreement.

13.8    Upon (i) the sale, transfer, conveyance or assignment of the capital stock of a corporate franchisee, the partnership interest of a partnership franchisee, or the membership interest of a limited liability franchisee (other than by the Control Person to the Control Person's spouse, sibling, child or parent as a gift or bequest) or (ii) any transfer or assignment of this Agreement, any of the Franchisee's rights or obligations thereunder or the restaurant business, the Franchisee shall pay to WTG the sum of $3,000 as an assignment expense charge; provided, however, that if several assignments are made simultaneously to the same party, the aggregate assignment expense charge will be reduced by WTG.  The assignment expense charge shall be $1,000 when a transfer to an existing WTG franchisee occurs.

13.9    Notwithstanding anything contained herein to the contrary, this Agreement and WTG's rights thereunder are assignable, in whole or in part, by WTG, without the Franchisee's consent.  An assignment by WTG shall inure to the benefit of WTG's successors and assigns.

13.10   Neither this Agreement nor any of the rights conferred on the Franchisee hereby shall be retained by the Franchisee as security for the payment of any obligation that may arise by reason of any transfer or assignment.

140   TERMINATION

14.1    Termination by Notice from the Franchisee.  If the Franchisee desires to close the Restaurant permanently and cease doing business, he may terminate the License by giving 30 days' advance written notice to WTG, provided the Restaurant is permanently closed simultaneously with such termination of the License.

14.2    Termination by WTG Without Notice.  Unless WTG, promptly after discovery of the relevant facts, notifies the Franchisee to the contrary in writing, the License will immediately terminate without notice (or in the event notice is required by law, immediately upon the giving of such notice or at the earliest time thereafter permitted by applicable law) in the event that:

14.2.1  The Franchisee is adjudicated bankrupt, or files any petition or pleading under Chapter 7 or 11 of the federal bankruptcy law or any other state or federal bankruptcy or insolvency laws, or an involuntary petition is filed with respect to the Franchisee under any such laws and is not dismissed within thirty (30) days after it is filed, or a permanent or temporary receiver or trustee for the Restaurant or all or substantially all of the Franchisee's property is appointed by any court, or any such appointment is acquiesced in, consented to, or not opposed through legal action by the Franchisee, or the Franchisee makes a general assignment for the benefit of his creditors or makes a written statement to the effect that he is unable to pay his debts as they become due, or a levy of execution is made upon the franchise, or an attachment or lien remains on the Restaurant for thirty (30) days unless the attachment or lien is being duly contested in good faith by the Franchisee and WTG is so advised;

14.2.2  The Franchisee loses possession or the right of possession of all or a significant part of the Restaurant through condemnation or casualty and the Restaurant is not relocated or reopened as provided in Section 11;

14.2.3  The Franchisee contests in any court or proceeding the validity of, or WTG's ownership of, any of the Marks or other rights licensed hereunder; or

14.2.4  If the Franchisee is a corporation, partnership, or limited liability company, any action is taken which purports to merge, consolidate, dissolve or liquidate the Franchisee without WTG's prior written consent.

14.3    Upon the occurrence of any of the following events of default, WTG may, at its option, terminate this Agreement and all rights granted hereunder, without affording the Franchisee any opportunity to cure the default, effective immediately upon the provision of notice to the Franchisee (in the manner provided under Section 15 hereof):

14.3.1  If the Franchisee fails to locate an approved site or to construct and open the Restaurant within the time limits provided in the Site Selection Addendum and Section 2.3 hereof;

14.3.2  If the Franchisee or the Franchisee's Manager fails to complete the initial training program described in Sections 6.2 and 6.3 hereof to WTG's satisfaction;

14.3.3  If the Franchisee at any time ceases to operate or otherwise abandons the Restaurant, or loses the right to possession of its Premises, or otherwise forfeits the right to do or transact business in the jurisdiction where its Restaurant is located. However, if, through no fault of the Franchisee, the premises are damaged or destroyed by an event such that repairs or reconstruction cannot be completed within sixty (60) days thereafter, then the Franchisee shall have thirty (30) days after such event in which to apply for WTG's approval to relocate and/or reconstruct the premises, which approval shall not he unreasonably withheld;

14.3.4  If the Franchisee is convicted of a felony, a crime involving moral turpitude, or any other crime or offense that WTG believes is reasonably likely to have an adverse effect on the System, the Marks, the goodwill associated therewith, or WTG's interest therein;

14.3.5  If a threat or danger to public health or safety results from the construction, maintenance, or operation of the Restaurant;

14.3.6  If any purported assignment or transfer of any direct or indirect interest in this Agreement, in the Franchisee, or in all or substantially all of the assets of the Restaurant is made to any third party without WTG's prior written consent, contrary to the terms of Section 13 hereof;

14.3.7  If an approved transfer is not effected within the time provided following death or permanent incapacity, as required by Section 13.4 hereof;

14.3.8  If the Franchisee fails to comply with, or fails to obtain execution of, the covenants required under Section 4.5 or Section 12 hereof;

14.3.9  If, contrary to the terms of Section 4.4 or Section 12 hereof, the Franchisee discloses or divulges the contents of the Operations Manual or other confidential information provided to the Franchisee by WTG;

14.3.10    If the Franchisee knowingly maintains false books or records, or submits any false reports to WTG;

14.3.11    If the Franchisee misuses or makes any unauthorized use of the Marks or any other identifying characteristics of the System, or otherwise materially impairs the goodwill associated therewith or WTG's rights therein;

14.3.12     If the Franchisee refuses to permit WTG to inspect the Restaurant premises, or the books, records, or accounts of the Franchisee upon demand;

14.3.13     If the Franchisee, upon receiving a notice of default under Section 14 hereof, fails to initiate immediately a remedy to cure such default; or

14.3.14     If the Franchisee, after curing a default pursuant to Section 14.4 hereof, commits the same default again, whether or not cured after notice.

14.4     Except as otherwise provided in Sections 14.2 and 14.3 of this Agreement, upon any other default by the Franchisee, WTG may terminate this Agreement by giving written notice of termination (in the manner set forth under Section 15 hereof) stating the nature of the default to the Franchisee at least thirty (30) days prior to the effective date of termination; provided, however, that the Franchisee may avoid termination by immediately initiating a remedy to cure such default, curing it to WTG's satisfaction, and by promptly providing proof thereof to WTG within the thirty (30) day period. If any such default is not cured within the specified time, or such longer period as applicable law may require, this Agreement shall terminate without further notice to the Franchisee, effective immediately upon the expiration of the thirty (30) day period or such longer period as applicable law may require. Defaults which are susceptible of cure hereunder include the following illustrative events:

14.4.1  If the Franchisee fails to substantially comply with any of the requirements imposed by this Agreement, as it may from time to time reasonably be supplemented by the Operations Manual, or failure to carry out the terms of this Agreement in good faith.

14.4.2  If the Franchisee fails, refuses, or neglects promptly to pay any monies owing to WTG or its affiliates when due, or to submit the financial or other information required by WTG under this Agreement;

14.4.3  If the Franchisee fails to maintain or observe any of the standards or procedures prescribed by WTG in this Agreement, the Operations Manual, or otherwise in writing;

14.4.4  If the Franchisee fails, refuses, or neglects to obtain WTG's prior written approval or consent as required by this Agreement;

14.4.5  If the Franchisee acts, or fails to act, in any manner which is inconsistent with or contrary to its lease or sublease for the premises, or in any way jeopardizes its right to renewal of such lease or sublease; or

14.4.6  If the Franchisee engages in any business or markets any service or product under a name or mark which, in WTG's opinion, is confusingly similar to the Marks.

14.5     Effect of Termination or Expiration.  Upon termination or expiration of this Agreement, all rights granted hereunder to the Franchisee shall forthwith terminate, and:

14.5.1  Franchisee shall immediately cease to operate the Restaurant, and shall not thereafter, directly or indirectly, represent to the public or hold itself out as a present or former franchisee of WTG and shall immediately and permanently cease to use, in any manner whatsoever, the Marks, any confidential methods, procedures, and techniques associated with the System.  In particular, the Franchisee shall cease to use, without limitation, all signs, menus, advertising materials, displays, stationery, forms, products, and any other articles which display the Marks.

14.5.2 Franchisee shall, at WTG's option, assign to WTG any interest which the Franchisee has in any lease or sublease for the premises of the Restaurant.  In the event WTG does not elect to exercise its option to acquire the lease or sublease for the premises of the Restaurant, the Franchisee shall make such modifications or alterations to the premises (including, without limitation, the changing of, and the assigning to WTG of, the telephone number) immediately upon termination or expiration of this Agreement as may be necessary to distinguish the appearance of the premises from that of Restaurant under the System, and shall make such specific additional changes thereto as WTG may reasonably request for that purpose. In the event the Franchisee fails or refuses to comply with the requirements of this Section 14.5.2 , WTG shall have the right to enter upon the premises, without being guilty of trespass or any other tort, for the purpose of making or causing to be made such changes as may be required, at the expense of the Franchisee, which expense the Franchisee agrees to pay upon demand.

14.5.3  Franchisee agrees, in the event it continues to operate or subsequently begins to operate any other business, not to use any reproduction, counterfeit, copy, or colorable imitation of the Marks, either in connection with such other business or the promotion thereof, which, in WTG's sole discretion, is likely to cause confusion, mistake, or deception, or which, in WTG's sole discretion, is likely to dilute WTG's rights in and to the Marks.  Franchisee further agrees not to utilize any designation of origin, description, or representation (including, but not limited to, reference to WTG, the System, or the Marks) which, in WTG's sole discretion, suggests or represents a present or former association or connection with WTG, the System, or the Marks.

14.5.4  Franchisee shall promptly pay all sums owing to WTG and its affiliates. In the event of termination for any default of the Franchisee, such sums shall include all damages, costs, and expenses, including reasonable attorneys' fees, incurred by WTG as a result of the default, which obligation shall give rise to and remain, until paid-in-full, a lien in favor of WTG against any and all of the personal property, furnishings, equipment, signs, fixtures, and inventory owned by the Franchisee and on the premises operated hereunder at the time of default.

14.5.5  Franchisee shall immediately deliver to WTG the Operations Manual and all other records, correspondence, and instructions containing confidential information relating to the operation of the Restaurant (and any copies thereof, even if such copies were made in violation of this Agreement), all of which are acknowledged to be the property of WTG.

14.5.6  Franchisee shall comply with the covenants contained in Section 12 of this Agreement.

14.6    Additional Rights of WTG.  In addition to any of its other rights, WTG shall have the right to seek judicial enforcement of its rights and remedies, including, but not limited to, injunctive relief, damages and/or specific performance.

## 150    MISCELLANEOUS

15.1    Indemnification.  If WTG shall be subject to any claim, demand or penalty or become a party to any suit or other judicial or administrative proceeding by reason of any claimed act or omission by the Franchisee, his employees or agents, or by reason of any act occurring on the Restaurant premises or by reason of an omission with respect to the business or operation of the Restaurant, the Franchisee shall indemnify and hold WTG harmless against all judgments, settlements, penalties, and expenses, including attorneys' fees, court costs and other expenses of litigation or administrative proceeding, incurred by or imposed on WTG in connection with the investigation or defense relating to such claim or litigation or administrative proceeding and, at the election of WTG, the Franchisee shall also defend WTG.

15.2    Performance of the Franchisee Obligations.  Franchisee shall perform all of its obligations set forth herein, including without limitation, filing reports and making payments, in the manner and within the time periods set forth herein and no controversies or disputes in connection with such obligations shall modify or extend the time period in which such obligations are to be performed by or on behalf of the Franchisee.

15.3    Consent to Jurisdiction.  Franchisee hereby irrevocably agrees that, except as otherwise provided herein, any action or proceeding arising out of or relating to this Agreement brought by the Franchisee shall be brought in Maryland state court or in the United States District Court in the judicial district in which WTG has its principal place of business. Nothing herein shall affect the right of WTG to (a) commence legal proceedings or otherwise proceed against the Franchisee in any jurisdiction or (b) obtain injunctive relief against threatened conduct that will cause it loss or damage, under the usual equity rules, including the applicable rules for obtaining specific performance, restraining orders, and preliminary injunctions. By execution and delivery of this Agreement, the Franchisee hereby irrevocably accepts and submits generally and unconditionally for itself and with respect to its property, to the jurisdiction of Maryland state court or in the United States District Court in the judicial district in which WTG has its principal place of business in any such action or proceeding, and hereby waives, to the extent permitted by applicable law, defenses based on jurisdiction, venue or forum non conveniens.  Any notice,

process, pleading or other paper served upon such ~~agent shall~~ at the same time be sent by, registered or certified mail, ~~return receipt requested, to the~~ Franchisee at the address set forth in ~~Section 15 or to~~ such other address as may be furnished by the Franchisee to WTG in writing.  *DELETE*

15.4   No Agency, etc.  The Franchisee shall neither have nor exercise any authority, express, implied or apparent, to act on behalf of or as an agent of WTG or any of its affiliates or subsidiaries for any purpose, and shall take no action which might tend to create an apparent employer-employee or agency relationship between WTG and the Franchisee.  No fiduciary relationship exists between WTG and the Franchisee.  The Franchisee is, and shall remain, an independent contractor responsible for all obligations and liabilities of, and for all loss or damage to, the Restaurant and its business and for all claims and demands based on damages or destruction of property or based on an injury, illness or death of any person or persons directly or indirectly arising from or in connection with the operation of the Restaurant.  In all public records and in its relationship with other persons, on stationery, business forms and checks, the Franchisee shall indicate its independent ownership of the Restaurant and that he is a licensee of WTG. Franchisee shall, if requested by WTG, exhibit on the premises in such places as may be designated by WTG a notification that the Restaurant is operated by an independent operator and not by WTG.  Franchisee shall be responsible for all loss or damage, including all loss or damage to the Restaurant arising out of the utilization of the License herein granted.  WTG shall neither have nor exercise the right to control the day-to-day managerial operations of the Restaurant or to manage the business of the Restaurant or to hire, fire or discipline persons employed by the Franchisee or at the Restaurant.

15.5   For Benefit of Certain Parties Only.  Nothing herein, whether express or implied, shall be construed to give any entity other than the Franchisee and WTG any legal or equitable tight, remedy or claim under or in respect of this Agreement and this Agreement shall be for the sole and exclusive benefit of the Franchisee and WTG.

15.6   No Conflict With Other Agreements.  The Franchisee represents that he is not a party to or subject to agreements which might conflict with the terms of this Agreement and agrees not to enter into any such Agreement during the License Term.

15.7   Further Assurances.  Franchisee acknowledges that increasing the number of WTG franchises benefits the Franchisee and accordingly, the Franchisee agrees to cooperate with WTG in WTG's sale of WTG franchises and any and all transactions contemplated in connection therewith.  In furtherance thereof and not in limitation thereof, the Franchisee shall  (i) answer all reasonable question of prospective franchisees of WTG ("Prospective Franchisees") relating to the operation of the Restaurant, (ii) permit Prospective Franchisees to observe and photograph the operation of the Restaurant, and (iii) permit WTG and Prospective Franchisees to use the Restaurant in connection with Prospective Franchisee's initial technical training, all at no cost or expense to Prospective Franchisee or WTG.

15.8    Corporate, Partnership or Limited Liability Company Franchisee. No stockholder in any corporation, no partner in any partnership, and no member in any limited liability company which is or becomes the Franchisee shall have any rights in or under this Agreement by reason of his stock ownership, partnership interest, or membership interest. The name of such corporation, partnership or limited liability company shall not include any of the Marks of WTG without WTG's prior written consent. If the Franchisee is a corporate, partnership, or limited liability company franchisee, then the Franchisee shall provide to WTG on or prior to the date of execution of this Agreement the following:

15.8.1 ~~a guaranty, in the form substantially similar to the one attached hereto as Exhibit C, executed by each of the stockholders, directors, officers, partners, members, managers, and employees of the Franchisee;~~    Delete

15.8.2 an agreement, in the form substantially similar to the one attached hereto as Exhibit D, executed by each of the stockholders, directors, officers, partners, members, managers, and employees of the Franchisee; and

15.8.3 a list containing the names and addresses of the stockholders of the Franchisee together with the amount of stock owned by each stockholder; a list containing the names and addresses of the partners of the Franchisee together with the partnership interest owned by each partner; or a list containing the names of the members of the Franchisee together with the membership interest owned by each member, as applicable.

15.9    Cost of Enforcement. If WTG institutes an action at law or in equity against the Franchisee based entirely or in part on the terms of this Agreement, WTG shall be entitled to recover, in addition to any judgment entered in its favor, reasonable attorney's fees, court costs and all of WTG's expenses in connection with the litigation. but only to the court so orders and WTG is fully successful

15.10   Non-Waiver. No failure, forbearance, neglect or delay of any kind or extent on the part of WTG in connection with the enforcement or exercise of any rights under this Agreement shall affect or diminish WTG's right to enforce strictly and take full benefit of each provision of this Agreement at any time, whether at law for damages, in equity for injunctive relief or specific performance, or otherwise. No custom, usage, concession or practice with regard to this Agreement, the Franchisee or WTG's other franchisees shall preclude at any time the strict enforcement of this Agreement in accordance with its literal terms. No waiver by WTG of performance of any provision of this Agreement shall constitute or be implied as a waiver of WTG's right to enforce such provisions at any future time.

15.11   Scope of Agreement, Changes, Consents, etc. This Agreement and the exhibits hereto, and to the extent applicable the Multiple Store Option Agreement, constitute the entire understanding and agreement of the parties concerning the Restaurant and supersede all prior and contemporaneous understandings and agreements of the parties, whether oral or written, pertaining to the Restaurant. No interpretation, change, termination or waiver of any provision

hereof and no consent or approval hereunder shall be binding upon the other party or effective unless in writing and signed by the Franchisee and an officer of WTG, except that a waiver need be signed only by the party waiving. Further, no modification, waiver, termination, rescission, discharge or cancellation of this Agreement shall effect the right of any party hereto to enforce any claim or right hereunder, whether or not liquidated, which occurred prior to the date of such modification, waiver, termination, rescission, discharge or cancellation. Further, the Franchisee acknowledges that neither WTG nor anyone on behalf of WTG has made any representations, inducements, promises or agreements, orally or otherwise, respecting the subject matter of this Agreement, or respecting any other subject matter, upon which the Franchisee has relied in any way, which are not embodied in this Agreement and to the extent applicable, the Multiple Store Option Agreement.

15.12   Severability.  All provisions of this Agreement shall be severable and no such provision shall be affected by the invalidity of any other such provisions to the extent that such invalidity does not also render such other provision invalid.  In the event of the invalidity of any provision, this Agreement shall be interpreted and enforced as if all provisions thereby rendered invalid were not contained herein.

15.13   Section Headings.  Section headings are for convenience of reference only and shall not affect the interpretation of this Agreement.

15.14   Governing Law.  This Agreement has been made and accepted in Maryland, and it shall be interpreted and construed in accordance with the laws of the State of Maryland (other than the choice of law rules thereof).

15.15   Notices.  All notices under this Agreement shall be sent by certified or registered mail and shall be effective upon posting to the following addresses:

To Franchisee:   _630 Wendy Way_
_Hatfield, PA_
_19440_

To WTG:   Wings To Go, Inc.
170 Jennifer Road, Suite 250
Annapolis, MD 21401
Attention:  President

Addresses for notice purposes may be changed by sending written notice in accordance with this Section 15.15.

15.16  References.  References to persons mean legal entities as well as natural persons. Whenever the pronoun "he" or "his" is used herein, it is understood that such usage is the common gender and refers to masculine, feminine and neuter genders and also singular and plural.

15.17  Liability of Multiple Party Franchisee.  If the Franchisee consists of more than one · person, each individual's liability under this Agreement shall be joint and several.

15.18  No Warranty.  Franchisee acknowledges that no approvals, waivers or conditions or the like, (i.e., site approval, lease approval, contract approval for purchase of land, construction plan approval, management approval, insurance approval) warrant the success of the Restaurant or the appropriateness or legality of the particular item so approved.  Such approval means only that the matter approved meets WTG's minimum specifications.  Franchisee acknowledges that the success of the business venture contemplated by this Agreement involves substantial business risks and will be largely dependent on the ability of the Franchisee as an independent businessman.  WTG has not received, any warranty, assurance, guarantee or other indication, expressed or implied, as to the potential volume of profits, or success of the business venture contemplated by this Agreement, upon which the Franchisee has relied in any way. Franchisee should obtain independent professional guidance as to all aspects of its business operations, and expressly acknowledges that it is not in any way relying on WTG's approvals, consents, waivers or conditions, or the like.  WTG makes no warranties or guarantees upon which the Franchisee may rely, and assumes no liability or obligation to the Franchisee by granting any waiver, approval or consent to the Franchisee, or by reason of any neglect, delay or denial of any request therefor.

16.  ACKNOWLEDGMENTS BY THE FRANCHISEE

16.1  Franchisee acknowledges that it has conducted an independent investigation of the business franchised hereunder, and recognizes that the business venture contemplated by this Agreement involves business risks and that its success will be largely dependent upon the ability of the Franchisee (or, if the Franchisee is a corporation, partnership, or limited liability company, the ability of its principals) as an independent businessman.  WTG expressly disclaims the making of, and the Franchisee acknowledges that it has not received, any warranty or guarantee, express or implied, as to the potential volume, profits, or success of the business venture contemplated by this Agreement.

16.2  Franchisee acknowledges that it received a complete copy of this Agreement, the attachments hereto, and agreements relating thereto, if any, at least five (5) business days prior to the date on which this Agreement was executed. Franchisee further acknowledges that it received the disclosure document required by the Trade Regulation Rule of the Federal Trade Commission entitled "Disclosure Requirements and Prohibitions Concerning Franchising and Business Opportunity Ventures" at least ten (10) business days prior to the date on which this Agreement was executed.

16.3    Franchisee acknowledges that it has read and understood this Agreement, the attachments hereto, and agreements relating thereto, if any, and that WTG has accorded the Franchisee ample time and opportunity to consult with advisors of the Franchisee's own choosing about the potential benefits and risks of entering into this Agreement.

**IN WITNESS WHEREOF,**  the parties hereto set their hands and seals as of the day and year first above written.

**FRANCHISEE**

By: _____

Name: HARIBALA  G. PATEL

Title: OWNER

**WINGS TO GO, INC.**

By: _____

Name: James F. Tisark

Title: Executive Vice President

**CONTROL PERSON**

By: _____

Name: _____

EXHIBIT A

## TERRITORY

The Territory shall be within a two and one half (2 ½ ) mile radius of the location listed in Section 1.1 of this agreement.

X˜ᴿMᴪ ΔOXYMΣNTΣ⅄˞⌐ ⌐ᴦ˜AᴦMᵀDΔOX

## ADDENDUM

Wings To Go, Inc. ("WTG") and _____HARIBALA  G.  PATEL_____ ("Franchisee") have this __10th__day of __May__ _____, 1999 entered into a franchise agreement (the "Franchise Agreement") and desire to supplement its terms, as set forth below, notwithstanding anything to the contrary. The parties therefore agree as follows:

1.  Franchisee shall pay to WTG a five thousand dollar ($5000) deposit towards the initial franchise fee upon the execution of Franchisee Agreement with the balance of the initial franchise fee due when Franchisee signs a lease for or otherwise secures the location in connection with the agreement.

**Franchisee**

By: _____

Name: __HARIBALA  G. PATEL__

Title: __OWNER__

**Wings To Go, Inc.**

By: _____

Name: __James  F. Tisecki__

Title: __Executive Vice President__

## Wings To Go, Inc.

846 Ritchie Highway, Suite 1B
Severna Park, MD 21146

## FAX



TEL  410-647-7160
FAX 410-647-5499

**To:** Joe Gindhart                **From:** John Brinton

**Fax:** 215-568-0580          **Pages:** 35 (inc. cover)

**Phone:**                **Date:** 4 / 23 / 03

**Re:** Franchise agreement WTG # 27 Montgomeryville          **CC:**

- **Comments**

I was asked to fax this to you by Taras Jurczak

Thank you,
John Brinton
VP Operations, WTG, Inc.
800-552-9464
bjohnwing@aol.com

#27

# WINGS TO GO

## FRANCHISE AGREEMENT

Original
~~for Montgomeru~~ Montgomeru lle
~~Willow Grove~~

~~#27~~
the~l owe
us $15k